### IN THE

# COURT FOR THE CORRECTION OF ERRORS

### OF THE

## STATE OF NEW-YORK,

### DURING THE YEAR 1835.

---

COSTER and others, *appellants, and* LORILLARD and others, *respondents.*

A *devise* and *bequest* by a testator, of all his estate real and personal, to his brother and to twelve nephews and nieces, *in trust* to pay over and divide the rents and profits of his real estate (after satisfying certain specific legacies and annuities) to and among the same twelve nephews and nieces, *during their natural lives,* and to the survivors and survivor of them, equally to be divided between them, or such of them as should from time to time be living, share and share alike—is a *void trust* within the provisions of the revised statutes of this state.

So the testator having directed that *after the death of all his said nephews and nieces,* all his estate then remaining should be equally divided among all the children of his said nephews and nieces, and the surviving children of such of them as might then be dead, in equal proportions, *per stirpes* and not *per capita,* such distribution not to be made until two years after the decease of all his said nephews and nieces ; *it was held,* that the limitation over of the ultimate remainder was also void.

The principal trusts created by the *will* being adjudged void, and thus the main intent and object of the testator defeated, *it was further held,* that certain *life estates* in particular lands, given by a *codicil* executed by the testator, to one of his nieces and two of his grand-nephews, for whom provision was made under the principal trusts, *were also void,* and that the whole estate passed to the *heirs at law* of the testator.*

---

* *Conclusions arrived at by the* CHIEF JUSTICE *in the opinion delivered by him :*

That if it be *conceded* that the trust in favor of the twelve nephews and nieces is embraced within the *third* subdivision of the 55th §, which authorizes the creation of an express trust " to receive the rents and profits of lands and

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

APPEAL from Chancery. George Lorillard, of the city of New-York, died in September, 1832, a bachelor, possessed of a large real and personal property, worth about three millions of dollars; most of which was in real estate in the city of New-York, and the annual income of which at the time of his death was from eighty to one hundred thou-

---

apply them to the use of any person, during the life of such person or for any shorter period; still the devise to the trustees necessarily continuing during the continuance of *twelve lives*, the estate is *inalienable*, because 1. the trustees are prohibited from conveying in violation of their trust, and 2. there are no persons in being who can convey the remainder.

That the absolute power of alienation is also suspended by the creation of the remainder in favor of the grand nephews and nieces, which by the terms of the devise is not to vest until two years after the death of the survivor of the nephews and nieces.

That the remainder thus created *is void;* but that the estate in the trustees, if authorized by the statute, *is not void*, and that the devise should be so construed as to sustain the trust *during the continuance of the lives of two* of the twelve nephews and nieces by the application of the rule of approximation or the doctrine of *cy pres*, i. e. to carry into effect the intention of the testator as far as is consistent with the rules of law; which doctrine he considers as incorporated into the revised statutes.

That the interest of the twelve nephews and nieces, under the will, is *inalienable;* that they have a mere right to enforce in equity the performance of the trust; and do not hold as *joint tenants* or as *tenants in common* with cross-remainders. That if they could be deemed to hold either of such estates, still as trusts to receive rents and profits and apply them is subjected by statute to the rules established in relation to *future estates* in lands, one of which declares every future estate void which suspends the absolute power of alienation for a longer period than *two lives*, and as the power of alienation here is suspended for *twelve lives*, the trust is void.

That the 15th § of the act on this subject, declaring that the absolute power of alienation shall not be suspended for a longer period than *two lives*, applies not only to *future estates*, but to *all estates* created " by any condition or limitation whatever," and therefore includes as well *present* as *future estates*.

That the authority given by the third subdivision of the 55th § to create a trust " to receive the rents and profits of lands and *apply them to the use of any person*," &c. does not authorize the creation of a trust to receive rents and profits and *pay them over* to such person; that the statute contemplates an *active trust*, in which the agency of a trustee is indispensable for the purposes of a trust, and not a mere *formal trust*.

That the devise to the trustees cannot be supported as a *power in trust*. Not as a *general power in trust*, because such a power contemplates an absolute sale and division of the proceeds, and cannot be executed by the grantees thereof for their own benefit; and not as a *special power in trust*, because the

sand dollars.  His mother was living at the time of his
death, but she survived him but a few days.  He left two
brothers of the whole blood Jacob and Peter Lorillard; one
brother and one sister of the half blood, Daniel Holsman,
and Catharine, the wife of John G. Coster; a niece, Maria
R. Bartow, daughter of a deceased brother, Blaze Lorillard;

---

statute does not authorize a disposition, limited to be made to any person or class of persons *other than* the grantees of the power, and also because the grantees of the power are designated as entitled to the benefit to arise from the disposition.  In short, that no trust is valid as a power in trust, if to be executed by the grantee for his own benefit.

That the legacies to the Theological Seminary and to St. Philip's Church are good, being authorized by the second subdivision of the 55th section of the statute on this subject; but that the other legacies and annuities fall, as depending on the same principles with the rights of the twelve nephews and nieces.

---

*Conclusions arrived at by Mr. Justice* NELSON, *in the Opinion delivered by him :*

That the trust to receive the rents and profits and *pay them over* to the twelve nephews and nieces of the testator, is a valid trust under the third subdivision of the 53d section; and that the *application* of the rents and profits need not be limited to the trustees; that a trust, however, in such cases, can be raised only where the beneficiary is destitute of the will, the discretion, or the power to hold and manage property for himself; that the *interest* of the beneficiaries in this case is *inalienable*, the prohibition to assign or dispose thereof being a restriction upon the *estate* or interest, and not merely upon the *person*.

That the twelve nephews and nieces took an estate in the nature of a *joint tenancy*, and not of a tenancy in common with cross-remainders; and that even if a *tenancy in common* had been created, it is doubtful whether the life-estates could have been maintained, by the application of the rule of *approximation* in the construction of wills.

That the twelve nephews and nieces taking an estate in the nature of a *joint-tenancy*, to be held by them and the survivor of them for *twelve lives*, and the *power of alienation* during that period not being possessed, either by them or the trustees, the estate was void in its creation by the 15th section of the act, which declares that the absolute power of alienation shall not be suspended for a longer period than *two lives*.

That the estate in joint tenancy being an entirety, cannot be reduced to the limitation of *two lives*, so as not to be affected by the 15th section, and the trust term consequently is void.

That if the estate could be considered in the nature of a *tenancy in common*, with cross-remainders, the trust term would still be void, because by cutting off the remainders, and saving the life estates only, under the doctrine of *cy*

and 2 grand-nephews, George and Blaze Lorillard, children of a deceased son of his brother Blaze Lorillard—who, upon the death of his mother, were the only heirs at law.    By the will of G. Lorillard, the decedent, made in October, 1831, and executed in due form of law to pass real estate, he appointed his brother Jacob Lorillard, and twelve nephews and

*pres*, the trust fund upon which the whole scheme of the will depends would be broken up, the provisions of the will deranged, rendered inconsistent, unreasonable and impracticable, and the general and particular intent of the testator defeated.

*Conclusions arrived at by Mr. Senator* MAISON, *in the Opinion delivered by him :*

That the ultimate remainder over to the grand-nephews and grand-nieces of the testator is void.

That the trust to receive the rents and profits and *pay them over* to the *cestuis que trust*, to be applied by them as they see fit, is not authorized by the third subdivision of the 53d section—the manifest object of which is to enable provision to be made for those who, from character, situation or circumstances, are not capable of holding and managing property for themselves.

That the trust created by the will is *void*, because it suspends the power of alienation for more than *two lives* in being ; that the whole legal and equitable estate is in the trustees, subject only to the execution of the trust ; that the *cestuis que trust* have no estate or interest in the lands—neither a *tenancy in common* or a *joint tenancy ;* that all they have is a mere naked right to enforce the performance of the trust in equity.

That the courts are not authorized to cut down the trust to *two lives*, and that the doctrine of *cy pres* cannot be applied, except in the cases enumerated in the statute.

That the estate is *inalienable*.

That the devise to the trustees cannot be supported as a *power in trust*, because a power in trust, whether general or special, authorized by the statute, is good only when the *grantees* of the power are different from those entitled to the benefit of the trust.

That the *annuities* charged upon the rents and profits fall with the trust estate.

That the estates given by the codicil also fall, and that the doctrine of *cy pres* cannot be applied to save them ; but that the legacies to the Theological Seminary and to St. Philip's Church are valid.

*Conclusions arrived at by Mr. Senator* YOUNG, *in the Opinion delivered by him :*

That the sole object of the statute, in permitting express trusts to be created to receive the rents and profits of lands, and apply them to the use of the beneficiaries, was to enable provision to be made for individuals destitute

nieces of the whole blood, children of his brothers Jacob, Peter and Blaze, trustees and executors of such will. He also devised and bequeathed to such executors and trustees, as joint tenants and not as tenants in common, all his real and personal estate, *in trust* to and for the uses and purposes in the will declared, and which were as follows:

*First.* As to his real estate in the city of New-York, to lease the same from time to time, and to receive the rents and profits thereof; and out of such rents and profits to pay a legacy of $20,000 to the Theological Seminary of the Episcopal

---

of the will, the discretion, or the power to manage property for themselves; and where, from the instrument itself creating the trust, it appears that the beneficiaries are not of that character or description of persons, as where the beneficiaries are also the trustees, the trust is void.

That the authority to *apply rents and profits to the use* of the beneficiary, does not authorize a trust to *pay over* such rents and profits to the bene-ficiary.

That the estate given to the trustees is a *joint tenancy* for twelve lives, and being for more than *two lives*, the trust is void; that the trust cannot be cut down to *two lives* under the doctrine of *cy pres*, as that doctrine cannot be extended by courts beyond the cases enumerated in the statute.

That the trust is void also, inasmuch as the rents and profits are given to the beneficiaries during the continuance of *twelve lives*, the statute having subjected all *dispositions of rents and profits* of lands to the rules established in relation to *future estates*—one of which is, that every future estate shall be void in its creation, which shall suspend the power of alienation for more than two lives in being at the creation of the estate.

That the trusts created by the will being void, the legacies and annuities given by the testator to his relatives are also void; the main intent and object of the testator having failed, the provisions of the will founded upon that intent also fail. The legacies however to the Theological Seminary and to St. Philip's Church, having no necessary connection with the other parts of the will, are valid.

---

*Conclusions arrived at by Mr. Senator* TRACY, *in the Opinion de-livered by him:*

That the statutes does not abrogate the doctrine of *cy pres*, and that the trust created by the will is a valid trust for *one twelfth* of the rents and profits to each of the twelve nephews and nieces of the testator, during his or her life.

That a trust to receive rents and profits and *pay them over* to the beneficia-ry is a valid trust, although not created in the words of the statute—viz. to receive the rents and *apply them to the use* of the beneficiary.

Church, and a legacy of $1000 to the vestry of St. Philip's Church; and an annuity of $2000 to his half brother D. Holsman, for life, or until the death of all the children of his brothers Blaze, Peter and Jacob; an annuity of $500 to each of his grand nephews and nieces, who should be living at the time of his death, the grand-children of his said three brothers of the whole blood, and to each of his three nieces of the half blood, children of his half brother, D. Holsman: such annuities to commence when the legatees respectively arrived at the age of 21, and to continue for life, or until the death of all the children of his brothers Blaze, Peter and Jacob Lorillard; and an annuity of $200 to his aunt, Rosanna Bowers, during her life, or until the death of all the children of his said brothers. And to account for, pay over and divide the residue of such rents and profits, after deducting expenses and disbursements, to and among the twelve nephews and nieces who were named as executors and trustees in the will, and who were the only children of his said three brothers of the whole blood, during their natural lives, and to the survivors and survivor of them, *to be divided equally between them or such of them as should from time to time be living, share and share alike.* The annuities or distributive shares of the several nieces and grand-nieces of the testator to be paid to them for their separate use and benefit, free from any control, liabilities or engagements of their husbands.

*Secondly.* To sell and convert all the residue of his real and personal estate into money, within three years after his death, and to invest the same in the purchase of real estate in the city of New-York, and the rents, income and profits of the real estate so purchased, after deducting expenses and disbursements, to be paid and divided by the executors and trustees, to and among all the children of his brothers Blaze, Peter and Jacob Lorillard, and the survivors and survivor of such children, during their natural lives; to be equally divided among such of them as should from time to time be living, share and share alike, and free from the control of the husbands of such of them as should be *femes covert.* The testator also declared it to be his will and desire, that his said nephews and nieces should not alienate, sell or transfer their respective interests,

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

shares or proportions of the rents, proceeds and income of any of his real estate, by his will directed to be paid to them, or any part thereof, without the written consent of a majority of his executors and trustees; such majority in no case to be less than three persons.

*Thirdly.* The testator directed that after the death of all his said nephews and nieces, the children of his brothers Blaze, Peter and Jacob, all his estate then remaining should be equally divided among all the children of such nephews and nieces and the surviving children of such of them as might then be dead, in equal proportions *per stirpes* and not *per capita :* special directions being given by the will as to the distribution of the estate among them ; which distribution was not to be made until the expiration of two years after the death of all the said nephews and nieces.

*Fourthly.* The testator authorized such of his executors and trustees, not less than three in number, as were willing to serve, and who should not be under age or non-residents of the state, to execute the trust. He further directed that when his executors and trustees should, by death, removal from the state, or other disability, be reduced to less than five persons, the number should be increased from time to time to seven persons. The eldest grand-children of his brothers, Blaze, Peter and Jacob, who should be qualified and willing to act, to be selected for that purpose to fill the vacancies that might occur from time to time ; the requisite conveyances to be executed by the surviving trustees and executors to vest in such new trustees and themselves, the trust estate for the purposes of the will. And such new trustees respectively were to receive one sixteenth of the nett income or rents and profits of the estate during the time they should act as such trustees and executors, in lieu of the annuities to which they would be entitled, during that time, under the previous provisions of the will.

By a codicil, made in December, 1831, the testator devised in fee unto his nephew, Peter Lorillard, junior, (son of his brother Peter Lorillard) a moiety of various parcels of real estate, and also a house and leasehold lot of ground in the city of New-York, upon condition that the devisee should within

two years after the decease of the testator pay to the executors and trustees named in the will $25,000 to be by them invested in trust for the uses and purposes expressed and declared in the second article of his will ; and also upon the further condition that he should covenant and agree to pay to one B. Moore, junior, an annuity of $200 for ten years after the decease of the testator. And in case that his nephew, Peter Lorillard, junior, should not elect, stipulate and agree to make such payments, then the devise and bequest contained in this article of the codicil to be void, and the executors and trustees were directed to dispose of the lands and premises thus given to Peter Lorillard, junior, and apply the proceeds as directed in the second article of his will. By the same codicil he gave a life estate in a certain farm unto his grand-nephew George, grandson of his brother Blaze ; also a life estate in another farm to his grand-nephew Blaze, also a grandson of his brother Blaze, and a life estate in two other farms to his niece Maria R. Bartow, daughter of his brother Blaze : directing that upon the expiration of the said life estates, his executors and trustees should sell and dispose of the property thus given by the codicil, and invest the proceeds as provided in the second article of his will. He also gave an annuity of $500 to every child of his brother Daniel Holsman not already named in his will, to continue during the natural life of every such child, or until the death of all the children of his brothers, Blaze, Peter and Jacob, to be paid by his executors and trustees out of the fund created by the will for the payment of annuities.

Shortly after the death of the testator, the will and codicil were duly proved before the surrogate of New-York, and letters testamentary were issued to *seven* of the nephews and nieces named in the will as executors and trustees. Maria R. Bartow, another of the nieces, afterwards took out letters testamentary thereon. The other four nephews and nieces named in the will as executors and trustees were minors. Catharine Holsman, the mother of the decedent, made a will of her personal estate previous to her death, and appointed her sons George and Jacob Lorillard, and her son-in-law J. G. Coster, executors ; and after her death, the will was proved

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

by Jacob Lorillard and J. G. Coster, the surviving executors, who took upon themselves the execution thereof.

The bill in this cause was filed by Jacob Lorillard, one of the executors of his mother, also one of the executors and trustees named in the will of his brother, and by the seven nephews and nieces who first took out letters testamentary and assumed the execution of the will of G. Lorillard, together with the husbands of such of those nieces as were married, for the purpose of settling the construction of the will and codicil of G. Lorillard, and of having the trusts thereof, so far as they were valid, carried into effect under the direction of the court of chancery; and Maria R. Bartow and her husband, who had refused to join in the suit, the four executors and trustees who were minors, J. G. Coster and his wife, Peter Lorillard the brother, and D. Holsman the half brother of the testator, together with George and Blaze Lorillard, his grand-nephews, were made defendants. The answers of the defendants, except of the four infant executors and trustees, admitted the material facts stated in the bill, but insisted that the devises and bequests were illegal, except some of the specific devises and bequests contained in the codicil; and they claimed to have the residue of the estate distributed as in case of intestacy. The four infant trustees submitted their rights and interests to the decision and protection of the court. The cause was heard before the vice chancellor of the first circuit, who decreed in favor of the validity of all the trusts contained in the first and second sections of the will, and directed them to be carried into execution according to the terms of the will. He expressly declined to make any decree, either in favor of or against the validity of the ultimate limitation over of the estate to the issue of the twelve nephews and nieces after their deaths, as provided for in the third section of the original will, the proper parties not being before the court; but in the opinion delivered at the time of making the decree, he arrived at the conclusion that the ultimate limitation over was void. From this decree all the defendants, except Peter Lorillard the brother, and the four minor executors and trustees of the testator, appealed to the chancellor.

VOL. XIV. 35

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

The appeals were argued before the chancellor in the month of July, 1834, and on the 20th June, 1835, the chancellor *decreed* : 1. That the legacies to the trustees of the General Theological Seminary of the Protestant Episcopal Church in the United States, and to the trustees or vestry of St. Philip's Church, and the several annuities to Daniel Holsman and to his children, to Rosanna Bowers, and to the several grand-nephews and nieces of the testator who were living at the time of his death, in the will and codicil mentioned, as stated in the pleadings in this cause, are valid, and are also valid charges upon the rents and profits of the testator's real estate whereof he died seized, in the city of New-York, during the lives of his twelve nephews and nieces, who are named as executors and trustees in his said will, and during the life of the survivor of the said twelve nephews and nieces, if the respective annuitants shall so long live ; and the rents and profits of each and every portion or share of the said real estate in the city of New-York, is chargeable with a just and rateable proportion of the said legacies and annuities, without reference to the validity of the devise to the executors and trustees.

2. That the limitation, devise or bequest of one sixteenth of the nett income of the estate of the testator to each of the grand-nephews and nieces of the testator who shall act as trustees and executors, after the number of the original trustees and executors shall be reduced to less than five persons, is illegal and void in its creation, and does not change or alter the rights of any of the nephews and nieces, or of the heirs at law of the testator, as to the distribution of the rents, profits and income of the estate. But the invalidity of the limitations, devises or bequests of the sixteenths of the rents and profits will not prevent the said nephews and nieces from acting as trustees, according to the provisions of the said will.

3. That the devise or limitation over, of the ultimate remainder in fee, to the grand-nephews and nieces of the testator, or their children, who may be in existence at the time of the death of the last of the twelve nephews and nieces who are named as the executors and trustees in the testator's will, is a limitation of future contingent estates which would sus-

pend the absolute power of alienation of every part of the testator's real estate in the city of New-York, for a longer period than during the continuance of two lives in being at the time of death, and is therefore absolutely void.

4. That the interests of the twelve nephews and nieces of the testator, named in the residuary clause of the first section or article of his will, in the income or rents and profits of the real estate in the city of New-York, are not in the nature of a joint tenancy, but are in the nature of a tenancy in common between the twelve nephews and nieces for life, with cross-remainders to the survivors in the shares of those who shall die before the time appointed for the vesting of the ultimate remainders in fee ; and that the trust created by the said will, as to the share of each of the twelve nephews and nieces, is valid during the continuance of the life of the person first entitled to such share.  But the several cross-remainders, so far as they are inconsistent with the provision of the Revised Statutes, which prohibits the creation of more than two successive estates for life, being void, all the cross-remainders in each share, except the first cross-remainders in such share, are therefore void.  That the several cross-remainders, in favor of the eleven surviving nephews and nieces, in the rents and profits of the original share of the nephew or niece who shall first die, and which are limited to take effect immediately upon the death of such nephew or niece, are valid.  But that all other cross-remainders, which are limited to take effect upon the death of any of the other eleven nephews or nieces, being limited in such a manner as to suspend the power of alienation for a longer period than during the continuance of two lives in being at the death of the testator, are therefore illegal and void.

5. That the trusts created in and by the second section or article of the will of the testator, George Lorillard, in the real estate to be purchased in the city of New-York, and the power in trust to sell the real estate out of the city of New-York, for the purpose of making such investments, are valid, to the same extent as the devise in trust, in the previous part of the will, in relation to the real estate of the testator in the city of New-York.  That the twelve nephews and nieces, named by

the testator as executors and trustees, are the persons intended to be designated by the words " all the children of my said brothers Blaze, Peter and Jacob Lorillard," in the second section or article of the will; and that the testator did not intend to include any afterborn children of his two surviving brothers, in the devise of the income or rents and profits of that part of his property.

And 6. That it be referred to one of the masters of this court, residing in the city of New-York, to settle and report to this court the form of the conveyances which shall be taken by the executors and trustees, upon the investments of the proceeds of the testator's real estate out of the city of New-York, and of his personal estate, in the purchase of real estate in that city, with proper limitations in such conveyances, securing to the several devisees and to the heirs at law of the testator their several rights therein upon the footing of this decree.  That the costs of all the parties in the original suit, as well as upon this appeal, be paid by the executors and trustees out of the income, rents and profits of the real and personal estate of which the testator died seized. And that all questions and directions, not herein decided or given, be reserved until the coming in of the said master's report ; with liberty to any party to apply to the court from time to time upon the foot of this decree, upon due notice to all the other parties in interest for such further directions as may be necessary ; and that so much of the decree of the vice chancellor as is inconsistent with this decree be reversed. See the *opinion* delivered by the Chancellor on pronouncing the decree, in 5 *Paige's Ch. Reports*, 213, *et seq*.

From this decree there were sundry *appeals* to the court for the correction of errors.

*John G. Coster* and *Catharine Margaret* his wife appealed, 1. From all that part of the decree by which it is declared that the bequests of *one-sixteenth* of the net income to each of the grand-nephews and nieces does not change or alter the rights of any of the nephews and nieces, or *of the heirs at law* of the testator, as to the distribution of the rents, &c.; 2. From all that part of the decree whereby it is adjudged that the interests devised to the twelve nephews and nieces and that the

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

trust declared by the will as to the share of each are valid, for any time or purpose whatever; 3. From all that part of the decree whereby it is adjudged that the trusts created by the second section of the will are valid; that the twelve nephews and nieces are the persons meant by the designation in the second section, "of all the children," &c.; and that the testator did not intend to include any afterborn children; and 4. From all that part of the decree which directs a reference to a master, &c.

*Robert Bartow* and *Maria R. Bartow*, his wife, appealed, 1. From all that part of the decree whereby it is adjudged that the interests of the twelve nephews and nieces in the income of the real estate are not in the nature of a *joint tenancy*, but are in the nature of a *tenancy in common*, with cross-remainders to the survivors; and that the *trust* created by the will, as to the share of each of the twelve nephews and nieces, is valid during the continuance of the life of the person first entitled to such share; but that all the cross-remainders, except the first, are void; 2. From all that part of the decree which places the trust created by the second section of the will upon the same footing with the trust created by the first section of the will; and adjudged that the nephews and nieces are the persons designated in the second section, and that the testator did not intend to include any afterborn children; and 4. From all that part of the decree which directs a reference to a master, &c.

*Daniel Holsman* appealed upon the same grounds stated in the appeal of *Bartow and wife.*

*Blaze Lorillard* and *George Lorillard* (grand-nephews of the testator) also appealed upon the same grounds stated in the appeal of *Bartow and wife.*

*Jacob Lorillard* (one of the infant trustees) appealed, 1. From all that part of the decree whereby it is adjudged that the bequest of *one-sixteenth* of the net income to each of the grand-nephews and nieces, after a certain event, is illegal and void in its creation; 2. From all that part of the decree whereby it is adjudged that the devise or limitation over of the ultimate remainder is void; 3. For the same causes assigned as

the second ground of appeal of *Bartow and wife ;* 4. From all that part of the decree which directs a reference, &c.

*Eliza M. Lorillard, Emily Lorillard* and *Julia Lorillard* (the three other infant trustees) appealed, 1. From all that part of the decree whereby it is adjudged that the devise or limitation over of the ultimate remainder is void ; 2. From all that part of the decree whereby it is declared that all the cross-remainders, except the first, are void; and 3. From all that part of the decree whereby a reference to a master is ordered.

*Jacob Lorillard* and the other complainants also appealed, 1. From all that part of the decree whereby it is adjudged that the *annuities* to Daniel Holsman, Blaze Lorillard and George Lorillard are valid, and charges upon the rents and profits of the testator's estate, without reference to the validity of the devise to the trustees ; 2. From all that part of the decree whereby it is adjudged that the bequest of the *one-sixteenth* of the net income to the grand-nephews, &c. after a certain event, is void ; 3. From all that part of the decree whereby it is adjudged that the limitation over of the ultimate remainder is void ; 4. For the same cause assigned as the first ground of appeal of *Bartow and wife ;* and 5. From all that part of the decree ordering a reference.

Appeals from the decree of the Chancellor having been entered as well by the *complainants* as by the *defendants* in the court below, the cause was argued in the *court for the correction of errors,* by counsel representing the interests of the several parties.

On the part of the *trustees,* the *complainants* in the court below, the following points were presented and argued by *Benjamin F. Butler,* (attorney general of the United States,) and by *Peter A. Jay.*

1. That part of the decree appealed from, which declares valid the annuities to Daniel Holsman, Blaze Lorillard and George Lorillard, and makes them chargeable on the rents and profits of the estate, without reference to the validity of the devise to the executors and trustees, is, when taken in connection with the residue of the decree, erroneous ; and if

the decree be in other respects affirmed, this part thereof should be reversed or modified. The annuities given by the will to these persons were so given by the testator, as a part of the general trusts of his will, and on the supposition that those trusts could be carried into effect; in which event these annuitants would not have taken any part of the estate as heirs at law. The annuitants claim in this suit as heirs at law, and against the will of the testator; and by the decree appealed from, they will take their shares of the reversion, and retain their annuities also, which is inequitable and should not be allowed.

2. That part of the decree appealed from which declares illegal and void in its creation the limitation or bequest of one-sixteenth of the net income of the estate to the grand-nephews and nieces, who shall act as trustees and executors after the number of the original trustees and executors shall be reduced below five, is erroneous, and ought to be reversed. This direction of the testator is a mere rule of compensation to the new trustees, for their personal services and is not a limitation of any estate or interest in the lands, or in the rents and profits thereof. The nature and quality of the trust estate, and of the interests of the *cestuis que trust,* will not be affected by this direction, nor will it suspend the power of alienation in respect to any part of the estate.

3. That part of the decree appealed from, which adjudges and declares that the limitation over, of the ultimate remainder in fee, to the grand-nephews and nieces of the testator, or their children, who may be in existence at the time of the death of the last of the twelve nephews and nieces, is absolutely void—is erroneous, and ought to be reversed. The question thus decided by the chancellor was not presented for decision, nor was any direction in respect to it sought by the bill; and if the defendants, or any of them, desired a decision thereon, they should have filed a cross bill, and have brought all proper parties before the court. The parties to be affected by the decision (the grand-nephews and nieces of the testator) were not before the court, though it is manifest from the will itself that there were such parties in being at its date, and it must be presumed that they continued to be in existence at

the filing of the bill.   Directions concerning the investment of the personal property and the proceeds of the real property out of the city of New-York, might have been given in general terms for conveyances to be executed, subject to the trusts of the will, and to the directions of the court of chancery, to be given whenever the question shall be presented by the proper parties, on the foot of the decree in this cause.

4. If the limitation over of the ultimate remainder in fee be void, and the interests devised to the twelve nephews and nieces in the rents and profits, are in the nature of a tenancy in common with cross-remainders, as adjudged in the decree appealed from, then all the successive estates for life in each share (when considered without reference to the alleged suspense of the power of alienation) are valid ; and that part of the said decree which declares that all the cross-remainders in each share, except the first cross-remainders in such share, are inconsistent with that provision of the Revised Statutes which prohibits the creation of more than two successive estates for life, and therefore void—is erroneous and should be reversed.   The provision referred to, 1 *R. S.* 723, § 17, allows the creation of any number of successive estates for life, provided they are limited to persons in being at the creation thereof, except where a remainder otherwise valid is limited on such life estates, in which case all the life estates after the first and second are avoided, for the purpose of giving effect to the remainder.   In the present case the cross-remainders or successive life estates in each share, being all limited to persons in being at the creation thereof, and there being no valid remainder limited thereon, capable of taking effect, the limitation of said successive life estates is not repugnant to the provisions referred to.

5. That part of the decree which declares that all the cross-remainders (except those in favor of the eleven surviving nephews and nieces, in the rents and profits of the original share of the nephew or niece who shall first die, and which are to take effect immediately on the death of such nephew or niece) are limited in such a manner as to suspend the power of alienation for a longer period than during the continuance of two lives in being at the death of the testator, and

that the same are therefore illegal and void, is erroneous, and ought to be reversed. The several cross-remainders in question are all and each of them vested, and not contingent; and if contingent, do not suspend the power of alienation. There being no valid disposition of the ultimate remainder in fee, the trustees and *cestuis que trust*, by uniting with the heirs at law, if at liberty to do so, can convey an absolute fee in possession. There is no provision or rule of law which prevents the execution of such a conveyance in the present case, unless it be found in the 63d section of the statute concerning uses and trusts; but that section creates a mere personal disability, which is not engrafted on the estate so as to become an integral part of the limitation to the trustees. The 63d section was evidently intended for the sole purpose of protecting the bounty of the testator from waste, in cases where, by the terms or nature of the trust, the alienation of the interest of the *cestuis que trust*, in the accruing rents and profits, would defeat the object of the trust. To extend it beyond such cases will produce the double mischief of fettering, unnecessarily, the alienation of estates, and of defeating trusts for useful and innocent purposes; both which consequences are repugnant to the spirit of the new statutes, and to public policy. In the present case the testator has imposed no restraint on the alienation of the interests of the *cestuis que trust*, except that he requires the written consent of a majority of his executors and trustees. With such consent, the will, by necessary implication, authorizes the alienation of the interests of each of the twelve nephews and nieces, at all times during the continuance of the trust. This provision takes the case out of the 63d section above referred to, and there is therefore no suspense of the absolute power of alienation. If the power of alienation be yet suspended by means of the 63d section, then it is insisted that such suspense of alienation is the act of the law, and not of the testator, and that the same is therefore allowable and does not defeat the trust in question, which being expressly authorized by the statute concerning uses and trusts, must be deemed to be excepted from any rule in the prior article, inconsistent with its validity and execution.

VOL. XIV. 36

6. If the interests devised to the twelve nephews and nieces are in the nature of a tenancy in common with cross-remainders, and the views presented in the last two points be correct, then it will follow that the trust which directs the payment of the rents and profits of the testator's estate to the twelve nephews and nieces during their lives, and to the survivors and survivor of them, is valid, and that its due execution should be decreed and enforced. The interests of the twelve nephews and nieces in the rents and profits of the property devised is a tenancy in common, each owning separately from the others one twelfth part. Upon the death of A., (the *first* of the twelve nephews and nieces who shall die,) his twelfth part of the rents and profits will vest in possession in the remaining *eleven,* as tenants in common; and on the death of B., (the *second* of the said nephews and nieces who shall die,) his original twelfth part, and his eleventh part of A.'s share, will pass to the remaining *ten,* as tenants in common; and on the death of C., (the *third* of the said nephews and nieces who shall die,) his original share, together with his eleventh part of A.'s share and his tenth part of B.'s share, will pass to the remaining *nine;* and so on until the death of all but one of the said twelve nephews and nieces, when all the shares will be united in the person of the survivor, and he will be entitled to all the rents and profits of the whole estate.

7. At all events, on the principles adjudged in the decree appealed from, two successive life estates should have been allowed in each share; and to that extent the trust in question should have been carried into effect.

8. In the foregoing points it has been taken for granted that the interests of the nephews and nieces are in the nature of a tenancy in common with cross-remainders, as decided by the chancellor and not in the nature of a joint tenancy, as admitted in argument before the vice chancellor, and as assumed in his opinion and decree; but if the latter view shall be considered the correct one, it is still insisted that the trust which directs the payment of the rents and profits to the twelve nephews and nieces during their lives, and to the survivors and survivor of them, is legal and valid, for the reasons

assigned in the opinion of the vice chancellor and in the preceding fifth point.

9. That part of the decree which directs the form of the conveyances to be settled is erroneous, because it is premature and unnecessary. The rights of the devisees and heirs at law, whatever they may be, will attach to any lands which the trustees may purchase, whatever may be the form of the conveyances to them.

On the part of the *heirs at law*, the defendants in the court below, the following points were presented, and argued by *George Wood, David B. Ogden,* and *Henry R. Storrs.*

1. Construing the will in question at common law, and independently of the revised statutes, it gives to the trustees therein named a legal estate in fee simple in the real estate, and also in the personal estate when converted into land, and they take the same under the statutes.

2. As to the real estate in the city of New-York, the twelve nephews and nieces specially designated in the will, would at common law take an equitable right to the use of the rents and profits thereof, for their joint lives, and the life of the survivor, subject to the personal legacies and annuities charged thereupon in the will.

3. In all the real estate, after the death of at least eight nephews and nieces, grand-children would come in and take each one-sixteenth of the rents and profits. This is sure to take place, but is uncertain as to the time and person.

4. The said grand-children would, **at** common law, take respectively a shifting use, displacing *pro tanto* the interests of those then holding for life, which is a future use under the revised statutes.

5. The legal estates, as well as the equitable uses under this will, are, at common law, joint tenancies, and the title, as well legal as equitable, continues one and entire until its termination in the last survivor.

6. The concurrent uses for life, as well in the city property as in the residuum, fetter the power of alienating an absolute fee in possession, beyond the period allowed by the revised

statutes, of each and every entire parcel of property, and are void, being prohibited by said statutes.

7. The revised statutes, 1 *R. S.* 723, § 15, prohibit the limitations contained in this will, by prohibiting all limitations and conditions, suspending the absolute power of alienation for a longer period than two lives in being at the creation of the estate.

8. By *limitations* in this section is meant the formation of estates or interests, and the word is not to be taken in its restricted sense, as meaning the terminating or ceasing of an estate upon the happening of a certain event.

9. The prohibition in this section extends to and embraces all estates, rights and interests, whether precedent or future, in possession, reversion or remainder; and this is evident, *first*, from the *words*. The language is not only broad, but is expressive of a *certain intent in particular* that it should be so broad and comprehensive as to embrace limitations and conditions generally, whether *de presenti* or *in futuro*. *Second*. Even if the words were vague or dubious, the secondary or auxiliary rules of construction confirm this view, viz. 1. The context or subject matter. The 14th section, immediately preceding, is a substantive enacting clause, embracing a particular prohibition, viz. future estates for a particular purpose, viz. to decree them void in their creation. The 15th section contains a distinct and equally substantive enactment, in terms studiously broad and comprehensive, and to confine it to future estates would render it vain and nugatory tautology. It should be more comprehensive to give it effect. *Ut res magis valeat quam pereat.* This whole article of the statute treats of precedent as well as future estates and interests, and the 3d, 4th and 19th sections respect perpetuities in precedent estates. 2. The mischief. This is particularly expressed in the statute, and extends to a fee in possession. The common law mischief intended to be remedied was the too great extension of the power of perpetuity, which was any limitation tending to take the subject of it out of commerce for any longer period than two lives in being and 21 years, allowing also a few months for the period of gestation. To advance the remedy and repress the mischief, the restriction upon the power of fettering alienation

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

must extend to precedent as well as future estates. When the precedent is inalienable for more than two lives, unfettering the future estate alone, does not reach the mischief. 3. The reason and spirit of the law. A future estate is not a marketable commodity.

10. The prohibiting enactment in question extended to equitable limitations as well as legal, under the revised statutes. 1. On general principles. *Equitas sequitur legem.* 2. By express enactment, 1 *R. S.* 728, § 55.

11. The inability of the *cestui que trust* entitled to the rents and profits of land to alienate, is a quality engrafted by legislative enactment, *id. p.* 730, § 63, upon his equitable right to the property, and not a personal disability.

12. The extending of such disability through more than two lives is not requisite to answer any supposed motives of the legislature in establishing and allowing this kind of limitation, and is directly within the mischief as above mentioned.

13. This limitation for the joint lives of the twelve *cestuis que trust* is void in toto. The parts cannot be distinguished so as to make the will work by fractions.

14. All the residue of the property, as well personal as real, is to be converted into real estate in the city of New-York, and is in equity to be considered as real estate, and forms a residuary disposition.

15. In the last mentioned real estate, the testator gives an equitable interest to a class of persons, viz. all the nephews and nieces, children of his three brothers, which would include such as should be born after, as well as those born before the testator's death, for their lives and the life of the survivor, in the rents and profits thereof, and is therefore void at common law.

16. Under the revised statutes, the direction to the trustees to divide the premises among the children of his nephews and nieces, is inoperative as a trust, and can only be carried into effect as a power in trust.

17. Under the power in trust no interest whatever in any of the said real estate, or the proceeds thereof, can pass to the class last named until the execution of the power, viz. until two years after the death of the surviving nephew or niece,

and then they would take legal estates; the estate in the mean time descending to the heirs at law of the testator.

18. In the residuary property, the disposition over is too remote, as tending to a perpetuity upon common law principles.

19. The concurrent interests for life in the residuary property of the first mentioned class, viz. all the nephews and nieces, including the *interest or one-sixteenth part, of the grand-children,* being inalienable, tend to a perpetuity as established at common law, and are void.

20. The equitable rights of the twelve nephews and nieces in the property, which would be joint at common law, is not touched by the 44th section, 1 *R. S.* 727, so as to convert them into tenancies in common, because, 1. They take no equitable estate or tenancy in the land, but only a mere right to profits analogous to an incorporeal right at common law ; 2. The section applies only to tenants having estates vested or which may vest, and by analogy could only apply in equity to tenants having equitable estates vested or which may vest in the land ; 3. The purpose of this section in discouraging joint tenancies and converting such limitations as are therein described into tenancies in common, was to facilitate the partibility and severance of the possession, and to accommodate the estates more effectually to that object ; a purpose which does not apply to mere incorporeal rights, whether at law or in equity ; 4. The section, extending only to estates granted or devised to persons in *their own right,* implies that they might be held in trust for others, and virtually excludes equitable rights, which cannot be held in trust for others ; 5. The proviso to the 3d subdivision of the 55th section, *id. p.* 728, extends only to such of the rules prescribed in the first article of that title as are properly applicable thereto.

21. Supposing the twelve nephews and nieces to take their equitable rights to the rents and profits as tenants in common. If so, they would at common law take such rights in their respective shares for their own lives, and there would be cross-remainders in the different shares to last during the lives of all the others. Such limitations would last longer than two lives in being at the death of the testator, and are therefore void.

22. A will is to be construed in reference to the state of things at the death of the testator; and if a limitation is so formed as that it may, when viewed at that period, last longer than two lives then in being, it is void, as tending to perpetuity.

23. If all the shares of the twelve were to terminate upon the death of the first two, it would not be a determination of them upon two lives certain and ascertained at the death of the testator, and it would be a limitation different from that prescribed by the testator, and for both reasons void.

24. If the shares of any two of the *cestuis que trust*, or parts of shares of any or all of them, on the termination of two lives should result to the heirs at law of the testator, no part of the land which would still be in the hands of the trustees could be aliened, and an absolute fee in possession therein would continue inalienable for a longer period than the two lives as aforesaid.

25. The future estates in fee in all the real property, being limited to a class of persons, are too remote, tending to a perpetuity as restricted by the revised statutes, and are void in their creation.

26. The court in this case will settle the construction of the whole will so far as respects the premises in dispute, and either establish it or declare its nullity in whole or in part, that the trustees and defendants, including trustees and others, may know the extent of their rights, duties and liabilities, and save the necessity of future expense and litigation.

27. The claim and prayer of the bill covers the whole ground, and a cross bill is unnecessary.

28. The decrees as well of the chancellor as the vice chancellor ought to be reversed, and a new decree rendered, declaring the dispositions in question in the will to be void.

On the part of Peter Lorillard and two others, provided for in and by the will of the testator, defendants in the court below, the following points were presented and argued by *John C. Spencer* and *Nathaniel S. Benton.*

1. The devises to the trustees, so far as they created a trust to pay over the income, rents and profits of the real estate to the twelve nephews and nieces, are valid and effectual.

1. The interest of the *cestuis que trust* is a tenancy in common in each of them in one-twelfth of the whole mass, from which the rents, profits and income are to be raised. 2. The interest is a life estate in each of the twelve nephews and nieces, in severalty, with cross remainders to the survivors.

2. On the death of any one of the twelve, his life estate in the rents and profits becomes vested in the survivors during their lives respectively.

3. The interest which the survivors thus acquire in the share of the deceased *cestui que trust*, is a successive life estate, and as, by the terms of the will, this interest is to be enjoyed by each of the surviving *cestuis que trust*, in succession, there are twelve successive life estates in the share of the person first dying; eleven in the share of the person secondly dying; ten in the share of the one thirdly dying; and so on diminishing the number of successive life estates, as each *cestui que trust* dies, until the death of the eleventh survivor, whose share will be held only for two lives, and that of the twelfth survivor will be held for only one lfe.

4. The remainder created by this will is therefore limited, as respects ten-twelfths of the property, on more than two successive estates for life, and by virtue of the 17th section of title 2, chap. 1, part 2, of the revised statutes, all the life estates in the portion of any share that shall have been enjoyed by the two persons first entitled thereto, subsequent to those two, are void, and the devise is to be construed as if such subsequent life estates had never been inserted in the will.

5. In consequence, the remainder takes effect as to each portion of a share that shall have been thus enjoyed for two successive lives, on the termination of the second life, and the devise is to be construed and read, as if it had so declared in terms. 1. The legal effect of the words and terms used by the testator, control an apparent contrary intent, and make his legal intent such as the policy of the law declares it should be. 2. It is not the policy of the law to destroy a remainder, the vesting of which, either in interest or in possession, is postponed for more than two successive life estates; but on the contrary to preserve it, by striking out the life estates subsequent to the two first, and giving effect to the remainder earlier than was

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

contemplated by the testator. 3. This is such a remainder as may take effect according to the legal intent of the testator, upon every portion of his estate as often as two successive life estates shall have been enjoyed in such portion. 4. The time when the remainder shall take effect, having thus been accelerated by the provision of the law, which has in this respect made a will for the testator, the directions as to the distribution and apportionment of his estate upon the death of all his nephews and nieces, must be controlled by the same law, and being inconsistent with it are to be regarded only as near as may be, in executing the legal intent of his will. 5. The power of alienation is not suspended in this case by the future estate. 6. The remainder in the present case is therefore valid, it taking effect in possession, by virtue of the statute as to each portion of the testator's estate which shall have been enjoyed for two successive lives 7. It will vest, as to every such portion, in the children of the nephews and nieces, and their descendants, who shall be in being at the time of the termination of the second successive life estate in that portion.

6. The bequest of one-sixteenth of the net income of the testator to such of his grand-nephews and nieces who shall act as trustees and executors after the number of the original trustees shall be reduced to less than five persons, is valid.

7. There is no necessity for a reference to a master to settle the form of conveyances to be taken by the trustees upon the investment by them of the proceeds of any part of the real or personal estate ; as the trustees will hold the same subject to the trusts of the will.

8. Daniel Holsman, Blaze Lorillard and George Lorillard are bound to elect whether they will take the annuities given them by the will, or whether they will take as heirs at law of the testator against the will.

On the part of the *infant trustees*, the following points were presented and argued by *John Duer*.

1. That this court have power, under the Revised Statutes, so to model the trusts of the will as to carry into effect the in-

tentions of the testator, so far as those intentions are consistent with the rules of law.

2. The trust estate being created for a purpose authorized by sec. 55, tit. 2, ch. 1, part 2, of the Revised Statutes, 1 R. S. 728, must be valid, unless it violate the statutory rules in relation to life estates, or in restraint of perpetuities.

3. The words " subject to the rules prescribed in the first article of this title," in section 55, are applicable either to the estate of the trustees, or to the interest of the *cestuis que trust*, considered as a legal estate.

4. Applying them to the estate of the trustees, (as under the Revised Statutes trustees can take no other or greater estate than the purposes of the trust require,) the estate of the trustees under the present will is not a fee, but a freehold during the lives of the twelve nephews and nieces, determinable on the death of the survivor.

5. As Jacob Lorillard, one of the trustees, is not a *cestui qi e vie*, and as the trustees are joint tenants, their estate is perhaps, strictly speaking, an estate *per autre vie*, and therefore subject to the rules prescribed in the article referred to, in relation to such estates.

6. Those rules do not prohibit the creation of such an estate for any number of lives in being.

7. It is true, that under the 19th section, 1 R. S. 724, when a remainder in fee is created on an estate, to continue during the lives of more than two persons, on the death of the two first named, the life estate will cease and the remainder take effect ; but the remainder here meant, is a remainder vested in its creation, and capable of taking effect at the period indicated, in favor of the persons intended by the testator, the time only of its vesting in possession being anticipated.

8. The ultimate limitation of the fee in the present will is not of this character, as it is not only contingent in its cieation, but must continue so during the whole period of the trust. It is therefore not capable of vesting on the death of the two nephews and nieces first named, according to the intentions, and in the persons contemplated by the testator.

9. Such ultimate limitation is either wholly void, (and then the will is to be construed in the same manner as if it had not

been inserted,) or, if valid, it can only be so on principles that apply equally to all the trusts of the will.

10. Even if the 19th section be construed as prohibiting the continuance of an estate *per autre vie*, during the lives of more than two persons, the consequence is, not that the estate of the trustees is absolutely void, but that it must cease on the death of the two nephews and nieces first named.

11. Even this cessation of the estate of the trustees would not invalidate the trusts if otherwise valid, but their subsequent execution would devolve on the court of chancery.

12. The words in the 55th section, "subject to the rules," &c. in their true construction, refer to the interest of the persons to whose use the rents and profits are to be applied : 1. Because the words were unnecessary for the purpose of subjecting the legal estate of the trustees to the rules in question ; 2. Because the application of the rules to the interest of the *cestui que trust*, is necessary to prevent the mischief which these rules were intended to prevent, and to carry into effect the intentions of the legislature, both in regard to life estates and future limitations ; and 3. Because express words were necessary to authorize such application.

13. There is one mode, and one only, in which the rules can be applied to the interest of the *cestui que trust ;* and that is, by considering the trust as an immediate devise of a legal estate.

14. Under the words of the present will, considered as an immediate devise, the twelve nephews and nieces take as tenants in common, each an equal undivided share, during his or her life, with cross-remainders to the survivors and survivor, until the termination of all the lives.

15. This construction ought to be adopted, 1. Because the words "share and share alike, and equally to be divided," are, even at common law, the appropriate words for creating a tenancy in common ; 2. Because, since the statute altering and reversing the rule of the common law, a joint tenancy cannot be created, unless it is expressly declared that the persons entitled shall hold as such ; 3. Because the supposed rule of the common law, that cross-remainders in life estates cannot be implied between more than two, is not applicable to

the terms of the present will; and if it were so, the rule itself is no longer in force; 4. Because the subsequent provisions of the will, for the introduction of grand-nephews and nieces as trustees, manifest the clear intent of the testator that they should enjoy, as tenants in common, and would otherwise be defeated; 5. Because it is necessary to prevent what would otherwise ensue on the death of Jacob Lorillard, a merger of the equitable interests in the legal estate, and the consequent extinction of the trust; and 6. Because it is this construction which will best enable the court to secure to the nephews and nieces, in whole or in part, the benefits intended for them by the testator.

16. Adopting this construction, each *cestui que trust* will not only take a life estate in his share, but it is admitted that there will be as many successive life estates in each share as there are nephews and nieces amongst whom the rents and profits are to be divided.

17. Such a limitation is not void as tending to a perpetuity, nor does it contravene the rule prescribed in the 17th section, 1 *R. S.* 723, as to successive estates for life.

18. The observations contained in the 7th, 8th and 9th points, *mutatis mutandis*, apply equally to the residue of the 17th section, avoiding all successive life estates subsequent to the two first, in order to vest in immediate possession a remainder in fee.

19. If the 17th section be construed as implying a general prohibition to create more than two successive life estates, still the intentions of the testator are so far legal, as they authorize the succession of two life estates in each sha e; and to that extent they should be carried into effect, and the trusts of the will be modelled accordingly.

20. The limitation to the trustees in the present case is not void as tending to a perpetuity, in violation of the rule prescribed in the 15th section, 1 *R. S.* 723.

21. The terms "limitation" and "condition" in that section are to be understood in their broadest sense, the object of the section being to declare a new rule, as extensive in its application as the rule of the common law which it was meant to supersede.

ALBANY,
Dec 1835.

Coster
v.
Lorillard.

22. But the limitation to the trustees involves in itself no suspense whatever of the power of alienation; that suspense, if it exist, being created by the act of the legislature, not the will of the party.

23. The incapacity to assign the beneficial interests in a trust for the receipt of the rents and profits of land, declared in section 63, is strictly personal, and is not engrafted on the estate, so as to be a component part of the limitation to the trustees.

24. The true meaning of that section is, that the beneficial interest in question is not *per se* assignable—not that the power to assign or alien it may not be given by the testator. The restraint is imposed to carry into effect an intent implied by the law, and it would be unreasonable so to extend it as to defeat an opposite intent declared by the party.

25. The power therefore given to the trustees by the present will to authorize alienation is valid, and there will consequently be no suspension whatever of the power of alienation during any period of the trust.

26. If the power be valid, the twelve nephews and nieces, by uniting. may alien the life interest of each, and by uniting with the heirs at law, if the reversion has descended, may convey an absolute fee in possession.

27. If this cannot be done, still there will be no suspense of the power of alienation, for other reasons, beyond a single life in being—that of Jacob Lorillard.

28. Upon his death, the trustees and the persons interested in the trust will be the same. The characters of trustee and *cestui que trust* are incompatible when the interests are co-extensive, and the only effect of a limitation which attempts to unite them, is to pass the legal estate discharged of the trust.

29. If the views contained in the preceding points, from the 20th inclusive, should not be adopted, still the limitation to the trustees is only void so far as it suspends the power of alienation beyond two lives in being, and to the extent of two such lives in each share ought to be supported and carried into effect.

30. The decree of the chancellor ought therefore to be so far reversed and modified, as that the trusts of the will may

be declared valid during the lives of the twelve nephews and nieces, or at least that it may be declared that each nephew and niece is entitled to one twelfth of the rents and profits during life as first taker, and also, by way of remainder, to one eleventh of the share of each of the others.

Whereupon, after advisement, the following opinions were delivered by members of the court for the correction of errors :

By Chief Justice SAVAGE. The validity of the legacies and annuities contained in the first clause of the will has not been argued ; they were conceded to be a charge upon the estate, and to be paid whether the principal trust in the will be sustained or not. That concession was unnecessary.

The estate may be said to be disposed of as follows : Devise to the executors and trustees, and the survivors of them, their heirs and assigns, in trust, to receive the rents and profits of the testator's lands, and to account for, pay over, and divide the net proceeds among his twelve nephews and nieces, during their natural lives, and to the survivors and survivor of them equally, to be divided share and share alike ; with remainder over to all the children of the said twelve nephews and nieces, and the children of such of them as may be dead. In shorter terms : devise to the trustees for the lives of twelve nephews and nieces, remainder in fee to their children. The main question is whether this devise is valid ?

Independent of the Revised Statutes, there could not be a well grounded doubt on the question. The only objection to such a disposition of property arises from the length of time during which it is inalienable, and its tendency to a perpetuity.

Anciently, in the time of the Saxons, an unlimited power of alienation existed in England ; but the Normans introduced the feudal law, and all lands became inalienable. William the conqueror well knew the effect of that system of military tenures, in giving stability to a throne which he had acquired by force of arms. Simultaneously with the introduction of the feudal system, he reduced the ecclesiastical revenues,

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

and compelled the bishops and abbots to furnish, when required, a number of knights or military tenants, in proportion to the property they severally held, and thereby probably laid the foundation of the hostility of the church to the feudal tenures, which subsequently, by the aid of the court of chancery, effected substantial changes in the system. By degrees the owners of land acquired the power of disposition. This power proved so beneficial, that for many centuries it has become an established rule that real property shall in no case be rendered perpetually inalienable ; in other words, that perpetuities shall not be allowed. The nobility indeed, by the statute *de donis*, made an attempt to render their possessions inalienable, but the ingenuity of the courts, both of equity and of law, effectually defeated the operation of the statute by means of fines and common recoveries.

The owners of estates have been permitted however to indulge, to a considerable extent, that propensity which seems to be inherent in human nature—a desire to continue their acquisitions in their own families as long as the law will admit, by means of what are called family or marriage settlements. Of these I shall only say, that one mode was that of limiting estates for life to the persons then in being, with remainders to their children, by purchase. This was not entirely effectual, because the tenants for life, by destroying their estates, might bar the remainders—and hence the introduction of trustees to preserve contingent remainders. By this means the estate is rendered inalienable till the eldest son of the marriage attains the age of twenty-one, when he can join with his father in suffering a common recovery, by which an estate tail limited to the eldest son and all the remainders are barred, and an estate in fee simple is acquired. *Cruise, tit.* 32, *Deed, ch.* 23.

It has become well settled in England, that real property may be rendered inalienable during the existence of a life in being, and twenty-one years after ; that is, till the son of a tenant for life shall attain his full age. From one life the courts gradually proceeded to several lives in being at the same time ; for this, in fact, only amounted to the life of the survivor. Provision has also been made for the case of an unborn

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

son of a tenant in tail, to whom an estate tail was limited, and the time of gestation has been added to the twenty-one years; and it has been said that this time of gestation may, if necessary, be added twice.

It has also become well settled in England, by analogy to these settlements, that an executory devise must vest within the compass of a life or lives in being, and twenty-one years and nine months after.

This subject has been much discussed of late in the case of *Thellusson* v. *Woodford*, 4 *Vesey*, 227 *to* 342, and 11 *Vesey*, 112 *to* 149, in which Lord Eldon repeats the language of Lord Thurlow in *Robinson* v. *Hardcastle*, 2 *Bro. C. C.* 30, that a man may appoint one hundred or one thousand trustees, and that the survivor of them shall appoint a life estate; that would be within the line of a perpetuity. What is a perpetuity, asked Lord Thurlow, but the extending the estate beyond a life in being, and twenty-one years after? Lord Eldon adds, that the language of all the cases is, that property may be so limited as to make it inalienable during any number of lives, not exceeding that to which testimony can be applied, to determine when the survivor of them drops. The testator, in that case, devised his estate after the death of his three sons and of his grandson, and of such other sons as his own sons might have, and of such issue as such sons might have as should be living at the time of his death, or should be born in due time afterwards, and after the death of the survivors and survivor, to such person as at that time should then be the eldest male lineal descendant of his son, Peter J. Thellusson, and his heirs forever. In that case there were nine persons at the testator's death whose lives must be terminated before the remainder could vest; in this there are twelve, and that is the principal difference. In that case the person of the remaider-man was equally contingent with the children of the twelve nephews and nieces in this case, with no other difference except as to the number. In that case the devise was declared to be good and valid in law by the lord chancellor, assisted by the master of the rolls and Judges Buller and Lawrence, and afterwards affirmed in the house of lords up-

on the unanimous opinion of all the judges. If that devise was good at common law, so is that now before the court.

The only question then will be, whether our Revised Statutes render such a devise invalid?

In considering this case, as it is affected by the Revised Statutes, I shall take three views of it:

I. The effect of the statute, supposing the trust to be embraced under the 3d sub. of the 55th section.

II. I shall inquire whether it is a trust under the 55th section at all.

III. If not embraced in the 55th section, is the trust valid as a power in trust?

1. In construing statutes, the usual and proper mode is to ascertain the intention of the legislature, from the language they have used, connected with the state of the law on the same subject anterior to the passage of the statute. When the courts know for what particular mischief the legislature intended to provide a remedy, it is their duty so to construe the statute as most effectually to suppress the mischief and advance the remedy. It seldom happens that a key is furnished by the law-making power, whereby the courts may unlock the arcana of the legislative mind, and thus ascertain with unerring certainty the real intention of the legislature. It fortunately happens in this case that we have such a key; and I hope and trust, that by a proper application of it, light may be thrown upon whatever may appear obscure; apparent discrepancies may be reconciled; and upon comparison of all its parts, we shall find " a system simple, uniform and intelligible."

It is known to us all, that preparatory to the late revision of the statutes, the work of revising, analyzing, collating, composing, and, if there were such a word, I might say codifying, and presenting to the legislature in a new form the statutes of the state, was committed to three gentlemen, distinguished for their legal learning, their ability and their industry. The result of their labors is before us in their reports to the legislature. Whenever their recommendations have been adopted by the legislature, and their notes have declared the

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

object in view in plain language, free from all technicality, we may safely pursue that object, and in the path pointed out. In relation to article first of the second title of chapter first of the second part of the Revised Statutes, the revisers inform the legislature that the provisions recommended by them are the result of much and attentive consideration, and are intended to "extricate this branch of the law from the perplexity and obscurity in which it was involved ; and render a system simple, uniform and intelligible, which was various, complicated and abstruse." The means by which they proposed to effect this object are: "To abolish all technical rules and distinctions, having no relation to the essential nature of property or the means of its beneficial enjoyment, to define with precision the limits within which the power of alienation may be suspended by the creation of contingent estates, and to reduce all expectant estates substantially to the same class, and apply to them the same rules, whether created by deed or devise." They subsequently, in the same note, allude to the general principles by which they have been governed, to wit : "If a rule of law is just and wise in itself, apply it universally, as far as the reasons upon which it is founded extend, and in no instance permit it to be evaded ; if it is irrational and fanciful, or the reasons upon which it is rested have become obsolete, abolish it at once." These are sound and salutary principles, and as justly entitled to the consideration of courts in expounding the statutes, as of the legislature in enacting them. That great and radical changes were intended to be effected is declared throughout—particularly all expectant estates, uses and trusts, and powers, are expressly abolished—except such as are authorized, enumerated and defined in the several articles relating to these several subjects.

In the further progress of my remarks, I shall quote freely from these notes when necessary, as expressing the intention of the legislature, and as containing the reasons or premises sustaining the conclusion to which I have arrived.

I refer again to the devise itself. It is a devise of all the testator's estate, real and personal, to the trustees, their heirs and assigns, as joint tenants, in trust, to account for, pay over and divide among his twelve nephews and nieces, the net

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

proceeds of the income, rents and profits of the estate devised to the trustees, during the natural lives of the twelve nephews and nieces, and to the survivors and survivor of them, equally to be divided between them, share and share alike— with remainder over, after the death of the twelve nephews and nieces, to such of their children as shall be then living, and to the children of such of them as shall be dead, to be equally divided *per stirpes* and not *per capita.*

It is a cardinal rule, in the construction of wills, that the intention of the testator shall be carried into effect if consistent with the rules of law ; so is the common law ; so are the Revised Statutes. What did the testator mean by the clause to which reference has been made ? On that subject there is no difference of opinion. All agree that the testator intended to prevent the alienation of his estate during the lives of the twelve nephews and nieces, and for two years after the death of the survivor of them ; and that then it should be divided among the children and grand-children of the twelve nephews and nieces. That such was the real and actual intention of the testator is perfectly plain ; and it is also perfectly clear that if that intention is consistent with the rules of law, it is the duty of the court to give it effect.

Previous to the operation of the Revised Statutes, it was competent for a testator to render his estate inalienable for any number of lives in being at the time of his death. " An estate," say the revisers, " is never inalienable unless there is a contingent remainder, and the contingency has not occurred ;" and they give the instance of a grant to A for life, remainder to B. (a person in being) in fee. Here there is no suspense of the power of alienation, because the owners of the life estate and of the remainder may unite, and thus convey the whole estate. This idea they have incorporated, as they supposed, in the 14th section. " Such power of alienation is suspended, when there are no persons in being by whom an absolute fee in possession can be conveyed." Unless therefore the owners of the precedent estate, the trustees, can unite with the owners of the remainder, the power of alienation is suspended. According to the doctrine of the revisers, if the remainder is contingent, and the contingency has not occurred, the estate is inalienable.

It will be seen that there are here at least two contingencies to happen before the remainder can be conveyed. 1. The twelve nephews and nieces must die; but this only renders the time of vesting contingent. 2. The persons to take must be in existence at the death of the last survivor of the twelve nephews and nieces; before that period the persons cannot be ascertained, and are therefore contingent. Remainders strictly so called, future uses and executory devises are all denominated expectant estates by the revisers. *See note to* § 10. At common law there were, according to Mr. Fearne, four kinds of contingent remainders. 1. When the remainder depends entirely on a contingent determination of the preceding estate itself. As if A. gives an estate to B. till C. returns from Rome; after the return of C. then remainder over in fee. Here the particular estate terminates and the remainder vests on the return of C., but as that event may happen, the remainder is contingent. 2. The remainder is contingent when some uncertain event must, by the nature of the limitation, precede the remainder: for instance, an estate for life is given to A., B. and C., remainder to B. and his heirs, if he survive C. Here, unless B. survive C. the remainder cannot vest, it is therefore contingent. 3. The third kind is when the remainder is limited upon an event which must happen at some time, but may not happen till after the determination of the particular estate. A remainder must vest during the continuance of the particular estate, or at the instant of its termination. If the event does not happen during the continuance of the preceding estate, the remainder is void. Thus, an estate to A. for life, and after the death of B. remainder to C. in fee, this is contingent; for though B. must die, yet he may survive A., by whose death the life estate is terminated, and the remainder will be void, because it could not vest before or at the termination of the life estate. 4. The fourth kind is when the remainder is limited to a person not ascertained, or not in being at the time when such limitation is made; as where an estate is limited to two persons for their joint lives, remainder to the survivor in fee—such remainder is contingent because it is uncertain which will survive—so the usual remainder in marriage settlements to the first and other sons

of the intended marriage, is a contingent remainder. *Cruise, tit.* 16. *Remainder, ch.* 1, § 10 *to* 27.

In the case now under discussion, the remainders fall under the fourth class of Mr. Fearne : the persons who are to take are not ascertained, and probably not in being. The event here upon which the remainders are to vest, is the death of the survivor of the twelve ; and their children who are to take, are such as shall be then in being, and the children of such as may be dead. The devise is not to such children of the twelve as should be living at the death of the testator ; they may be all dead before the death of the survivor of the twelve. It was perhaps unnecessary for me to have referred to the former definitions of contingent remainders, as the statute before us contains all that are necessary to a clear understanding of this case. By § 10, a future estate is an estate limited to commence in possession at a future day, either with or without a precedent estate. By § 11, a future estate dependant on a precedent estate, is termed a remainder. By the statute definitions, therefore, the estate given to the grand-nephews and nieces is a rema nder, and is what is called a future estate ; it is also dependant upon the precedent estate, which is the estate vested in the trustees for the lives of the twelve nephews and nieces. Thus far then we have, in the language of the statute, the precedent estate in the trustees, which may be called a present estate, and we have the remainder over in fee, which is a future estate, and these two compose the whole estate which the testator himself had. I shall hereafter take notice of the interest of the twelve nephews and nieces ; I am now speaking of the estate in the lands which are the subject of the devise. Section 13. Future estates are either vested or contingent. They are vested when there is a person in being who would have an immediate right to the possession of the lands upon the ceasing of the intermediate or precedent estate. They are contingent whilst the person to whom, or the event upon which they are limited to take effect, remains uncertain. These definitions of vested and contingent remainders, it will be seen, are very different from the common law definitions of those estates. At the common law, vested remainders are those by which a present

interest passes to the party though to be enjoyed in future; and by which the estate is invariably fixed to remain to a determinate person after the particular estate is spent. *Cruise, tit.* 16, *Rem. ch.* 1, § 8. By this definition, the remainder in the present case is not embraced; for, by the devise, a present interest does not pass to any particular determinate person, to whom it is to remain invariably fixed. On the contrary, the persons who are to enjoy the remainder are unknown and must be of course contingent until the death of the twelve nephews and nieces. But by the statute definition this is a vested remainder, because there are persons in being who would have an immediate right to the possession upon the ceasing of the precedent estate, that is, there are persons in being who would take the possession of the estate were the precedent estate now to cease. Should the twelve nephews and nieces all die this day, there are persons now in being who would be entitled to the remainder under the devise.

This remainder is also contingent, according to the statute definition—the event upon which it is limited to take effect is certain, to wit, the death of the twelve nephews and nieces; but the persons who are to take are uncertain, depending upon the fact of their being in existence at the death of the last of the twelve. If the remainder now vests in the fifteen grand-nephews and nieces, the estate is not, in the language of Mr. Cruise, invariably fixed to remain to a determinate person—for all who shall be born before the death of the twelve nephews and nieces will also be entitled to a share. It was contended upon the argument, that this was an estate which would open to let in after-born children. It is not necessary, I apprehend, to discuss that point, though such must be the case, if this is a vested remainder. Whether, however, the remainder be vested or contingent is not a controlling fact in the case, and does not determine the rights of the parties.

The 15th section declares that the absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate. By § 14, the power of alienation is suspended where there are no persons in being by whom an absolute fee in pos-

session can be conveyed; and by the same section, every future estate shall be void in its creation which shall suspend the absolute power of alienation for more than two lives in being at the creation of the estate. A present estate which should have the same effect is not necessarily void in its creation. It is therefore important to inquire whether the estates granted in the present devise, are present or future, and whether the absolute power of alienation is thereby suspended for a longer period than is permitted by the statute? At the death of the testator, the estate of the trustees vested immediately; that is therefore a present estate; but the remainder over is limited to commence in possession at a future time; that is therefore a future estate.

To determine whether the power of alienation is suspended by either or both of these estates, we must ascertain whether there are persons in being by whom an absolute fee in possession can be conveyed. It is argued that the power of alienation is not suspended, because an absolute fee in possession can be conveyed—that the trustees, the twelve nephews and nieces who are entitled to the net proceeds of the rents and profits, and the grand-nephews and nieces in whom the remainder vests, may all unite in a conveyance, by which the whole estate may be alienated. To this it is answered, that the trustees cannot convey, because the 65th section declares, that when the trust shall be expressed in the instrument creating the estate, every sale, conveyance or other act of the trustees in contravention of the trust, shall be absolutely void. The creator of the trust intended it should continue during the lives of his twelve nephews and nieces. The trustees cannot therefore legally convey in contravention of their trust: it is not enough that they have the physical power to execute a conveyance; the statute requires the moral legal power. To be able to convey within the meaning of the 14th section, the persons must be able to execute a legal valid conveyance; an absolute fee in possession must be conveyed, which cannot be done by a deed which is void the moment it is executed. To my mind it is clear that the trustees cannot legally convey their estate.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

In my judgment it is equally clear that those beneficially interested in the rents and profits cannot convey. Sect. 63. "No person beneficially interested in a trust for the receipt of the rents and profits of lands can assign it, or in any manner dispose of such interest." In answer to this, it is said, that by the devise the twelve nephews and nieces may convey with the assent of the trustees or a majority of them. I reply, the statute says they shall not; the statute is paramount, and must control the permission in the will; and as the statute forbids the sale or transfer, any assent by the trustees would itself be invalid and void. The trustees can do no valid act which is contrary to law, or contrary to the will of the testator. When the testator says that the trustees shall hold the estate for twelve lives, it is a violation of the trust to dispose of it by way of sale; or to convey to any but those designated to receive it, unless by order of some court of competent jurisdiction.

It may be doubted, perhaps, whether the twelve nephews and nieces have any interest to convey. Section 60 says, that "every express trust, valid as such in its creation, except as herein otherwise provided, shall vest the whole estate in the trustees, in law and in equity, subject only to the execution of the trust. The persons for whose benefit the trust is created shall take no estate or interest in the lands, but may enforce the performance of the trust in equity. This is positive and plain; the whole legal and equitable estate is vested in the trustees, and the twelve nephews and nieces have no estate or interest. The whole legal and equitable estates embrace the whole estate; there is nothing left. There may be liens upon it, but they constitute no part of the estate itself; the twelve nephews and nieces have no estate or interest to convey; all they have is a mere right to compel the performance of the trust; more like an unassignable chose in action than an estate in lands; and this right they are prohibited from conveying.

I have shown that the trustees cannot lawfully convey; and that alone renders the estate inalienable. I apprehend also, that the remainder-men cannot convey, for the reason that the persons who are to take the remainder are contingent, and

cannot be ascertained until the death of the survivor of the twelve nephews and nieces—but this point will be discussed hereafter. If I am correct that all of these persons, or either of them, cannot convey legally, so that a fee in possession can be transferred, then it follows that the power of alienation is suspended.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

It will be seen by the devise, that the time of suspension is during the natural lives of twelve persons, the nephews and nieces of the testator, who are named in the devise ; that is, during the continuance of twelve lives in being at the creation of the estate. The 15th section says, " The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate." The devise in effect says, that the absolute power of alienation shall be suspended during the continuance of twelve lives in being at the creation of the estate, and for at least two years afterwards. There is a manifest repugnancy, and at least so much as is repugnant must be void.

Before I pursue this subject further, I will consider an objection to the application of the 15th section to this case, which was urged upon the argument. It was said that the 15th section was applicable to future estates only. The reason for that assumption is, that future estates alone were the objects of the six previous sections. The juxta position of these sections is not alone sufficient to authorize the court to say, that future estates only were intended, when the language is broad enough to embrace all estates attempted to be conveyed by " any limitation or condition whatever." But there is a conclusive answer found in the notes of the revisers, and the amendments made by the legislature to that section as originally reported, together with the rejection of the 17th section as reported. The 15th section as reported, reads thus : " The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance and until the termination of *a life or lives in being* at the creation of the estate." The 17th section as reported, reads thus : In every creation of a *future* estate the

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

absolute power of alienation shall not be suspended longer than the lives of *two persons then in being."* Did the revisers mean the same thing by these two sections? or did they mean that property might be rendered inalienable by a *present* estate for any number of lives in being at the creation of the estate, and *future* estates for only two such lives? or did they mean that after the termination of a present estate, which should continue for any number of lives in being at the testator's death, that then a *future* estate should be created by conveyance from the trustees which should continue for two lives then in being: that is, two lives in being at the termination of the lives in being at the death of the testator? This would be going as far as Lord Thurlow, in *Robinson* v. *Hardcastle*, allowing the survivor of one thousand trustees to appoint a life estate; and which was attempted, but not permitted, in Humberston's case. The note of the revisers upon sections, from 14 to 22, states the leading objects in view in those sections. They state that by means of executory dispositions of land and its profits, as the law then stood, the land itself might be rendered inalienable for a life or lives in being, and twenty-one years thereafter; that by means of a springing use or executory devise, it might be rendered inalienable longer than by an entail; that any number of lives might be introduced for the purpose of protracting the period of alienation; that in these sections they have proposed some new regulations which will considerably abridge the present power of rendering real estate inalienable. They state the difference to be the following: 1. That alienation by these sections cannot be protracted by means of mere nominees unconnected with the estate, beyond the period of two lives. 2. That no more than two successive estates for life can be created; and 3. That the period of twenty-one years after a life or lives in being, is no longer allowed as an absolute term; and they suggest " whether the genius of our government, and the state of our society, do not require that the right of suspending alienation should be still further reduced."

From these remarks it is evident that the object was to abridge, not to enlarge the period of inalienability; that the termination of any number of lives selected by the testator was

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

the utmost limit; and that in respect to future estates, that number of lives should not exceed two. When the subject was acted on by the legislature an alteration was made; whether it was first suggested by the revisers or some member of the legislature, does not appear; but by a special report it does appear that the revisers recommended an alteration of the 15th section, in the manner in which it now appears, to wit: that the power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate. They recommended to the legislature to strike out the 17th section, as being rendered unnecessary by the above amendment. Both these amendments were adopted, showing conclusively the intention of the legislature that the same rule should be applied to the inalienability of real estate, whether it is attempted by means of creating a present or future estate. Such inalienability shall not continue beyond the termination of two lives in being at the creation of the estate. It makes no difference, therefore, by what sort of limitation or condition the attempt may be made; the matter is settled—inalienability for a longer period cannot be effected. This is doing what the revisers recommend, to wit: " to define with precision the limits within which the power of alienation may be suspended by the creation of contingent estates," and in consonance also with some general principles recommended by them which have been already quoted. The legislature, doubtless, saw no reason why estates should be rendered inalienable in this state, for so long a period as was lawful before the passage of the revised statutes, which were then before them, and they reduced the period, as being better suited to the nature of our institutions, as a free as well as a commercial people. Nor was there any reason why property should be rendered inalienable by means of a present estate, rather than by a future estate.

But to return to the devise. I have said, and I think it has been shown, that there is a manifest repugnancy between the statute and the devise to the trustees. The statute fixes the limit of the inalienability of the estate to the termination of two lives. The devise extends such inalienability to twelve lives. It is clear therefore, that the devise to the trus-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

tees cannot be sustained in its full extent.    The question then
arises, is the whole devise void, or can a part be supported
upon the doctrine of *cy pres?*    There is nothing new in that
doctrine ; there are many cases in the books in which it has
been applied, and it is now a part of our statute law.    1 *R.
S.* 748, § 2.    " In the construction of every instrument, crea-
ting or conveying, or authorizing the creation or conveyance
of any estate or interest in lands, it shall be the duty of courts
of justice to carry into effect the intent of the parties, so far
as such intent can be collected from the whole instrument,
and is consistent with the rules of law."    The general intent
of the testator was to make his estate inalienable as long as
the law would permit ; that is a lawful intent.    In this case
he attempted to render the estate inalienable during the con-
tinuance of twelve lives ; that intent is not consistent with
the rules of law, and therefore cannot be carried into effect
to that extent.    It is consistent, however, with the rules of
law, that any testator should tie up his estate, and render it
inalienable during the continuance of two lives.    In the lan-
guage of Mr. Justice Wilmot, 3 *Burr.* 1635, " Let his inten-
tion therefore take place as far as it can go ; but it can go no
further."    It seems to follow that it is the duty of the court
to carry the testator's intent into effect to that extent.    By
the *cy pres* doctrine, which is now statute law, it is the duty
of the court to carry that intent into effect, as far as is con-
sistent with the rules of law.    And that is done by construing
this devise, as if the direction to pay over the net proceeds
of the rents and profits of his real estate to his nephews and
nieces, instead of saying *during their natural lives,* had said
*during the natural life of such two of my nephews and nieces as
shall soonest die.*    He might have selected any two by name,
but not having done so, no other selection can be made by the
court than as above.    There are in the revised statutes them-
selves numerous instances of the application of the *cy pres* doc-
trine.    I will refer to a few.    The 17th section provides that
when a remainder shall be limited on more than two succes-
sive estates for life, all the life estates subsequent to those of
the two persons first entitled thereto shall be void ; and upon
the death of those persons the remainder shall take effect.
That is *cy pres,* viz. carry into effect the intention of the party

as far as you can, to wit: as far as is consistent with the rules of law. Other instances are found in the 19th section, in the 37th, and many more, which I will not now particularly designate. In short, in all cases where a party attempts to go beyond what the law allows, the instrument shall be construed as though it went no farther than the law permits. The 37th section contains a clear illustration. There it is provided, that when an accumulation of rents and profits is permitted during the minority of any person—if the testator attempts to carry it further, the provision is not all void, but only so much as goes beyond the minority, that being the limit fixed by law. That is the doctrine of *cy pres*. There are several instances in which the legislature declare, that when an instrument attempts to create a larger estate than the law allows, such estate shall be void in its creation; section 14 is such an instance. My conclusion, therefore, upon this view of the case, assuming what I shall presently deny, that the trust itself is lawful, would be that the estate in the trustees is good, during the continuance of two lives; and that as soon as two of the twelve persons named shall have died, the estate of the trustees must cease. The inquiry seems naturally to present itself, upon whom does the title fall at the termination of the estate of the trustees? It must necessarily go to those in remainder, or to the heirs at law. It goes to those in remainder, if that part of the devise is valid. I have shown that by the definitions of the statute, the remainder contained in this devise is a future estate. It is an estate limited to commence in possession at a future day, on the determination of a precedent estate created at the same time; and whether it is vested, or contingent, or both, is quite immaterial, unless upon the fact of its being either vested or contingent, depends the question whether it suspends the power of alienation.

I must again refer to the notes of the revisers as explanatory of this branch of the case. " To prevent a possible difficulty," say they, " in the minds of those to whom the subject is not familiar, we may also add, that an estate is never inalienable, unless there is a contingent remainder, and the contingency has not yet occurred. When the remainder is vested, as when the lands are given to A. for life, remainder to B. (a

person then in being) in fee, there is no suspense of the power of alienation, for the remainder-man and the owner of the prior estate, by uniting may always convey the whole estate. This is the meaning of the rule of law prohibiting perpetuties, and is the effect of the definition in section 14." That definition is as follows: " Such power of alienation is suspended, when there are no persons in being, by whom an absolute fee in possession can be conveyed." This definition, it will be seen, is exemplified in the instance put by the revisers, of a life estate granted to A., remainder to B. in fee. Here there is no contingency as to the person entitled to the remainder; and it is true that the whole estate can be conveyed by A. and B., uniting in a conveyance. But I will put this case: an estate for life to A., remainder to the eldest son of B., who shall be living at the death of A. Suppose B. has a son living at the creation of the estate. Can there be a union of the life estate and remainder so as to convey the whole estate? Manifestly not. Here is a contingency which has not occurred, and cannot be determined until the death of A. Such a remainder would necessarily suspend the power of conveying an absolute fee in possession, until the death of A., and yet there is a person in being who would have an immediate right to the possession upon the death of A. We will suppose, however, that A. and B.'s son, unite and convey to C. what purports to be the whole estate. But before A.'s death, B. had another son born, and the eldest son dies, then A. dies, what becomes of C.'s remainder? It goes according to the grant or devise to the eldest son of B., living at the death of A., and C. loses it.

The case I have supposed is in principle the case now before us. Suppose, for the sake of the argument, that the trustees can convey, though I have shown that they cannot—suppose, too, that the twelve persons beneficially interested in the rents and profits can convey, though the statute says they shall not—and I will for the present suppose that a conveyance from them is necessary for the purpose of alienation—suppose they and the trustees are ready and willing to unite in a conveyance to transfer an absolute fee in possession. It is very clear that they cannot do it alone, for the interest and estate

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

of all of them ceases, by the terms of the devise, upon the death of the survivor of the twelve nephews and nieces. Application is then made to the grand-nephews and nieces now in existence ; and who would take were the twelve nephews and nieces now to die—what estate can the grand-nephews and nieces convey ?   They are indeed persons answering the description in the devise as owners of the remainder ; they may be said to stand in the character of heirs presumptive ; whether they will ever enjoy the remainder of the estate depends upon a contingency—it depends upon the fact of their surviving all the twelve nephews and nieces. But to test it still farther ; suppose all parties unite in a conveyance to John Stiles, and he takes possession.   The nephews and nieces continue to increase and multiply and replenish the earth with a numerous progeny ; they live to a good old age themselves, and one of them, as we all know is consistent with possibility, should more than double the ordinary period of human existence ; in all probability the fifteen grand-nephews and nieces now in existence, will have descended to the tomb, and their children or grand-children, together with all the other descendants of the original twelve, will claim their shares as purchasers.   They take under the original devise, not by descent, and the conveyance of their particular ancestor is no estoppel to them.   Is it not clear that John Stiles, or his descendants, must give up the possession ?   The truth is as I have already stated, that the present fifteen grand-nephews and nieces have no present estate ; they have a possibility.   If they survive the twelve nephews and nieces then they take their proportion ; if they die, no interest of theirs in the estate in question can descend to their heirs.   It is impossible, then, to convey an absolute fee in possession ; and this impossibility results upon the previous supposition, from the fact that the estate given in remainder suspends the power of alienation during the continuance of twelve lives.   That the estate in remainder is a future estate, dependant upon a precedent estate, has already been shown.   Parts of the 14th and 15th sections close this view of the case, and draw the conclusion resulting from these premises.   Every future estate shall be void in its creation, which shall suspend the absolute power of

alienation for a longer period than during the continuance of not more than two lives in being at the creation of the estate. The remainder over was therefore void in its creation.

Unless I greatly deceive myself, I have established these propositions :

*First.* That as to all estates, whether present or future, the absolute power of alienation shall not be suspended beyond the continuance of two lives in being at the creation of the estate. This shall not be done by any limitation or condition ; that is by any kind of assurance or conveyance ; by any shift or contrivance whatever, by which estates may be created. In short, that it shall not be done at all.

*Second.* That the devise in question attempts to render the estate inalienable for twelve lives : 1. By conveying an estate to the trustees for twelve lives ; the trustees being unable to convey without a violation of the trust. 2. By the creation of a future estate to commence in possession in two years after the death of the survivor of the twelve lives.

*Third.* That by the devise the estate is inalienable : 1. Because the statute prohibits trustees from conveying in violation of their trust ; and 2. There are no persons in being who can convey the remainder. I take no notice here of the inalienability of the interests of the twelve nephews and nieces in the rents and profits, for if alienable, the estate itself would not be, and these interests are no part of the estate. From this view of the case, my conclusions are, 1. That the future estate or remainder was void in its creation, according to the 14th section : 2. That the precedent estate in the trustees was not necessarily void in its creation.

Although the testator attempted to render his estate inalienable longer than the law will permit, yet it is the duty of the court to carry into effect his intent, so far as is consistent with the rules of law ; in other words, so to construe the devise as to render the estate inalienable as long as the law will permit : which is for two lives, and no longer. It follows, upon this view of the case, that at the expiration of the second life, the estate of the trustees would terminate, and the whole estate would vest in the heirs at law of the testator. This seems to me to

be a plain common sense view of the case, so far as concerns the principal devise, and assuming that the devise itself is authorized by the statute for the term of two lives.

Other views have been presented; it is proper to pursue them. Before doing so, I will remark, that the revisers in presenting the provisions in article second, on the creation and division of estates, expressed their confident belief that their adoption would extricate this branch of the law from the perplexity and obscurity in which it was before involved. They have certainly succeeding to a very great extent, if not entirely. And they have effected this object as they have themselves remarked, principally by the new application of established rules, to all classes of expectant estates created by the act of the party. There are, however, some new principles; one I will point out, to which the revisers have not called the attention of the legislature. Formerly estates could not be rendered inalienable, but by means of contingent estates. They may now be rendered inalienable by means of a present estate—a trust estate, when the trust shall be expressed in the instrument creating the estate. Such an estate, by section 65, cannot be aliened by the trustees in contravention of the trust. Whoever, therefore, creates a trust estate to receive the rents and profits of land for any fixed period, renders the estate inalienable during the existence of the trust, or to the extent permitted by law. If indeed the trust be to sell and convey, then it is not inalienable.

If, however, the revisers have accomplished much in the creation and division of estates merely by a new application of old principles, they found in the old doctrines of uses and trusts, and powers, subjects which baffled their powers of modification. In their notes to these articles (No. 2 and 3) they remark in the language of Mr. Cruise, that "the law of real property is the most extensive and abstruse branch of English jurisprudence,"—and in their own more eloquent language, they say: "Such indeed are its extent and intricacy, that even in the legal profession it is very imperfectly understood by any who have not made it an object of peculiar study and attention; and so remote are its principles and maxims

from ordinary apprehension, that to the mass of the community, they seem to be shrouded in impenetrable mystery." "The law of powers," say they, "as all who have attempted to master it, will readily admit, is probably the most intricate labyrinth in all our jurisprudence. Few in the course of their studies have been called to enter it, who have not found it difficult to grope their way in its numerous and winding passages." Instead, therefore, of endeavoring to unravel the mysteries of uses and trusts, or to cast light into the numerous dark and winding passages of the labyrinth of powers, they demolished the whole. The learned antiquarian will pause and ponder over this vast pile of ruins; venerable at least for their antiquity, the erection of which occupied centuries, and put in requisition the labors of kings, ecclesiastics and laymen. Upon these ruins have been erected new edifices—a new system of uses and trusts, apparently plain and intelligible, and adapted to the real wants of society; but whether it is so in reality is yet to be proved. Instead of the labyrinth of powers, we have a new building of modern architecture, through which I hope we may pass with safety, with such clue as the revisers have furnished.

Though the labyrinth of cross-remainders is left standing, I shall not enter it, believing that it does not stand in our way in pursuing the path of justice. I will state my reasons for this belief; and for this purpose I shall assume, as has thus far been assumed, that the trust in controversy, to wit, a trust to receive and pay over, is one authorized by the Revised Statutes.

The revisers, in a learned note to article 2, have given a concise and accurate history of the rise and progress of the doctrine of uses and trusts, and have shown its defects. They say, "There are three classes of trusts, each requiring to be noticed: 1. When the trustee has only a naked and formal title, and the whole beneficial interest or right in equity to the possession and profits, is vested in those for whose benefit the trust is created; 2. When the trustee is clothed with some actual power of disposition or management, which cannot be properly exercised without giving him the legal estate and actual possession; 3. Trusts arising or resulting by implica-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

tion of law." They proceed to state that the first class is not only useless, but they facilitate fraud, by separating the legal and equitable estates. The second class they propose to retain, only *limiting their continuance and defining the purposes* for which they may be created. The third class they retain in order to prevent fraud, prohibiting however a secret resulting trust from being created by the party claiming its benefit. In pursuance of this plan, in the 47th section they declare, that the person entitled to the possession of lands and the rents and profits, shall be deemed to have the legal estate. In section 49, they prohibit the creation of formal trusts, and declare that in such cases " no estate or interest, legal or equitable, shall vest in the trustees." In their note to this section they put this emphatic question : " Why indeed should uses and trusts be continued for the mere purpose of converting them into legal estates as soon as they arise, unless it is thought desirable that conveyances should continue complex and obscure, and difficult questions of title be perpetuated ?

The only possible way in which cross-remainders can be introduced into this case, is by converting the interest of the twelve nephews and nieces in the proceeds of the rents and profits, into legal estates. Now I ask, if it was the intention of the revisers and the legislature to abolish all such fictions, not only as unbecoming the dignity of a due administration of justice, " not merely as curious and overstrained, but as entirely useless, unless to propogate lawsuits," why should this court seek to perpetuate " that infinity of subtleties and refinements" with which this branch of our jurisprudence has been overloaded ; and from which it was the expressed intention of the revisers and the legislature to relieve us ? I know it may be said that these remarks were made in relation to formal trusts ; but if active trusts are to be involved in the same intricacy and obscurity, and to be followed by similar consequences, are they not liable to the same objections ? In relation to trusts of this description, the revisers remark, note to section 56, as reported, now section 55, " As the creation of trusts is always in a greater or less degree the source of inconvenience and expense, by embarrassing the title and requiring the frequent aid of a court of equity, it is desirable that express

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

trusts should be limited as far a possible, and the purposes for which they may be created strictly defined." I shall hereafter have occasion to quote the remainder of this note. The section to which they refer is as follows : "Section 55. Express trusts may be created for any or either of the following purposes : 1. To sell lands for the benefit of creditors ; 2. To sell, mortgage or lease lands, for the benefit of legatees, or for the purpose of satisfying any charge thereon ; 3. To receive the rents and profits of lands, and apply them to the use of any person during the life of such person, or for any shorter term, subject to the rules prescribed in the first article of this title ; 4. To receive the rents and profits of lands, and to accumulate the same for the purposes and within the limits prescribed in the first article of this title." " Section 60. Every express trust, valid as such in its creation, except as herein otherwise provided, shall vest the whole estate in the trustees in law and equity, subject only to the execution of the trust. The persons for whose benefit the trust is created shall take no estate or interest in the lands, but may enforce the performance of the trust in equity."

This is a modification of a species of trust mentioned by Mr. Cruise, 1 *Cruise, tit.* 12, *Trust, ch.* 1, § 12, 13, where a man made a feoffment in fee to his own use during his life, and after his decease that J. N. should take the profits ; this was a use in J. N. ; contrary, if he said that after his death his feoffees should take the profits and deliver them to J. N. ; this would be no use in J. N., because he could have them only by the hand of the feoffees. Thus the feoffees would have the legal estate, and consequently J. N. could only have a trust which would be enforced in equity. This rule has been applied to devises ; but a distinction has been made between a devise to a person in trust to pay over the rents and profits to another, and a devise in trust, to permit some other person to receive the rents and profits. In the first case it was held that the legal estate should continue in the first devisee, in order that he might be able to perform the trust ; for when he is directed to pay over the rents, he must necessarily receive them. But in the second case it has been adjudged that the legal estate is vested by the statute in the person who is to re-

ceive the rents. By the statute all the right which the twelve nephews and nieces have, is a right to enforce the performance of the trust in equity. They have no estate or interest in the lands—nor have they any right to receive the rents except from the hands of the trustees. We must consider the trustees as distinct persons from those entitled to receive the proceeds of the rents and profits, in order clearly to understand the question. Suppose John Doe, the trustee, who is to receive and pay over the rents and profits to Richard Roe. Richard Roe would have no right to go to the tenants and receive the rents—he must receive them from John Doe, and from him alone. If J. D. refused to pay over what he had received, R. R. might file his bill in equity and compel him. Suppose now a greater number of persons entitled to receive ; all J. D. would have to do, would be to pay over to them their several proportions. Suppose that in the present case Jacob Lorillard alone was trustee, and the income $84,000 net proceeds. He would pay each of the twelve the sum of $7000. Suppose one of the twelve dies, the $84,000 must be divided equally between eleven, and each must receive $7,636 and a fraction ; and so on as one drops away, the dividend is increased among the survivors. How does this differ from an annuity, except that the amount is contingent, depending on the amount of rents and profits ? What has this to do with cross-remainders, with the doctrine of joints tenancy or tenancy in common ? Who ever heard of either of them existing in a mere right of action—in other words, a chose in action ? And how does this ideal theory of cross-remainders in the beneficiaries of the trust, consist with the intent of the revisers, " To abolish all technical rules and distinctions having no relation to the essential nature of property, or the means of its beneficial enjoyment." A simple question in arithmetic settles the rights of the parties better than the doctrine of cross-remainders.

But suppose I am wrong in this view of the subject ; suppose there may be a joint tenancy or a tenancy in common with cross-remainders in " a right to enforce the performance of a trust in equity :" how does that aid the perpetuity which

is attempted? It is claimed that this is a trust under the third subdivision of the 55th section, to receive rents and profits and apply them, subject to the rules prescribed in the first article of this title. The first question which naturally arises is, what are the rules referred to? What rules are there in the first article relating to the rents and profits of lands? Rents and profits are the subject of the trust, and we must look for rules regulating that subject. Such rules we find in the 36, 37, 38 and 39th sections, and those are the only sections in the first article which speak of the rents and profits of lands. The 36th is as follows: "Dispositions of the rents and profits of lands to accrue and be received, at any time subsequent to the execution of the instrument creating such disposition, shall be governed by the rules established in this article in relation to future estates in lands." A reference to the devise in question, will show that it is precisely such a disposition. The three following sections relate to the accumulation of rents and profits for the benefit of minors during their minority. The 36th section turns us back upon the doctrine of future estates in lands. We go back then to the 10th section, which defines a future estate; the 11th defines a remainder; the 12th defines a reversion; the 13th explains when future estates are vested and when contingent; the 14th section is the first which may be said to contain a rule regulating future estates—it is as follows: "Every future estate shall be void in its creation, which shall suspend the absolute power of alienation for a longer period than is prescribed in this article." This period, by the next section, the 15th, is limited to two lives. Thus then we have the rule, subject to which is the trust authorized by the third subdivision of the 55th section. When it is all put together it will read thus: "Express trusts may be created to receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter term; such trust shall be void in its creation if it shall suspend the absolute power of alienation, for a longer period than during the continuance of not more than two lives in being at the creation of the trust." It will be seen at a glance, that to make sense of it, we must read the word *person*, in the plural *persons*, and that the trust must be to re-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

ceive and apply the rents and profits to the use of any persons during the lives of such persons.   This is the species of trusts which the revisers call active trusts, and in their notes they " propose to retain them, only limiting their continuance, and defining the purposes for which they may be created." It will be seen that the revisers have done both by the sections which I have brought together; and unless they are to be thus limited, there is no limitation to be found in the first article, or any other to which we have been referred.   Suppose that this is the true solution of the enigma contained in the words " subject to the rules prescribed in the first article of this title;" then it is clear, that if the execution of this trust will require the suspension of the power of alienation of the the lands, out of which the rents and profits are to accrue, for a longer period than two lives, the trust was void in its creation.   I have already shown that the trustees cannot convey. § 65.   The beneficiaries of the trust cannot convey. § 63.   The absolute power of alienation is therefore suspended for a period of twelve lives, and that being a longer period than is allowed by the first article, the trust is void.

How can this consequence be avoided by the supposition of a tenancy in common in the interest, of the twelve nephews and nieces ?   In order the more clearly to convey my ideas, I will separate the trustees from the persons benefitted by the trust.   I will suppose John Doe and Richard Roe are the trustees who are to collect the rents and profits, and the twelve nephews and nieces are the persons who are to receive them.   The estate of John Doe and Richard Roe is a joint tenancy, and not a tenancy in common.   It is so expressly by the devise itself; it is so by the 44th section. They hold the legal and equitable estate, and that is a joint tenancy.   It cannot be separated, unless by some other section such separation is permitted.   We now suppose the interest of the twelve nephews and nieces to be a tenancy in common; that is, the rents and profits, when received by the trustees, (John Doe and Richard Roe,) are separated into twelve separate parcels, and marked from one to twelve.   The nephews and nieces are numbered in the same way, and each person is entitled to his corresponding number of the parcels.   It is argued that each

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

owns his own parcel not only, but that each has a cross-re-
mainder in every other parcel except his own.   It is fur-
ther argued, that when No. 1 dies, his share is to be divided
into eleven parts, one of which goes to each of the eleven
survivors.   That each one, therefore, is to enjoy his own
twelfth for his own life, and only the eleventh of the part
of No. 1 for another life ; and therefore, when No. 2 dies,
the ten survivors divide his share into ten parts, and drop
their eleventh of the share of No. 1, because it is admitted
that their estates can be enjoyed for two lives only.   I ask
now, what becomes of that part of the rents and profits
which has dropped ?   It cannot go to the heirs; the estate
is still tied up in the hands of John Doe and Richard Roe.
They go on upon this supposition, receiving the rents and
profits until the whole twelve are dead.   Is it not plain that
the supposition of a tenancy in common does not relieve the
case from its embarrassment ?   It is no answer to say, that
by section 67, when the trust ceases, the estate in the trus-
tees ceases ; and that when one twelfth drops, one twelfth
of the estate in the trustees is at an end.   The estate of the
trustees is joint, and cannot be severed.

Besides, if we suppose a tenancy in common, there can
be no remainders.   The trust is for the life of each person,
and that part of the devise which purports to give a remain-
der is void, not being authorized by the statute.   The stat-
ute authorizes such a trust for *the life of any person, or for
a shorter term*, not for a longer term ; but the negative is
implied.   The trust however is to pay to the survivor, and
clearly intended to be joint and continue for twelve lives,
and therefore void in its creation ; and by the 67th section,
the trust being at an end, the estate in the trustees ceases.
To speak more correctly as to this case: the trust at-
tempted to be created being void, the devise to the trustees
is also void, and the estate belongs to the heirs at law.

II.  Is this a trust under the 55th section ?   As to this sec-
tion the revisers say, " The object of the revisers in this sec-
tion, is to allow the creation of express trusts in those cases,
and in those cases only, where the purposes of the trust re-
quire that the legal estate should pass to the trustees.   An

assignment for the benefit of creditors would, in most cases, be entirely defeated if the title were to remain in the debtor; and where the trust is to receive the rents and profits of lands, and to apply them to the education of a minor, the separate use of a married woman, or the support of a lunatic or spendthrift, (the general objects of trusts of this description,) the utility of vesting the title and possession in the trustees is sufficiently apparent. After much reflection, the revisers have not been able to satisfy themselves that there are any cases not enumerated in this section, in which, in order to secure the execution of the trust, it is necessary that the title or possession should vest in the trustees. Where no such necessity exists, (as when the trust is to convey, or to make partition, &c.,) it is obvious that without giving any estate to the trustees, the trust may as well be executed as a power; and that trusts of this kind may not be entirely defeated, it is provided in section 59, (now 58,) that they shall take effect in the manner suggested."

In this note the revisers have told us what cases the 55th sect., sub. 3, was intended to provide for, to wit: minors, married women, lunatics and spendthrifts. As the 3d subdivision of this section was first drawn, it is very clear that this species of trust was intended for no other persons than those enumerated. It reads thus: " To receive the rents and profits of lands, and to apply them to the education and support, or support only, of any person, &c.; and it was passed by substituting the words *or either* for the words *support only.* So it appears now in the Revised Statutes. During the session of 1830, an act was passed " to amend certain provisions of the Revised Statutes, and in addition thereto." This subdivision was then amended by striking out the words "education and support, or either," and by substituting the word " use" in lieu thereof. The only reason given by the revisers was, that " the word 'use' includes education and support, and each of them. It will also include other purposes which ought to be provided for." But it is not intimated that any other classes of persons are intended to be provided for, nor that a trust nearly approaching a mere formal trust, was to grow out of the word

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

"*use.*" The trustees are to receive the rents and profits, and *apply them to the use.* This surely does not mean to *pay over* to the person for whose benefit the trust was created. In that case he would apply them himself to his own use. Here the trustees are to judge of the propriety of the expenditure. A trust to *receive rents and profits and to pay over* was a trust known at common law, and was of course abolished with all other trusts; but the legislature, from the peculiar phraseology *apply to the use of,* seem to convey a different idea; and this view receives support from the report of the revisers. (*Note to* 56*th section.*) A trust to receive and pay over is very little if at all different in principle from a formal trust. The only difference is, that in one case the *cestui que trust* is entitled to the possession and profits; in the other, to the profits only. One gives the *cestui que trust* the equitable estate in the possession; the other, in the profits only. According to Mr. Cruise, in one case the *cestui que trust* has the legal estate; in the other, the legal estate remains in the trustee, 1 *Cruise, cited above.* The equitable estate would be in the *cestui que trust.* Precisely the case disapproved of by the revisers in their note: " They separate the legal and equitable estate for no purpose that the law ought to sanction. They answer no end whatever, but to facilitate fraud—to render titles more complicated, and to increase the business of the court of chancery," and it may now be added, "to render estates inalienable." Most assuredly, neither the revisers nor the legislature intended to effect any such object; their intention was to abolish all but active trusts, in which the trustee should have the whole title, the whole estate, legal and equitable, and the whole management of the estate; in cases where there is a real necessity for the interference of a trustee, where the person for whose benefit the trust is created shall have no estate whatever, and only a right to enforce the trust in equity; not as a contrivance to effect an object disapproved by the law—to prevent the absolute power of alienation of real estate. A trust to receive the rents and profits, and pay them over, gives the *cestui que trust* the equitable estate; but the statute permits no such trust. The persons to be benefitted shall have no estate or interest, but only a right to enforce the trust. If

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

the rents are to be paid over, why not give the estate directly? Such is the spirit of the statute. It was not intended that any one should be his own trustee. As all trusts are abolished except those expressly authorized by the second article, section 45, and as no trust to receive rents and profits and *pay them over to another* is authorized by that article, the trust in question is not authorized by the Revised Statutes; it is not a valid trust.

III. If the devise is not valid under the 55th section, is it valid as a power in trust?

The counsel for the trustees, aware that the view of the case just presented might be taken by the court, suggested that if the devise is invalid as a trust, it is valid as a power, and refers to the 58th section, which is as follows: "When an express trust shall be created for any purpose not enumerated in the preceding sections, no estate shall vest in the trustees; but the trust, if directing or authorizing the performance of any act which may be lawfully performed under a power, shall be valid as a power in trust, subject to the provisions in relation to such powers contained in the third article of this title." The 59th section is in these words: "In every case where the trust shall be valid as a power, the lands to which the trust relates shall remain in or descend to the persons otherwise entitled, subject to the execution of the trust as a power." Our attention and inquiries must therefore be directed in a new channel. If no estate has vested in the trustees, then it would seem to follow, that if the property is inalienable, it is not imputable to the devise to the trustees. We must inquire, therefore, whether the acts which it directs may be lawfully performed under a power; if so, it is valid as a power of trust.

It is to be remarked, that the whole doctrine of powers, as it existed previous to 1830, is abolished, and a new system introduced. The old vocabulary is superseded by a new one. Instead of powers appendant and appurtenant, collateral and in gross, or simply collateral, we have now powers general or special, and beneficial or in trust. (§ 77.) Instead of donor or donee, we have grantor and grantee of a power. I will give the definition of each from the statute itself. And, first,

what is a power? (§ 75.) A power is an authority to do some act in relation to lands, or the creation of estates therein, or of charges thereon, which the owner granting or reserving such power might himself lawfully perform. A power is general when it authorizes the alienation in fee, by means of a conveyance, will, or charge of the lands embraced in the power, to any alienee whatever. A power is special: 1. When the persons or class of persons to whom the disposition of the land under the power is to be made, are designated. 2. Where the power authorizes the alienation, by means of a conveyance, will, or charge of a particular estate, or interest less than a fee.

A power, whether general or special, is beneficial where no person other than the grantee has by the terms of its creation any interest in its execution.

A general power is in trust, where any person or class of persons, other than the grantee of such power, is designated as entitled to the proceeds, or any portion of the proceeds, or other benefits, to result from the alienation of the lands according to the power.

A special power is in trust: 1. Where the disposition which it authorizes is limited to be made to any person or class of persons other than the grantee of such power; or, 2. Where any person or class, other than the grantee, is designated as entitled to any benefit from the disposition or charge, authorized by the power.

Every trust power is imperative, unless made expressly to depend on the will of the grantee. § 95 *to* 97 *inclusive.* Section 128 provides that the period during which the absolute right of alienation may be suspended by any instrument in execution of a power, shall be computed not from the date of such instrument, but from the time of the creation of the power. This last section shows clearly that the legislature did not intend that property should be rendered inalienable by means of a power, longer than by the act of the party creating the power; and that the time should run from the creation of the power, not its execution. For instance, the owner of land grants or devises the same to A. for life, with power to him to devise the same in fee. It shall not be in the pow-

er of A. to render the land inalienable for a longer time than the original owner could, calculating the commencement of the inalienability from the grant or devise to A.—in other words, the land may be inalienable for two lives only. The life of A. is one, and A., by the power, may render it inalienable for one other life, and no more.

A general power authorizes the inalienation in fee to any one ; a special power authorizes a like conveyance in fee to persons designated, or an estate less than a fee. The only question therefore, that can arise thus far, is whether the power to lease may not be embraced in these definitions. The powers last spoken of, however, are not powers in trust, and unless the devise in question is good as a power in trust, it must fail. It is not sufficient that it is within any other definition. I have already given the definition of a general power in trust. It is only applicable when the grantee of the power *aliens* the land, sells absolutely by virtue of an express power, and divides the proceeds, if more than one, or pays them over to one, if there are no more designated as entitled to them. It is essential also, that the person or class of persons entitled to the proceeds, or any portion of them, or other benefits to result from the alienation, shall be *other than the grantee of such power.* Here the grantee of the power, or grantees, (for it is immaterial whether singular or plural is used,) are the persons entitled to a portion of the proceeds. It is therefore not valid as a general power in trust. A special power in trust is, 1. Where the disposition which it authorizes is limited to be made to any person, or class of persons, other than the grantees of such power, that is, perhaps to lease, sell or mortgage to some persons designated by the grantor of the power, other than themselves ; or, 2. Where any person or class of persons, other than the grantee, is designated as entitled to any benefit from the disposition or charge authorized by the power. That is, as I understand it, the grantee of a special power in trust, may sell, lease or mortgage lands for the benefit of any designated person or class, other than himself, when he is expressly authorized to do so ; but he has no authority to receive the rents and profits himself, and pay them over, or dispose of them in any way whatever, and for

the reason that he has but a bare authority. He has no interest in the lands which he has authority to sell or dispose of. Section 58 declares that, in all trusts not created under the 55th section, no estate shall vest in the trustees; and section 59 declares, that in such case the lands shall remain in or descend to the persons otherwise entitled, subject to the execution of the power.

To apply these remarks and propositions: If the devise in question is good as a power in trust, then the trustees take no interest under the devise; the lands descend to the heirs at law, and they are entitled to receive the rents and profits, until the grantees of the power choose, or are compelled to execute it. But the conclusive answer to the whole argument is, that the grantees of the power, if the trustees are to be considered such, are the very persons entitled by the devise to the proceeds, or part of the proceeds, or other benefits to result from the alienation or disposition which they, as grantees of the power, are to make; and in such case it is not a general power in trust, neither is it a special power in trust. It is not embraced in the first subdivision, because the leases which it authorizes are not limited to be made to any person or class, other than the trustees themselves. Nor is it embraced in the second subdivision, because the grantees, that is, the trustees, are designated as entitled to the benefits arising from the execution of the power. Nothing therefore can be more clear than that the power contained in this devise is not a power in trust at all, neither general nor special. Powers which would execute trusts like this would be subject to the same objections as formal trusts. "They would answer no end but to facilitate fraud; to render titles more complicated, and to increase the business of the court of chancery," as the revisers justly remarked concerning formal trusts.

I have thus gone through this whole case with some care; although I cannot presume to say, that I am sure I am right, yet never has my mind come to a more satisfactory conclusion, founded, I flatter myself, upon the statutes, upon reason and common sense. If the other members of the court shall have come to the same conclusion, the whole trust estate in the trustees, so far at least as it operates in favor of the

twelve nephews and nieces, must fall before the supremacy of the laws. The owners of large landed estates will learn, that in this state, overgrown fortunes are not to be rendered perpetual ; and this court will perceive that they are but carrying out the principles upon which our system of laws relating to real estate is founded. "It is not surprising," say the revisers, "that powers should be favored in England ; for the continuance of the landed property of the kingdom in the hands of its aristocracy, is the basis upon which the monarchy itself may be said to rest ; but with us it should never be forgotten that it is the partibility, the frequent division and unchecked alienation of property, that are essential to the health and vigor of our republican institutions." Never was there a sounder sentiment uttered, nor in more appropriate terms. The partibility of real estate, the absolute power of alienation, is the basis upon which republican institutions must rest in this country not only, but throughout the world.

Before I leave this subject, I must be indulged in a single remark in relation to the revisers' reports. I have quoted freely from them, because they are the fountain head of information as to the intention of the legislature. It is only by taking a view of the whole system, that we can judge correctly of any of its parts. In those reports we have an expose of the old system, its defects pointed out, and the remedies proposed. It is by keeping these objects constantly in view, that we can most effectually carry into operation the intentions of the legislature.

I will now recapitulate the points upon which I rest my opinion.

1. Assuming that the trust in favor of the twelve nephews and nieces is authorized at all, for any time, by the 3d subdivision of the 55th section, I have endeavored to show that the estate is rendered inalienable by the devise to the trustees, which by the devise itself necessarily continues during the continuance of twelve lives.

I have endeavored to show that the absolute power of alienation is also suspended by the creation of the remainder in favor of the grand nephews and nieces, to be vested in possession two years after the death of the survivor of the nephews,

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

and nieces; and that this remainder was void in its creation. That the estate in the trustees, if authorized by law was not void; but that it would in that case be the duty of the court, so to construe it as to sustain the trust during the continuance of the lives of two of the twelve nephews and nieces— that the right of the twelve nephews and nieces, to enforce the trust in chancery, ought not to be likened to a legal or equitable estate; that their interest is inalienable; but if otherwise, the estate itself would not be alienable—that the idea of cross-remainders in the right which the twelve nephews and nieces have to enforce the trust in equity has no real existence, but is entirely fanciful; but if real, the devise to the trustees being expressly an estate in joint tenancy, cannot be construed a separate devise, or rather twelve separate devises, being one in favor of each of the twelve beneficiaries of the trust—and that if the interest of the twelve nephews and nieces is to be assimilated to an estate in lands, it must be subject to the restrictions upon future estates; and having the effect to suspend the alienation of the estate for a longer period than is allowed by law, it was void in its creation, and consequently that the trust being at an end, the trust estate itself is at an end.

2. Under my second general head, I have examined the 55th section and the intent of the legislature in the 3d subdivision, and have endeavored to show that the words *apply to the use of* do not mean *to pay over*, and consequently that the object of the trust in the devise in question is not sanctioned by the Revised Statutes, but is such as the law cannot approve; and that the trusts authorized by that subdivision are intended to be active *trusts*, in which the agency of a trustee is indispensable for the purposes of the trusts; not to constitute a person his own trustee, nor to effect a purpose disapproved by the law, to render real estate inalienable.

3. Under my third head, I have endeavored to show that the trust attempted to be created by the devise in question cannot be sustained as a power in trust: 1. Not as a general power in trust, because such a power contemplates an absolute sale and division of the proceeds, and because such a power cannot be executed by the grantee thereof for his own

benefit; 2. Nor as a special power in trust; *first*, not under the first subdivision, because it does not authorize a disposition, limited to be made to any person or class of persons other than the grantees of the power; and *second*, nor under the second subdivision, because the grantees of the power are designated as entitled to the benefit to arise from the disposition. In short, that no trust is valid as a power in trust, if to be executed by the grantee for his own benefit. It is then beneficial.

In any view of the subject which I have been able to take, I cannot avoid the conclusion that the devise, in so far as it conveys a trust estate for the benefit, and to continue during the lives of the twelve nephews and nieces, is entirely void, and that the estate vests in the heirs at law.

The validity of the legacies and annuities was not argued; but if my premises are correct, the annuities must also fall, as depending upon the same principles with the rights of the twelve nephews and nieces. They depend upon the trust for the lives of the twelve nephews and nieces, and render the estate inalienable; and resting upon the same rules as future estates in land, are void in their creation. The legacies to the Theological Seminary and to St. Philip's Church are good, as clearly authorized by the 2d subdivision of the 55th section. I state these conclusions as to the legacies and annuities as corollaries from the principles above supposed to be correct, and not as being any part of the present adjudication.

My opinion is, that the decree of his honor, the Chancellor, be reversed.

By Mr. Justice NELSON. The first question to be considered and decided is, whether the *trusts* raised by the first and second clauses in the will, for the benefit of the twelve nephews and nieces, come within any of the provisions of the second article of the Revised Statutes regulating these interests. If they do not, then it follows they are void, unless they can be preserved and executed under the next article as a *power*.

The 45th section expressly abolishes all uses and trusts, except as authorized and modified in that article; and it is declared that every estate and *interest* in lands shall be deem-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

ed a *legal right*, cognizable as such in courts of law, except when otherwise provided in the chapter. We must there-fore look to the provisions of this article alone, when search-ing for authority, express or implied, to create this trust.

The 55th section authorizes the creation of express trusts for four specified purposes. The 3d subdivision, to receive the rents and profits of lands and apply them to the use of any person, during the life of such person or for any shorter period, subject to the rules prescribed in the first article. This is the only section or clause within which it is pretend-ed the trust can be brought or supported as such. The clause was originally reported to the legislature as follows : " and apply them (rents and profits) to the education and support, or support only," of any person, &c. It was amend-ed by striking out *"support only"* and inserting *"either,"* so that it read, as passed and took effect 1st January, 1830, " and apply them to the education and support, or either," of any person. In about three months after the section went into operation, it was amended again by striking out the words " education and support, or either," and substi-tuting simply the word " *use*," giving obviously much greater scope to the power in creating the trust ; the legislature deemed it, no doubt, too much restricted as it was originally passed. It should be borne in mind, that while this clause, permitting by far the most important trust in the article, un-derwent very material modifications, the other sections re-mained as originally reported ; and it will then be perceiv-ed that some, if not most of the apparent incongruities and difficulties in the practical operation of the article as a sys-tem, are to be traced to this circumstance. As the clause was originally reported and passed, the object of it was to permit the creation of trusts to receive rents and profits, and apply them to the education and support of persons not qualified from age, condition, or some infirmity, to take charge of the fund themselves. This is sufficiently clear from the qualified language used ; and the propriety and even absolute necessity of allowing the creation of such a trust was too obvious to have escaped either the revisers or the legislature. It was recommended and defended upon the above ground.

The 60th and 63d sections are intelligible and appropriate in connexion with the 55th as thus understood. They were enacted more effectually to carry out the purposes of the third clause. By the 60th, every express trust, valid in its creation, except as otherwise provided, shall vest the whole estate in the trustees in *law and equity*, and the persons for whose benefit the trust is created, shall take no *estate* or *interest* in the lands, but may enforce it in equity. This positive and negative exclusion of any legal or equitable interest, or any interest whatever in the land, would seem to be sufficient to preclude alienation by *cestuis que trust;* which no doubt was the object of the section. But for abundant caution the 63d was also adopted. It provides that no person beneficially interested in a trust for the receipt of the rents and profits of land, can assign or in any manner dispose of such interest. The 65th section makes every sale, conveyance, or other act of the trustee in contravention of the trust, absolutely void. Now, taking all these provisions together, as a system, and they skilfully accomplish the purposes intended; the different provisions harmonize, and the fund is effectually secured from dissipation, by the inexperience, improvidence, or weakness of the beneficial owner on the one hand, and from, perhaps, less excusable infirmities of the trustee on the other. We discover the reason and value of each provision, and can cheerfully give to them full scope, and practical operation. When the restriction of the trust to the two objects, education and support, was removed, and a general one was authorized, the effect, I think, of the amendment of 1830, the good sense, and direct use of the 60th and 63d sections, are not so obviously apparent.

When the office of the trustee may be confined, as in this case, simply to collect the rents and profits, and pay them over, without the exercise of any discretion in their application, all the provisions to prevent the beneficial owner from disposing of his interest, do not seem to be so material; and yet they may be. A prudent father or benefactor may consistently confide to his son, or other object of his bounty, the absolute control of the annual rents and profits, and withhold from him the disposition of the estate. At first I entertained doubts

whether this trust came within the terms and meaning of the 55th section, but upon further consideration, I am inclined to think it does. The mode of applying the rents and profits, as well as the amount of them, as the section now stands, is not limited or made material, and rests in the discretion of the person creating the trust. Even under the restricted clause, he might, I think, have directed as has been done here, the rents and profits to any amount specified, to be paid over at fixed periods, for the education and support, or either, of any person—leaving the application of them to himself. There was nothing in the clause necessarily preventing this. The legislature, I think, could not have meant that a parent should be compelled, in creating a trust for the education or support of his son, to place him at the mercy of an undefined discretion in the trustee ; and thereby exclude the exercise of all discretion on the part of the parent. The reverse would seem to be the more reasonable construction of the clause. The legislature meant that the person creating the trust might exercise the discretion, if he pleased, and regulate the administration of the trust.

The difficulty in the clause in its original enactment, consisted in restricting the power to create the trust to the two specified objects, and which necessarily excluded by implication, any discretion over the trust fund beyond them. The whole of the rents and profits might not be exhausted in education and support. What was to be done with the excess? Striking out the limitation left the object undefined. This enlargement, however, of the trust, has not altered the effect or bearing of the 60th and 63d sections. They are still as applicable and controlling, as regards the interest of the beneficial owner, as before. Indeed, his condition and the nature of his interest are in no way changed. He may now exact from the trustee in equity, the amount of the rents and profits, directed to be applied to his use, be they more or less, as he before could those directed to be given to him for his education and support. But the principal trust fund, in the hands of the trustee, is beyond his reach.

It was said on the argument, that the 63d section was intended as a restriction upon the person, and not upon the estate, and that as the devisor in this case authorized the *cestuis*

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

*que trust* to alien, the prohibition is removed. I shall not stop to inquire whether such authority is or is not given in the will, as I am satisfied the disability is annexed to the fund. It must be remembered that no trusts now exist in this state out of this second article, except those created before it became a law. They are now the creature of the statute; and to be sustained by the court, must not only be in conformity to the provisions authorizing their creation, but subject to the restrictions the statute has imposed. The legislature must have deemed all of them essential to constitute a perfect system. When we recur, also, to the original object of the section, and the nature of the trust as it then existed, and as has been briefly stated, we are confirmed in this construction. No trusts were intended to be authorized under this third clause, except in cases where the prohibition against assignment of the principal fund was deemed necessary. It was to allow a trust to be raised in cases where the beneficiary was incapable of judiciously managing the fund himself. Another consideration also is decisive to my mind. If the person creating the trust may at discretion lodge a power in the trust instrument, and thereby enable the beneficial owner to control and dispose of the trust term, or principal fund, then we have, to all intents and purposes, a revival of trust estates, as they before existed in this state. The case would fall within the very definition of a formal trust, which is defined to be a right in equity to take the rents and profits of lands, whereof the legal estate is vested in some other person; and to compel the person thus seized of the legal estate, who is called the trustee, to execute such conveyances of the land as the beneficial owner shall direct. Assuming that the beneficial owner within the trust under the 55th section possessed the power to assign his interest, a court of equity would be obliged to compel the trustee to convey to the purchaser the legal title; otherwise the power of sale would be nugatory. The legal estate might be in one person, and the equitable, with the power of controlling the legal, in another, under the statute, and all the attendant evils so frequently lamented, and which were believed to have been removed, growing out of the separation of the two estates, would remain to an indefinite extent. One great object of

the article on uses and trusts was to cut up the separation
of the legal and equitable title where no valuable purpose
was effected by retaining it.

In this case, if the nephews and nieces can dispose of the
trust term, of what use could it be to any one to put the legal
estate into the hands of the trustees? Why not devise it to
them at once, without the useless machinery of passing it
through the hands of trustees to purchasers? It is true the
assent of a majority required in the will is some check; but
if a trust can be thus raised with a qualified, it may be with
an absolute power of assignment. By applying strictly the
60th section to the trusts under the 55th, and thereby pre-
venting any assignment of them by the beneficial owner, we
shall go far in confining the creation of them to the real ob-
jects for which they were originally designed, and at the
same time accomplish all that the necessity of society or
convenience can require. It is surely no hardship if we
compel a man, to give to a son, or other object of his boun-
ty, an estate directly, of which he is willing to give him the
absolute disposal through the instrumentality of a trustee.

Believing the trust to be expressly authorized within the
provisions of the second article, I am brought to the consid-
eration of the only difficult question, upon my view of the
case, and that is, whether or not this trust term violates the
provisions of the Revised Statutes, designed to prevent the
creation of perpetuities? That it would be unexceptiona-
ble in this respect, according to the rule of the common
law, is not doubted; but the statute has materially modi-
fied that rule. It allowed property to be tied up; that is,
the power of alienation to be suspended, for any number
of lives in being at the creation of the estate, (which is at
the death of the testator in case of a will,) and the period
of minority, and gestation. This enabled any person to
keep his estate in his family during the period of the long-
est liver of the persons whose lives he selected, and twen-
ty-one years and nine months. I did not understand the
position taken, and I think satisfactorily maintained by
the chancellor in his opinion, now to be seriously disputed,
that under the 15th section, the absolute power of alien-
ation could not be suspended beyond two lives in being

at the creation of the estate ; and that this prohibition applied to both present and future estates. The 16th section makes a single exception, which it is not material to notice. The 14th defines what is meant by the suspension of this power ; it is suspended " when there are no persons in being by whom an absolute fee in possession can be conveyed." Has then the power of alienation been suspended beyond two lives in being at the creation of this trust term by the testator, upon a proper and legal construction of the language of the will ?

In order understandingly to answer the question, we must inquire into the nature of the estate or interest devised. On the part of those who maintain the validity of the will, it is contended it is in the nature of a tenancy in common with cross-remainders, that is, that each holds an undivided twelfth part of the rents and profits for life, with cross-remainders, that give to each survivor a portion in the share of the deceased co-tenant. Those contending against the validity of the will, maintain that the estate is in the nature of a joint tenancy, a distinguishing incident of which is, the estate being an entirety, but one in law, on the death of a joint tenant the survivors or survivor still enjoy the whole. It will be seen that the practical operation upon the nephews and nieces in either view of the nature of the estate devised, is the same, the interest of any one dying goes over to the survivors. It is contended, however, that the mode of arriving at the result is very material in regard to the validity of the trust. The testator devised all his estate, both real and personal, to his executors and trustees, and the survivors of them, their heirs and assigns forever, as joint tenants, and not as tenants in common, in trust for the purposes afterwards declared. There were thirteen of them, the twelve nephews and nieces and the brother of the testator. Superadded to this express grant is the positive enactment of law, contained in the 60th section before referred to, and " shall vest the whole estate in the trustees in law and equity, subject to the execution of the trust," and the negative provision that the nephews and nieces " shall take no estate or interest in the lands, but may enforce the performance of the trust in equity." Upon a strict and literal construction of this section, it is obvious the nephews and nieces

have but a chose or right in action. The expression, "no estate or *interest* in the lands" would seem entirely to exclude it when the interests of the *cestuis que trust* are the subject of consideration. That is not, however, in my view, the just and sound construction of the section, when we are engaged in ascertaining the interest or estate of the nephews and nieces, to the enjoyment of which they are entitled. The language was used in the section, when the legislature were seeking to interpose obstacles against disposition and assignment by the beneficial owners, and should be construed with reference to the object of the provision, *secundum subjectam materiam.* By the 55th section, the express trust allowed by the third subdivision, is made subject to the rules prescribed in the first article. That article is devoted to the creation and division of legal estates, and it seems necessarily to follow, that the rules there prescribed concerning these estates, so far as they can be consistently applied, are to govern the interest, or trust, or whatever other name the right may be called, that belongs to the nephews and nieces, under the second article.

It may be observed that the application of rules concerning legal estates to trusts, in a court of equity, is not original in the statutes. The beneficial owners, soon after the statute of uses were, and ever since have been, regarded in that court as the legal owners, and the trust regulated in the same manner as a legal estate. We have the authority of Lord Mansfield, that the *cestui que trust* is actually and absolutely seized of the freehold in the consideration of that court; that the trust is there the land, and that the declaration of the trust is the disposition of the land. *Cruise, tit.* 12, *ch.* 2, § 1 *to* 6 *inc.* Assuming, then, that in determining the nature of the interest of twelve, that is, whether it must be deemed a *joint tenancy* or *tenancy in common*, we are to be governed by the rules applicable to legal estates, it becomes necessary to look at some of the principles and authorities concerning them.

At common law, an estate in joint tenancy, says Sir W. Blackstone, is where lands or tenements are granted to two or more persons to hold in fee simple, fee tail, for life, for years or at will. In consequence of such grants, an estate is called an estate in joint tenancy, which signifies an union, or conjunc-

tion of interest. Each joint tenant has the entire possession of every parcel and of the whole ; and this union and entirety of interest and possession has given rise to the principal incident to the estate, which is the right of survivorship. The interest being not only equal or similar, but also one and the same, on the death of his companion, the sole interest in the whole remains to the survivor. 2 *Black. Com.* 182 *to* 187. 1 *Co. Litt.* 840, 845. 2 *Cruise,* 503, 4. Tenants in common are such as hold by several and distinct titles, but by unity of possession, because none knows his own severally, and therefore they all occupy promiscuously. Lord Coke draws the true distinction between these estates, in his commentaries on Littleton. The essential difference, he says, between joint tenants and tenants in common is, that joint tenants have the land by one joint title, and in one right ; and tenants in common by several titles, or by one title and several rights ; which is the reason joint tenants have one joint freehold, and tenants in common have several freeholds. 1 *Co. Litt.* 875, In the more brief language of Mr. Preston, joint tenants have one estate in the whole and no estate in any particular part. Tenants in common have several and distinct estates in their respective parts. *Preston on Estates,* 137.

Before we refer to some authorities on this branch of the case, we will recur to the material words of the will : " I direct my executors and trustees to pay over and divide (the rents and profits) to and among my nephews and nieces, (naming the twelve) during their natural lives, and to the survivors and survivor of them, *equally to be divided between* them, or such of them as shall from time to time be living, share and share alike." The case of *Fisher* v. *Wigg,* 1 *Ld. Raym.* 622, the words were—and after her decease (his wife) " to the use of B., C., D., E. and F., his children, equally to be divided among them, and their respective heirs and assigns forever." The question was, whether the children took as joint tenants, or tenants in common. The case was elaborately examined by the judges ; Turton and Gould maintaining it was a tenancy in common—Ch. J. Holt, that it was an estate in joint tenancy. He conceded the position to his brethren, if these words had been in a will.

In *Rigden* v. *Vallier*, 2 *Ves. sen.* 252, the words were, " my said two daughters, M. and H., to have the said last mentioned lands, to them and their heirs forever, equally to be divided between them." Lord Ch. Hardwicke said, this question depends on a very litigated and disputed point in the books. He considered the words " equally," or " share and share alike," when found in a will, as creating a tenancy in common. He said the courts had leaned against survivorship, and therefore had created a tenancy in common, by construction, on the intent of the parties.

In *Hawes* v. *Hawes*, 2 *Ves. sen.* 13, the words were " to his three children and their heirs when he, she and they attained the age of twenty-one or married, equally to be divided between them, share and share alike as tenants in common, and not as joint tenants, with benefit of survivorship." The will then directed the rents and profits to be for their maintenance and education during their minority ; one of the three children died under age, and the question was, whether his share went to the survivor. The lord chancellor said, that joint tenancies were not favored, because they were inconvenient estates, and made no provision for famillies in consequence of the incident of survivorship. The only difficulty in this case arose from the words, with benefit of survivorship, that followed those indicating a severance of the interest. He gave effect to them, however, by holding that the share of the deceased child should go to the survivors, and not to the heir at law, deciding that there was a joint tenancy in the rents and profits during the minority.

In the case of *Clerk* v. *Clerk*, 2 *Vernon*, 323, the words were, " that his sisters, T. and A., might live in the capital house, and equally divide the rents and profits of the four farms betwixt them, and the whole to the survivor of them." It was resolved that this was a joint estate, and not a tenancy in common ; for although the words equally to be divided betwixt them, in a will, made a tenancy in common by way of construction on the intent of the testator, yet if afterwards it is declared it should go to the survivors, that would oust such construction, and it would be a joint estate.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

In *Baker* v. *Giles*, 2 *P. Wms.* 280, the words were, " to the use of the testator's two nephews, and the survivor of them, and their heirs, equally to be divided between them, share and share alike." Lord Ch. King, after referring to the rule that in the construction of wills every word should have effect, if poss.ble, said, the first part of the devise being to two and the survivor of them, made them plainly joint tenants for life; and he so decided ; under the other words the heirs, took a tenancy in common in the inheritance.

In *Rose* v. *Hill*, 3 *Burr.* 1381, the words were, " to his five children, and the survivors and survivor of them, and the executors and administrators of the survivor of such survivors, share and share alike, as tenants in common, and not as joint tenants." Lord Mansfield said, " an estate to more than one, with a benefit of survivorship, was a joint tenancy." But he put the case upon the express words, that the estate should be held as a tenancy in common.

In *Armstrong* v. *Eldredge*, 3 *Br. Ch.* 215, the words were, " in trust to pay the interest and profits thereof to his four grand daughters, equally between them, share and share alike, for and during their respecting natural lives, and after the decease of the survivor of them, in trust, to pay the principal money to and among the children of his said grand daughters, equally to be divided between them, share and share alike." Two of the grand daughters died, leaving children. It was decided the two living grand daughters took the whole interest by survivorship ; for notwithstanding the words, equally to be divided, share and share alike, the context shewed that a joint tenancy was intended, as the interest was to be divided among four, whilst they were alive ; three, whilst they were alive ; and nothing was to go to the children whilst the mothers were living.

In *Blissel* v. *Cranwell*, 1 *Salk.* 226, the words were, "I give to my two sons, and their heirs, and the longest liver of them, equally to be divided between them and their heirs." This was decided to be a tenancy in common, according to the intent of the testator ; it being manifest he meant to provide not only for his two sons, but for their posterity ; that not only his

sons, but their heirs should have an equal part, the words being, " equally to be divided between them and their heirs. '

In *Russel* v. *Long*, 7 *Ves.* 551, the words were, " to pay, apply and dispose of the whole sum, principal and interest, unto his three sisters, and the survivors and survivor of them, during their natural lives, share and share alike ; or permit his said sisters, and the survivors and survivor of them, to receive and take the same in equal parts, shares and proportions, to and for their and her separate use and benefit, the survivors and survivor, or their and her heirs forever." One of the sisters died before a distribution of the property, which was personal estate. The master of the rolls declared it to be in the nature of a tenancy in common.

We might refer to numerous other cases upon this " litigated and disputed point in the books," as determined by Lord Hardwicke, but they would shed no additional light upon the question. It is clear, that where the words " equally to be divided," " share and share alike," "to and among," and others of like import, stand alone in a will, they indicate a severance of the estate devised, and establish a tenancy in common. In connexion with a peculiar phraseology of the will, they may also so strongly indicate an intention of a severance of the estate, as to compel the court to reject the term survivor, or other repugnant expressions ; as in the case of *Blissel* v. *Cranwell*, and *Russel* v. *Long*. In the former case the devise clearly shews that the testator intended to provide for the heirs of the two sons, which was repugnant to the idea of a survivorship, and joint tenancy. In the latter, the estate being personal, and the principal and interest directed to be paid to the three sisters in equal parts, shares and proportions, for their separate use, and their heirs, afforded very conclusive ground against the claim of survivorship. It is equally clear and well settled, that if the testator intended to give the estate to the survivors or survivor of the devisees named, the idea of a severance is excluded, and they take an estate in joint tenancy, as was declared in the cases of *Clerk* v. *Clerk*, *Baker* v. *Giles*, and *Armstrong* v. *Eldredge*, even against words of a contrary import. There is perhaps no general or useful rule to be extracted from the cases. The intent of the testator being

the cardinal object, and that to be derived from the language of the will, giving to every word its reasonable weight, the reasoning of the court, and the decision must necessarily depend more or less upon the circumstances and language of the particular case. Another observation may also be made upon the numerous cases that, one difficulty common to them all, was to ascertain whether survivorship was within the intent of the testator, and the leaning of the court being against it because it cut off the heirs, and did not provide for posterity, a construction was sought after, that would create a severance of the estate. But where the intent of survivorship was plain, no such reason existed, and other apparently repugnant words were made to yield.

In this case the language of the testator is so explicit that no question can be raised as to the intent of survivorship. The estate must remain in the survivors till the whole vest in the last, before it goes over, and after his death, is then distributed among the descendants. The postponement of the severance and distribution till that probably remote event, was a primary object, obviously the most prominent in the mind of the testator. The scheme as well as the language of the will, favors the conclusion that it was the design of the testator to keep the estate together; and that it should be held in the nature of a joint tenancy. The whole fund is placed in the hands of the nephews and nieces, with one exception, to be jointly managed during the trust term. They are the persons who are entitled to the enjoyment of the income that arises out of the joint estate, and the expenses and disbursements are to be first deducted, and annuities paid before any distribution is to be made. No such division among themselves is contemplated till then. It is the "residue" of the rents and profits that is to be paid among them, the survivors and survivor. The words "equally to be divided," "share and share alike," have no application or effect, from the express terms of the will, till the income is supposed to be collected, and the annual charges upon it satisfied. A provision that the share of each should bear an equal proportion of these charges, would have been a natural one, if the idea of a several estate had existed in the mind of the testator. A distribution of this

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

" rest and residue" of the rents and profits, is not necessarily a severance of the beneficial interest in the trust term. The latter must be regarded, when we are endeavoring to ascertain the nature of the estate devised. I freely concede, that if the words directing a division of the annual income stood alone, they might justify the construction of an intent to sever the estate, as courts lean against survivorship. But other words precede and follow them, expressly providing for this incident to a joint tenancy. The rents and profits are to be paid to the 12, and to *the survivors and survivor of them*, language, which upon all the cases, so far as I know, was never doubted, create this estate. Equally to be divided between them, or *such of them as shall from time to time be living*, share and share alike, again in terms provide for the survivorship ; that is, the income is to be paid to those happening to be alive at the time. As was said in *Armstrong* v. *Eldredge*, the context shews a *joint tenancy* was intended, as the interest was to be divided among 12 while 12 were living, 11 while 11 were living, 10 while 10 were living, and so on, excluding necessarily the idea of any permanent severance of the estate between the 12, 11, 10, or any other number. Other parts of the will also confirm this view. The testator directs the real estate out of the city of New-York, and all his personal estate, to be converted into real property in the city ; thus turning the whole into real estate, and concentrating it at one place, to be held jointly by the trustees. After tying it up in the hands of the nephews and nieces, till the death of the last survivor, he makes provision for its distribution ; directs particularly the mode. In order, he says, to a fair and just division and distribution of my estate, I do direct, &c. And such division and distribution shall not take place until two years, &c. My executors shall cause a fair and equitable distribution, reasonably implying a supposed previous joint and undivided estate. I may add that in arriving at the conclusion that the estate is one of joint tenancy, we give effect to all the words in the will, to the explicit language of survivorship, a leading intent of the provision ; and to the other words, by referring them to the distribution of the

balance of the income, when paid over to the nephews and nieces, and the survivors, after deducting all charges upon it.

I have come to this conclusion without overlooking the 44th section of the first article, and intend to admit its application as one of the rules concerning legal estates referred to, and to be regarded when determining the nature of the estate in the trust. By that section, every estate granted or devised to two or more persons in their own right, shall be a tenancy in common, unless expressly declared to be in joint tenancy. Now if my construction given to the language of the will be correct, according to the intent of the testator, a joint tenancy has been expressly declared. The words *joint tenancy* need not be used in order to create the estate; any other expression clearly importing such an intent must be sufficient. The statute did not mean to establish a mere verbal distinction. Before its enactment, as has already appeared, a grant or devise to two or more, without any other words, created a joint tenancy. It has reversed the rule by declaring the estate shall be a tenancy in common. This is the whole amount of the provision. If there be other words in the instrument, which, upon a legal construction, necessarily create an estate in joint tenancy, the statutory inference is rebutted. A joint estate is then expressly declared by the grantor or devisor, within this section.

But it is said there is another mode of carrying into effect the intent of the testator as to survivorship, compatible with the idea of a severance of the estate between the twelve, i. e. by a tenancy in common, with cross remainders. It will be necessary, therefore, to examine briefly this doctrine. Until the case of *Perry* v. *White*, decided 1778, *Cowper*, 777, the law was understood to be, that cross remainders could not be raised by implication between more than two persons; and it had been frequently so decided. In that case Lord Mansfield held, that wherever cross remainders are to be raised by implication between two and no more, the presumption is in favor of cross remainders; where they are to be raised between more than two, there the presumption is against them. But that presumption may be answered by circumstances of plain and manifest intention either way. This, he said, was a qualifi-

cation of the rule laid down in former cases, for they seem to say that there shall not be cross remainders between more than two. It was said, on the argument, that they are expressly given in this will; or if not, the presumption against them is rebutted by that part of it directing survivorship. But this is assuming the whole point in dispute. If the estate is in joint tenancy, then no cross remainders need be implied to carry it on to the survivors, and surely there are none in express terms.

I have examined many cases in the books involving a consideration of this complicated doctrine, and will not say that none can be found, but none were cited, nor have any come within my researches, where the devisees took an estate, as a class, to them and the survivors and survivor, in terms cutting off the heirs till the death of the last survivor, in which cross remainders were implied, to fulfil the intent of the will. There are many cases to be found, some of which have already been referred to, where this has been done, by considering the devisees as holding in joint tenancy. This answers all the purposes intended.

Where an estate is given to two or more, and their heirs, and the survivor of them, and in default of such heirs then over, cross remainders are necessarily implied, to carry out the intent of the will. As the estate was not to go over till all the descendants of the devisees became extinct, in order to carry it on, throughout perhaps numerous branches of the families in the line of descent, before their blood became extinct, this complex doctrine was devised. *Phipard* v. *Mansfield, Cowp.* 797. *Alberton* v. *Pie,* 4 *T. R.* 710. *Watson* v. *Fox,* 2 *East,* 36. *Roe* v. *Clayton,* 6 *East,* 628. 1 *Saund.* 180, *n.* 6. It will undoubtedly perform that office, however multiplied the descendants or the branches, as cross remainders may now be raised between any number; but it is apparent the application of the rule in the case of a long line of descent and numerous progeny, must be appalling, and may be out of the reach of human capacity. The power of mathematics would fail to trace or comprehend the practical operation or result.

It is not surprising, then, that courts at first were deterred from extending them further than between two persons and their descendants; and that the presumption of law exists still against them beyond that number. In *Claches' case, Dyer*, 330, the court say that no implication of any cross-remainder could be raised, when an express and special gift and limitation are made by the devisor himself. The same principle was applied in the recent case of *Wooler* v. *Andrews*, 2 *Bingh.* 126. The devise there was in trust, to permit six children to receive one sixth part each, in the rents and profits during their natural lives, and after decease, to their issue. And further, *that in case any or either of his said six children should die without leaving any lawful issue, then his or her share to go to the survivors or survivor.* All died but the defendant, and one only left issue, a son, the plaintiff. He claimed a moiety of the rents with his uncle, on the ground that the surviving children of the testator took the shares of those dying without issue, by cross-remainders; and it was contended the heirs of a deceased child would take the same share as their parent would have taken if living. This was conceded to be the effect, if cross-remainders were allowed. But Chief Justice Best said, though the court will imply cross-remainders, where there appears to have been an intention on the part of the testator that the property should be so disposed of, we cannot imply them here, because the testator expressly gives the property to the survivors or survivor, that is, to the survivors for life, and afterwards to the last survivor; that the accruing shares passed on to the defendant, as survivor. He repudiated the idea of raising cross-remainders between the six children, for the purpose of giving the shares falling in to the issue of a deceased one, as well as to the survivors, and put the case upon the ground that the rents and profits were held in this respect in the nature of a joint tenancy, from the express language that the share of a deceased child without issue should go to the surviving brothers and sisters.

Without pursuing this branch of the examination further, it appears well settled that cross-remainders are never raised by implication, unless upon the plain and manifest intent of

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

the testator, nor when a different mode of directing or vesting the estate has been expressly declared by him. They are never implied in a deed. From an attentive examination of the several provisions of the will, (and the language is not ambiguous,) we cannot say the testator intended to raise cross-remainders in this case. They are not necessary to accomplish any general or particular purpose he had in view. The persons who were to enjoy the rents and profits are all designated, and it is declared, in the most explicit terms, how they are to be received. After deducting charges and annuities, the trustees are to pay them to the twelve, and the survivors or survivor in equal proportions. There is no permanent severance of their interest, nor can there be, consistent with the language used, because there is no fixed division among any number; and it is only upon the idea of a several estate that cross-remainders can be necessary. The income is to be paid directly to those living at the time, to 12, 11, 10, as the number may happen to be. How can it be said that cross-remainders are plainly and manifestly implied, or that they are necessary to carry a share falling in, over to the survivor, when every thing is expressed. The court say, in *Claches' case,* no implication of any cross-remainder could be raised, when an express and special gift and limitation are made by the testator himself. Nothing can be more express and specific than the limitation in this case. All presumption is excluded. Every intent of the testator and the mode of carrying it into effect is declared.

If I could have arrived at the conclusion that the testator intended to sever the interest of the nephews and nieces, and thereby create a tenancy in common, giving to each an estate in severalty for life, it is possible that under the rule of approximation in the construction of wills, the validity of the trust term for the life estates might be maintained. I must confess, however, I am not prepared to concede the position. I do not intend to examine it, but will state some of the difficulties. This qualified execution of the will grows out of the disposition of courts to carry into effect the intent of the testator, as far as consistent with the rules of law. The general principle is, that in construing wills according to such

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

intent, courts should look at the general intent, and give effect to that; and if there is a secondary or particular intent which interferes with it, the whole is to be reconciled as far as can be; but, at all events, give effect to the general intention. Now, upon the doctrine of cross-remainders, as explained by the learned chancellor, the life estates are saved by cutting off all the remainders but one. The consequence is, that the several estates of the twelve, after that of the one first dying, instead of going over to the survivors, descend to the heirs at law. The exceptionable part of the trust is thus turned into a separate estate, to enable the court to cut it off and save the rest. In this way, however, I am unable to comprehend how any one provision of the will, save the annuities and other independent bequests, can be carried into execution according to any general or particular intent of the testator. Not as to the nephews and nieces, because, instead of enjoying the whole fund during their lives and the survivors of them, but one twelfth and one eleventh of one twelfth is the utmost that will be left in the hands of any one, and of the last survivor. What is to become of the share of the last one, upon his death? Is it to descend to the heirs at law as the others have, or to be distributed by the trustees in the manner particularly directed in the will? In the mean time, how are the annuities to be paid by the trustees, when the fund upon which they depend is passing beyond their control, upon the decease of each? When the trustees are reduced below five, and the grand nephews are brought in, out of what fund will their one-sixteenth be taken? Is it not obvious that upon this scheme, after considerable reduction of the number, the fund remaining in the hands of the trustees will not be adequate to bear the burdens upon it, if the annuities are to continue? In this way, the general intent of the testator, which obviously was to secure to the twelve the enjoyment of the rents and profits of the entire fund, during their joint lives, and after that, a distribution of it among their posterity, is altogether defeated. The twelve hold but the twelfth of the estate separately for life, besides the fraction; and the entire mass, at the death of all except the last, instead of being distributed to their posterity, has already gone to a different

class of persons, to wit, the heirs at law. There is not even a particular intent saved by this construction. Can it be believed, if it had been presented to the mind of the testator, that he was giving but one-twelfth of the rents and profits to each nephew and niece for their lives, with all the consequences that must follow such a disposition, he would have directed it? It seems to me, we would not only be making a will for him, but making one that he or any other rational man would instantly reject—one that is incoherent, repugnant and impracticable. As was said by the master of the rolls, in *Leake* v. *Robinson*, 2 *Merivale*, 388, " If I could at all alter the will, I should be inclined to alter it in the way in which it seems to me most probable that the testator himself would have altered it." That would have been, if he had known the rule of law, judging from what he has done, to limit the enjoyment of the whole estate to the twelve for two lives in being, and after that a distribution as directed. That would undoubtedly come much nearer his intention than is effected by the scheme of cross-remainders. Indeed, without protracting this discussion, it may be said that no one can read the will without its being apparent to him, the scheme depends upon the preservation of the trust fund entire. Excepting the two legacies of $20,000, and $1000, and perhaps some independent bequests in the codicil, there is not another disposition made, but what is expressly or necessarily dependant upon it. If it falls, the whole must fall with it. Under the idea that we are carrying into effect the intent of the testator, as far as is consistent with the rules of law, in regard to the twelve, we are not to shut our eyes to the consequences upon other parts of the will. That these are thereby made inconsistent and impracticable, afford at least some ground for saying no such intent could have existed as that we are asked to effectuate.

I have no difficulty in conceding, if the trust term had been valid in this case, and the ultimate remainder over void, that under the rule of approximation, the term would have been sustained. The cases of *Spencer* v. *Duke of Marlborough*, 5 *Bro. P. C.* 572, *Humberston* v. *Humberston*, 1 *P. Wms.* 332, *Chapman* v. *Brown*, 3 *Burr.* 1626, *Pitt* v. *Jackson*, 2 *Bro. C. C.* 31, and others, would have afforded abundant authority.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

The will, then, as far as sustained, would have been consistent and reasonable, as well as in pursuance of the testator's intent.

I put the case however, for myself, upon the broad ground that, according to the language of the will, when tested by established rules of construction, and also upon adjudged cases so far as they are applicable, the twelve took an estate in the nature of a joint tenancy, and, therefore, to be held by them and the survivor of them for twelve lives; that under the 63d section it was inalienable during that period, so far as their interest was concerned; and as to the interest of the trustees, not alienable at all under the 65th section; and that the power of alienation was suspended for more than two lives in being, to wit, for twelve lives at the creation of the estate, and therefore a violation of the 15th section.

If the trust term is to be deemed an estate in the nature of a joint tenancy, it is an entirety—but one estate. The interest the twelve hold in it, is one and the same; and under no rule of construction that I have been able to find, can it be split up for the purpose of carrying into effect the intent of the testator. If we could cut it down to a joint estate for two, instead of twelve lives, upon legal principles, and thereby bring it within the limitation of the perpetuities allowed by law, I do not know but I should be willing so to modify it. As before said, this would approximate nearer to the intention of the testator than any other proposed alteration. But after a diligent inquiry, I have not been able to satisfy myself that there is any principle or decision that would authorize such an interference. It would be arbitrary, and establish a precedent for courts, not to construe wills according to the intent of the testator as derived from a consideration of the language used to express it; but to make a will for him, such an one as we undertake to presume he would have made, if advised that his own was void as against law. This I cannot consent to do. Better that the intent of a testator should fail, in a particular case, than that the court should assume such arbitrary and undefined discretion over his estate. If we cannot execute the whole will, or some distinct and independent intent, the whole had better be declared void. The law

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

makes a better one than will usually be made by the court.
Assuming the estate to be one in joint tenancy, the court
below came to the conclusion that no part of the trust term
could be sustained.   From the result to which I am brought,
it is apparent the immediate objects of the testator's bounty,
the twelve nephews and nieces, are deprived of it ; and
they, or their ancestors, are obliged to take their estate in
common with the heirs at law.   I am, however, the more
reconciled to this result as to them, from the fact that other
objects of his bounty must also be deprived of it, or the es-
tate made valueless to a portion of the twelve.   For if they
take separate estates for life, the utmost contended for, in-
stead of their income increasing as their numbers diminish,
as provided for in the will, it decreases by descending to the
heirs at law.   If the annuities are to be continued, it is ob-
vious, after a considerable reduction of the number of the
nephews and nieces, and consequent diminution of the fund,
they may entirely exhaust it.   The longest liver of the twelve,
instead of enjoying the accumulated income of a princely
and growing fortune, might not receive enough from the
trustees for the necessaries of life, upon the proposed modi-
fication.   Upon the whole, without pursuing the examina-
tion further, I conclude :

1. That the trust in this case comes within the third sub-
division of the 55th section.

2. That the interest of the *cestuis que trust* is in the nature
of a joint tenancy for twelve lives, and that the power of
alienation is suspended during that time by the 6th section,
which is in violation of the 15th, limiting perpetuities.

3. That the estate in joint tenancy, being an entirety, the
twelve nephews and nieces having but one estate in the
whole, cannot be reduced to the limitation of two lives with-
in the 15th section, and the trust term is therefore altogeth-
er void.

4. That cross-remainders between the nephews and nieces
are not expressly declared in the will, and cannot be implied :
every intent being so clearly declared that nothing is left to
implication.

5. That if the estate of the twelve nephews and nieces
could be considered in the nature of a tenancy in common

with cross-remainders, the trust term would still be void, because, by cutting off the remainders and saving the life estates only, under the doctrine of *cy pres*, we should break up the trust fund, upon which the scheme of the will depends. It would be thereby entirely deranged, made inconsistent, unreasonable and impracticable; every general and particular intent of the testator would be defeated.

I am therefore in favor of reversing the decree of his honor the chancellor, and of the vice chancellor.

By Mr. Senator MAISON. The different devises and bequests in this will, including the ultimate remainder over, are valid at common law; and it has been very elaborately and learnedly argued that the Revised Statutes do not affect or control the provisions in this will, except so far as to render null and void the ultimate remainder over. *I agree with the chancellor* in the opinion, and for the reasons by him given, and by the chief justice more fully detailed, *that the remainder over is void.* The vice chancellor, before whom the cause was first argued, has considered the *cestuis que trust* as joint tenants, and the trusts in the will as valid and legal. The chancellor, on the appeal from the vice chancellor, considers the *cestuis que trust* as tenants in common, with cross-remainders, and decides that the trusts in the will cannot be fully carried into effect by reason of the provisions of the Revised Statutes, and reverses the decree of the vice chancellor. When judges of such learning and ability, after devoting to the case all their mental energies, in patient investigation and labored research, have been unable to harmonize in their views and opinions on this will, it cannot well be expected that those of more humble pretensions should be able to form an opinion which will meet with general satisfaction. After bestowing upon this case much anxious labor and deliberation, I am reluctantly compelled to disagree with both.

The first section of the article on uses and trusts, 1 *R. S.* 727, § 45, declares, that "uses and trusts, except as authorized, and modified in this article, are abolished." The reasons which induced the legislature to adopt this provision, are ably and eloquently set forth in the revisers' notes; they were to

simplify the law relative to real estates, to annihilate all the entangling perplexities, the complicated and abstruse distinctions, and palpable inconsistencies and contradictions to be found in our books, which has enshrouded the law relating to real estate in dark mysterious doubt, and to render that which was incomprehensible, complex and uncertain—plain, consistent and intelligible. Never were the powers of a legislature more beneficially exerted than when they applied the axe to the root of the evil, in abolishing all uses and trusts, except those specified in the provisions of the statute.

The 55th section, page 728, declares that express trusts may be created for four specified purposes : 1. To sell lands for the benefit of creditors ; 2. To sell, mortgage, or lease lands for the benefit of legatees, or for the purpose of satisfying any charge thereon ; 3. To receive the rents and profits of land, and apply them to the use of any person during the life of such person, or for any shorter term, subject to the rules prescribed in the first article of that title ; and 4. To receive the rents and profits of lands, and to accumulate the same for the purposes and within the limits prescribed in the first title of that article. It is contended, that the 3d subdivision of this section is authoritative of the trust in this will, and gives to it legal vitality. Although the section seems to authorize a trust to receive rents and profits to be applied to the use of only one person during his life, yet by the act of the legislature, 2 *R, S.* 778, § 11, it may be read so as to authorize the creation of a trust, to receive rents and profits to be applied to the use of *persons* during the lives of such persons. Now, what was the object of the legislature in adopting this 55th section ? The object is lucidly set forth by the revisers in their notes, and the vice chancellor and chancellor both agree in opinion with the revisers, that the grand, prominent and unquestionable object of the legislature was to enable persons by devise or deed to make provision for the helpless and infirm ; for married women, whose husbands may be deemed unfit to be trusted with the management of property ; for dissolute and improvident persons, spendthrifts, whose wasteful and profligate habits render it necessary that the fund intended for their support should be beyond their reach or control. This object is also apparent

from the provisions of this statute, which became needful and proper, in order that the object should not be frustrated. The 63d section, p. 730, declares, that " no person beneficially interested in a trust for the receipt of the rents and profits of lands can assign, or in any manner dispose of such interest; and with a view of more certainly securing to the objects of the bounty of the testator, the absolute certain enjoyment of the funds designed for their use, as for other purposes, the legislature has thrown around them another safeguard, by declaring in the 65th section, that " where the trust shall be expressed in the instrument creating the estate, every sale, conveyance or other act of the trustees in contravention of the trust, shall be absolutely void." The provisions thus far are full and complete, in securing the fund for the enjoyment of those for whose use it is intended, but there is reserved to the trustees the discretionary right of paying to the use of the *cestuis que trust,* such sum and sums, at such time and times, as the trustees shall consider the necessity of the *cestuis que trust* may require. This discretionary power is necessarily implied by the word *apply,* in the 55th section. The trustee is to receive the rents, and *apply* them to the use, &c., and in case the trustee abuses this discretion, or does not perform the trust, the *cestui que trust,* by the 60th section, p. 729, may apply to a court of equity to enforce its performance ; which court, by the 70th and 71st sections may remove the trustee, if he shall be deemed for any cause to be an unsuitable person to execute the trust, and appoint another in his place.

I am not to be understood as going so far as to say, that no express trust can be created under any circumstances, unless there be in the trustee plenary and uncontrolled discretion in paying to *the use* of the *cestui que trust* such sums at such times as he shall see fit; for it is apparent that if the devisor or grantor, create a trust to pay the *cestui que trust,* a certain specified sum, there the trustee has no discretion in paying or withholding such sum ; the duty is imperative ; he must pay as directed, and this for a very sensible reason, that in the direction to pay a specified sum, the creator of the trust recognizes the ability of the *cestui que trust* to dispose of such sum to his

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

own use, with proper prudence and discretion ; while he may doubt the propriety of giving to the *cestui que trust* the control of the whole estate out of which the fund may arise. In harmony with this view is the authority given by the act, p. 730, § 63, to such *cestui que trust*, to assign his right and interest, where the payment of a sum in gross is directed. Is the trust in this will such an one as comes within the intent, spirit or policy of the statute ; or rather, is it not in palpable direct contravention of its provisions ? Who are these *cestuis que trust*, the twelve nephews and nieces of the testator ? Are they married women, infirm, helpless ; are they dissolute and improvident ; are they spendthrifts, unfit to be trusted with the management of property ? They are the very persons who, of all others, the testator has singled out as the most calculating, prudent, sagacious and trust worthy persons, to manage and improve this enormous estate. He has entrusted them with full and absolute power over his whole estate, confident in the belief that they will faithfully and honestly fulfil the requisitions of his will. He has made these very *cestuis que trust* his trustees ; nay, further, he has, in the face of the statute, authorized each of them " to alienate, sell, assign and transfer their respective interests, shares or proportions of the rents, proceeds and income of any part of his real estate, in his will directed to be paid to them, or any part thereof, with the written consent of a majority of them." It is true, the testator has appointed his brother a co-trustee with these twelve *cestuis que trust*, but that can have no influence in removing the objections stated. It is apparent he is merely a nominal trustee ; his power and control over the property, in opposition to the views and wishes of a majority of them, is nothing. The testator has left no discretion to be exercised by the trustees in paying these trust monies, as the necessities of the *cestuis que trust* may require, and as prudence may dictate. The direction in the will is imperative, that the executors and trustees account for, divide, and pay over to the *cestuis que trust*, the whole of their respective shares of the income of this estate. Indeed, the giving of any discretion in the will would be a palpable absurdity ; these twelve nephews and nieces, as trustees, are to receive all the rents, and these same persons, in

the double character of trustees and *cestuis que trust*, are to divide among themselves, and to pay themselves each one his share. The *cestuis que trust*, being the same persons who are trustees, have, contrary to the express provisions of the statute, the whole legal and equitable estate. This trust is not then, in this view of it, such a trust as was designed to be authorized by the statute.

But there is another objection to the validity of this trust: it effectually suspends the power of alienation for more than two lives in being. The object of the testator, as appears from the whole will, is to tie up this estate for twelve lives, and for two years thereafter. There can be no question of this; for, after the expiration of the twelve lives, he directs a fair and just division and distribution of his estate, but no such division and distribution shall take place until two years after the decease of all his nephews and nieces. If this trust could be deemed a valid trust, as the testator intended it should be, the whole legal and equitable estate, by the 60th section, is in the trustees, subject only to the execution of the trust; and the *cestuis que trust* have no estate or interest in the lands, having only a mere naked right to enforce the performance of the trust in equity; and by the 65th section, the trustees cannot sell the trust estate, in contravention of the trust. There is then an absolute statutory prohibition to sell, during the lives of these twelve nephews and nieces, and during these lives the power of alienation is absolutely suspended.

The object of the revisers and of the legislature in these enactments, was to abridge the then existing power of rendering real estate inalienable. The revisers, in their notes, state the difference between the sections by them proposed for adoption and which were adopted, and the then existing law, to consist in the following particulars: " 1. Alienation cannot be protracted by means of mere nominees, unconnected with the estate beyond the period of two lives; 2. No more than two successive estates for life can be created; and 3. The period of twenty-one years after a life or lives in being is no longer allowed as an absolute term; but the rule is restored to its original object, by being confined to the case of *actual infancy*, which is directly provided for, by rendering the dis-

position defeasible, and allowing another to be substituted during that period." It cannot be necessary, at this late day, to inquire into the reasons which in this country render it ex-tremely proper that estates should not be tied up, and their alienability suspended for an unreasonable length of time ; they are well known to all who are the least conversant with the principles and spirit of our institutions. It is enough on this present occasion to know, that the legislature, in carry-ing out those principles, have expressly enacted, p. 723, § 15, that the absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate, except in the single case mentioned in the next section, which does not reach this case. This estate is therefore, in the manner it is sought by the will to be disposed of, perfectly and absolutely inaliena-ble ; the trusts cannot be carried into effect, unless the estate remains entire in the trustees, until the death of the last sur-vivor of the twelve nephews and nieces. The trust is there-fore, for this reason, in my judgment, not such an one as is authorized by the statute, and cannot prevail.

It is however urged upon our consideration, that the pow-er of alienation is not suspended, because there are persons in being who can, by uniting, convey a fee ; the remain-der over being deemed void, the reversion is in the heirs, and the heirs, *cestuis que trust* and trustees together, can con-vey a fee—and that, although the trustees cannot sell in contravention of the trust, yet they can sell subject to the trust. There might be some plausibility in the arguments ably and ingeniously urged on this branch of the case, were it not for the fact that any sale or conveyance of the es-tate, would be in direct contravention of the trust ; all the rents and profits of this estate are disposed of by the trust ; every fraction which can be produced from the land is appro-priated to the use of the *cestuis que trust ;* not a foot of this es-tate can be sold, unless in contravention of the trust. But it is said a sale can be made, not in contravention, but subject to the trust. I must be excused in saying that this appears to me quite absurd. Who would purchase any part of this estate, where the purchaser could not be permitted to en-

joy even the smallest fraction of benefit or advantage which the premises might produce? for even that smallest portion belongs to the *cestuis que trust.* Land thus shackled and encumbered is worth nothing; it is valueless; the fee is not worth the paper upon which the conveyance would be written. The power of alienation is as effectually suspended where no human being will buy, where there is nothing to sell, as where a conveyance is absolutely prohibited; the effect is precisely and identically the same. But the *cestuis que trust* cannot convey—they cannot release—they have nothing in the estate but a mere naked right to have the performance of the trust enforced. The language of the act is absolute and imperative: they "shall not assign or in *any manner* dispose of their interest;" they may refuse to receive the rents and profits, but they cannot legally bind themselves that they never will receive them, for that would be in a *manner* disposing of them. Even if they should obligate themselves that they never would receive the rents, and thereafter they should claim in opposition to their deed all the rents which they had not received, it cannot be doubted but that the court of chancery would order those arrearages of rents to be paid to them, upon the ground that the deed is absolutely void. The shackles and encumbrances then still remain; the power of alienation is yet suspended, and must necessarily remain suspended during the twelve lives.

The legislature, in carrying out their plan as to the alienability of estates, have, with proper caution, restricted the power of creating trusts of the rents and profits of land, and have subjected them to the same rules as control the disposition of estates, so far forth as relates to the creation and continuation of the trust; aware that a full disposition of all the rents and profits was tantamount to an absolute control of the fee. The interests of the *cestuis que trust* have been considered, upon the argument, what in fact they are not, estates. The *cestuis que trust* have been considered as the persons holding an intermediate or precedent estate, the remainder being limited to the grand-nephews and nieces, and their children. It is unnecessary, from the view I have taken of this case, to examine with much minuteness or particularity, what kind of

*quasi* estates these *cestuis que trust* have. The vice chan-
cellor is of opinion that they are joint tenants ; the chancel-
lor, that they are tenants in common with cross-remainders.
If it were at all material to express an opinion on this point,
I should hold that they both were partly right and partly
wrong. The directions in the will are, to pay over and di-
vide the rents among the twelve nephews and nieces during
their natural lives, and to the survivors and survivor of them.
This creates a joint tenancy ; they all come in at the same
time and by the same title. The will then proceeds, "equal-
ly to be divided between them." This regulates the enjoy-
ment of the estate among them as tenants in common. " Or
such of them as shall from from time to time be living, share
and share alike ;" carrying out the idea to the last life, that
the survivors take the deceased's share as joint tenants, to be
enjoyed as tenants in common. Was the estate a tenancy
in common, then when one of the twelve, having children,
should die, his share would go to his children. This was not
intended by the testator, for he directs his estate to go to the
survivors and survivor, and the children of the nephews and
nieces have no participation in the estate until the lapse of
two years after the decease of all the nephews and nieces.
What Lord Ellenborough said in *Boswell* v. *Abey*, 1 *Maule
& Selw.* 428, is quite pertinent to this case. He said, " The
words tenants in common are of a flexible meaning, and
may be understood, that although they should take by sur-
vivorship as joint tenants, yet the enjoyment was to be regu-
lated among them as tenants in common. The prevailing
intention of the testator seems to have been, that the estate
should not go over till the death of the survivor." And
Chief Justice Best, in *Wollen* v. *Andrews*, 9 *Com. Law R.*
345, said, the remark of Lord Ellenborough, above, was ap-
plicable to that case, because the the testator has expressly
mentioned the survivors and survivor, by which he means
not the surviving stock, but the surviving children. 2
*Cruise, tit.* 18, *ch.* 1, § 26, 27, 28, 29. 6 *id. tit.* 38, *ch.* 15,
§ 4, 5, 6, 7 ; *also* § 1, *pt.* 6, 7. Had the devise been to the
twelve, share and share alike, or equally, without the word
survivor, *Gaskin* v. *Gaskin*, 2 *Cowp.* 657 ; *Prince* v. *Hey-
lin*, 1 *Atk.* 493 ; *Heathe* v. *Heathe*, 2 *id.* 122, or to them

and their heirs, and the longest liver of them, equally to be divided between them, *Blisset* v. *Cranwell*, 1 *Salk.* 226 ; 3 *Lev.* 372 ; *Prince* v. *Heylin*, 1 *Atk.* 493 ; *Warner* v. *Stone*, *Prec. in Ch.* 491, then would they have been tenants in common. As was remarked in the case of *Clerk* v. *Clerk*, 2 *Vern.* 323, so may it be remarked in this, that although the words " equally to be divided between them, sometimes in a will, may make a tenancy in common, yet it is only by construction, and that it was the intent of the testator that there should be a division ; yet if afterwards it is declared in the will it should go to the survivor, that would oust such a construction, and it will be a joint estate." *See also Tuckerman* v. *Jeffries*, 11 *Mod.* 108 ; *Holt*, 370 ; 1 *Vent.* 188 ; *Com. Dig. tit. Estates by Devise, n.* 8 ; *Hawes* v. *Hawes*, 1 *Wils.* 165 ; 3 *East,* 533 ; and *Barber* v. *Giles*, 2 *P. Wms.* 280. But the *cestuis que trust* have no estate whatever in the premises ; the whole legal and equitable estate are in the trustees ; and besides a legal and equitable estate, there is none which can exist in the *cestuis que trust.* The have nothing but a right to receive the rents, a mere chose in action, and to enforce the payment thereof in a court of equity. This is not the subject matter of a tenancy, either joint or common ; much less the subject of cross-remainders. The trustees having the legal and equitable title, and the *cestuis que trust* the right to receive the fruits of the estate, together form a precedent estate ; and it is a precedent estate, created to continue during the lives of twelve persons in being ; during which time the absolute power of alienation is suspended, there being no persons in being by whom an absolute fee in possession can be conveyed : the power of the persons in being, who have the fee to convey, is taken away expressly by statute, and nothing short of legislative interposition can restore it.

But again : The trust in this will is not authorized or sanctioned by any of the provisions of section 53. The power given to the trustees is an unlimited power, except that of conveying and appropriating the rents otherwise than directed in the will ; they are empowered to *improve and manage the estate.* I know not what the trustee could not do with this estate, under the head of improvment ; any thing, every

thing which will tend to enhance its value. They have the power of laying out streets, of tearing down and building up houses, churches, theatres, or any other edifices which the peculiar locality of the premises would seem to justify as an improvement; and all the " necessary expenses, charges and disbursements, consequent upon such improvements, are first to be paid, before there is to be any division or distribution of the rents." It may well be, that it might be necessary for years to apply all the rents which the premises might produce, to meet the expenses of these improvements, and the *cestuis que trust* thus effectually deprived of the enjoyment of the intended bounty, which it was the design of the statute should be most certainly secured and faithfully applied for their use and enjoyment. The creation of such a trust was never intended to be authorized by the statute, however well it comports with the design and object of the testator ; for certainly he who would make the *cestuis que trust* recipients of the rents for their lives, their own trustees, to receive the rents and divide them among themselves, giving to them as trustees an absolute fee of his estate, determinable two years after the death of the *cestuis que trust*, would not deem it inconsistent to empower them to do with this estate what they pleased, by way of improvement, as the expenses thereof come out of their own pockets, and particularly as after their death the whole property, with the improvements, will go to their children, and their children's children. But the intent of the testator is in conflict with the intent of the law ; and in such a contest, the law must triumph, or else must be imparted to every man the power to repeal a statute when it is in the way of gratifying his will or inclination.

It is, however, contended, that if the trusts in this will cannot be directly carried into effect by reason of the provisions of the statute, and are to be deemed illegal or invalid trusts, yet they can be indirectly carried into full effect under section 58. That section declares, that where an express trust shall be created for any purpose not enumerated in the preceding sections, *no estate shall exist in the trustees*, but the trust, if directing or authorizing the performance of any act which may be lawfully performed *under a power*, shall be valid as a power in

trust, subject to the provisions in relation to such powers, contained in the third article of this title. The first difficulty to be encountered on the threshold is, that if this section is to control this will, then is the manifest, direct, unequivocal intent of the testator, most clearly thwarted and perverted, and there is a total and unqualified repeal of a part of his will. This section declares, no estate shall vest in the trustees. The will provides, " I do will, devise and bequeath all my estate, real and personal, &c. to my executors and trustees, and the survivors of them, their heirs and assigns, forever, as joint tenants, and not as tenants in common, in trust," &c. ; and the fee is necessarily invested in them, for the purpose of carrying out the general design of the testator, as they are to convey that fee to the grand-nephews and nieces, and the children of such as shall be dead, after the death of the twelve nephews and nieces. In connection with section 58, is to be read section 59, which declares, that in every case where the trust shall be valid as a power, the lands to which the trust relates, shall remain or descend to the persons otherwise entitled, subject to the execution of the trust as a power. This at once transfers the fee from the trustees to the heirs at law, where the testator intended it never should fully vest. A conveyance to trustees and their heirs in trust, is a conveyance recognized by the law, and yet would the giving of such conveyance be adjudged illegal; and that which the testator might lawfully do, is to be entirely vacated, in order to carry into effect the trust in this will as a power in trust, which, as an express trust, is utterly void. What is a power in trust? The Revised Statutes have given a technical definition of a power in trust, whether general or special. They declare, 1 *R. S.* 734, § 94, that a general power is in trust when any person, or class of persons, *other than* the grantee of such power, is designated as entitled to the proceeds, or any portion of the proceeds, or other benefits to result from the alienation of the lands, according to the power. They declare in the next section that a special power is in trust, 1. When the disposition which it authorizes is limited to be made to any person, or class of persons, *other than* the grantee of such power ; and 2.

When any person or class of persons, *other than* the grantee, is designated as entitled to any benefit from the disposition or charge authorized by the power. There are no other powers in trust recognized by the statute; and though a general and special power differ in some respects, yet they agree in this : that the grantee of the power must be a person other than he who is entitled to the benefits of the trust. In this will the trustees are the grantees of the power, and they are the very persons, with the exception of one, who are entitled to the benefits of the trust. The addition of the one can make no difference ; it does not remove the objection that all the *cestuis que trust* are grantees of the power. It appears to me, there can be no well grounded pretence that the trusts in this will can be carried into execution as a power in trust. But even if this objection were removed, by converting this trust into a power in trust, the power of alienation is alike suspended. The next section (96th) declaring that every trust power, unless its execution or non-execution is made expressly to depend on the will of the grantee, *is imperative*, and imposes a duty on the grantee, the performance of which may be compelled in equity for the benefit of the parties interested. Although the fee of this estate would be taken from the trustees, by converting this trust into a power in trust, and be vested in the heirs at law, yet the heirs at law hold subject to the charge of this power, and they cannot alien until the power be spent by the death of the twelve nephews and nieces. The power of alienation, therefore, is as effectually suspended by considering this trust as a power in trust, as in the case where it might be deemed an express trust.

It is contended that the provisions of this will can, in part, be carried into effect, and that the courts are required to do so : the statute, 1 *R. S.* 708, § 2, declaring that "in the construction of every instrument creating or conveying, or authorizing the creation or conveyance of any estate, or interest in lands, it shall be the duty of courts of justice to carry into effect the intent of the parties, so far as such intent can be collected from the whole instrument, and is consistent with the rules of law." This has always been the rule in relation to the construction of wills. The object of this provision is to place deeds

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

and wills on the same footing, and that the same rules of interpretation shall be applicable to each. The intent of the testator, to be collected from the whole will, is to be carried into effect as far as is consistent with the rules of law. What is that intent? It unquestionably is, that his whole estate should be kept entire, and that the rents and profits should be enjoyed by the twelve nephews and nieces, and the survivors of them, and that no part of his estate should be aliened until after two years from the death of these twelve nephews and nieces. This is an intent inconsistent with the rules of law, and cannot, therefore, be carried into effect. But it is urged that so far as this intent is consistent with the rules of law, it may be carried into effect, and that the trust should be considered good during the continuance of the lives of the two of the twelve nephews and nieces who shall first die. There is no warrant for this, either in the will or at law. The act has contemplated and has authorized in three instances a part of the whole intent of the testator in locking up his estate for a longer period than the law will allow, to be carried into effect. The first is to be found in the 17th section, where successive estates for life are limited to persons in being, and a remainder limited on more than two successive estates for life; all the life estates subsequent to those of the two persons *first entitled* shall be void, and upon the death of those two, the remainder shall vest. Here, though the intent may have been to limit the estate for twelve or more successive lives, the limitation for a longer period than the law permits, shall not therefore be void in toto; but is valid for the lives of the two first entitled. The other is to be found in the 19th section, where a remainder is created upon estates for lives, and more than two persons named, during whose lives the life estate shall continue, the remainder shall take effect on the death of the two persons *first named,* in the same manner as if no other lives had been introduced. In this case, as in the other, the whole limitation is not declared void, but good for the lives of the two first named. The third is to be found in 38th section, in regard to the power of directing accumulation of rents—that if an accumulation be directed for a longer term than during the minority of the persons intended to be

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

benefitted thereby, it shall be void as respects the time beyond such minority, and all directions for an accumulation of the rents and profits of the real estate, except as are therein allowed, shall be void. So, also, in the cases under the Thellusson act, so called, of which ours is substantially a transcript, of *Griffith* v. *Vere*, 9 *Ves.* 127 ; and *Langdon* v. *Simpson*, 12 *id.* 295, it was held, that though the *intention* appears, to attempt to make an accumulation for more than twenty-one years, the whole trust shall not therefore be void, but it shall take effect for the period during which the legislature meant it to be lawful, to direct an accumulation. Such decisions are warranted from the phraseology of the act itself, it declaring "that any accumulation, otherwise than by the act directed, shall be null and void, and that the rents so directed to be accumulated, shall, *so long* as the same shall be directed to be accumulated *contrary* to the provisions of the act, shall go to the persons entitled, had not an accumulation been directed ;" thereby manifestly intending, as the court of chancery in England have decided, that the direction for accumulation is sanctioned by the act, for the period therein limited, and is void for the excess only. There are in this case no two persons *first entitled ;* there are no two persons *first named* with a view to successsive estates for life ; they are concurrent life interests with the benefit of survivorship—a *quasi* estate, with a view to evade the statutory declaration, inhibiting the suspension of the power of alienation, for a longer period than two lives in being, which cannot be recognized. In relation to the trust in this will, there is no redeeming power in the statute giving it vitality for even a moment of time. It was no sooner conceived than it became illegal ; it was no sooner penned than it became void. *All uses* and *trusts*, except as authorized and modified by the statute, are abolished. This trust is not authorized by the statute, neither by its letter nor its spirit ; nor is it authorized by any modified common law use or trust ; it is void *ab initio,* and cannot be sustained to any extent, either at law or equity. The trust being void, it is as though it had never existed ; and the fee, instead of being vested in the trustees, with an ultimate remainder over to the grand-nephews and nieces and their children, by operation of law is vest-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

ed in the heirs at law, and it is consequently a fee unincumbered of the trust.

As to the annuities : The trust as to the annuitants, in my judgment, must be on the same footing as the trust in behalf of the nephews and nieces. The annuitants are in fact *cestuis que trust* to every purpose, except that they are not prohibited from selling their interest. They receive a sum in gross annually, and are allowed by the 63d section to assign the same, and this upon the basis that they are deemed competent to take care of and manage to their best interests, the sums given them ; a suppposition which does not legally exist in regard to the *cestuis que trust*, for whom unlimited provision is made in this will, and who are consequently expressly prohibited by the 63d section, from disposing of their interests in any manner ; nevertheless, these annuitants are under this will to be deemed as *cestuis que trust.* The will gives the legal estate to the trustees, in trust to pay these annuitants out of the rents and profits the sums given to them respectively, and what shall thereafter remain to be divided and paid to the twelve nephews and nieces ; and the payment of these annuities are to be enforced in the same manner as the other trusts. They are to continue during the respective natural lives of the annuitants, or until the death of all the children of the testator's brothers, Blaze, Peter and Jacob. An annuity, it is true, does not directly affect the alienability of the land charged, unless the sum total of the annuities exceed the annual rents and profits, which the land might produce during the continuance of the annuities, any more than a mortgage or judgment thereon. But annuities should not be chargeable on land for a longer period than two lives in being, if the rule is intended to be preserved inviolate throughout, that the power of alienation shall not be suspended by any condition whatever, for a longer period than two lives, unless the amount of the annuities in relation to the value of the land shall be fixed by law ; the allowance of annuities to any amount, for any number of lives, out of the rents and profits of land, would in effect be giving to the creators of them a power to lock up the alienability of the lands for an indefinite period, in defiance of the law prohibiting the suspension of the power of alienation. A mean of getting

around the statute, and of accomplishing indirectly what the law will not permit to be done directly. Suppose an estate at the present day should yield rents to the amount of $20,000, and out of those rents, annuities should be directed to be paid to forty persons during their lives of $2000 each, and the survivors and survivor of them, share and share alike, making a charge upon the rents received of $80,000 ; would not such a disposition as completely render the estate inalienable as though alienation had been expressly prohibited ? The annuitants would receive only one quarter the amount of their annuities, until the rise of property and the consequent increase of rents would give them more. This is putting the supposition upon the ground, that the property would not probably quadruple in value during the lives of forty persons, but it may be carried to any extent, if the rule is to be permitted to prevail at all. These annuities are not a charge on the land, but on the rents thereof which shall come into the hands of the trustees in virtue of the trust in the will. If the trust be declared void, then the power of the trustees over the fund is gone, and is as though such a power had never existed ; and by necessary consequence there is no fund out of which, nor persons by whom the annuitants can be paid. These annuitants (nineteen in number, besides the grand-children of the testator's brothers Blaze, Peter and Jacob,) are to continue in the reception of the annuities from the time they respectively commence during their respective natural lives, or until the death of all the children of those brothers. It is one systematically arranged and indivisible plan, no part of which can be carried into effect in relation to the annuities, unless it also be carried into effect in relation to the nephews and nieces. These very annuitants, with the exception of Rosanna Bowers, who may be living at the death of the twelve nephews and nieces, are the persons among whom, by the directions in the will, the whole estate is to be ultimately divided. The trust, therefore, as well in behalf of the annuitants as the nephews and nieces, being void in its creation, cannot be sustained for any purpose, and I cannot escape the conclusion, that the trust is void in toto.

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

The testator has reared a splendid edifice, the only foundation of which is this trust; and, however well proportioned and seemly the building may appear to be, yet if this foundation, the trust, is removed by the strong arm of the law, the superstructure and all that appertains to it, must fall to the ground. All the special devises, therefore, in the codicil, must utterly fail. They have been made with exclusive reference to the trust, and upon the hypothesis that that was to remain a sure and immoveable foundation, without which it is apparent that none of those devises would have been made. No part thereof can be sustained but in violation of the intent of the testator, as collected from the whole will. And when we are called upon to carry the will into effect, as near to (*cy pres* the intention of the testator as the law will permit, we are compelled to the answer that the whole intent is one and indivisible, and no part thereof can be carried into effect, in accordance with the manifest intent of the testator. Had the question been propounded to the testator, If the trust in your will should be deemed an invalid illegal trust, and your estate should be decreed to descend to your heirs at law, do you will that those heirs, for whom provision is made in your codicil, shall be entitled to the devises to them therein respectively made, and in addition thereto to have their respective shares as heirs at law in the residue of your estate? it cannot be for a moment doubted, that he would have unhesitatingly answered in the negative; and yet is the application of the *cy pres* doctrine asked for in this case, with a view of carrying the intention of the testator into effect, as near as may be consistent with the rules of law, when the very first effort in making the application is in direct violation of his intent. I am of opinion, therefore, that no part of the codicil can be sustained, and that none of the devises or bequests in the will or codicil can be carried into effect, except the legacies to the Episcopal Seminary and to St. Philip's Church. The consideration whether the trust stands or not, in part or in whole, could have had no influence over the will or intention of the testator in relation to these legacies. They are separate, distinct, perfect and independent legacies, in no manner connected with, dependent upon, or influenced by the other

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

dispositions of the will. He intended these legacies should be paid at all events, and they are in my judgment a charge on his real estate. Although a will may be good in part, and bad in part, the part which may be good cannot be carried into effect, if it works such a distribution of the estate as from the whole will taken together, it is apparent it never was the intent or design of the testator that it should effect. The adoption of any other rule would lead to the making of a new will for the testator, which neither this nor any other court has the power to do. The decrees of the chancellor and vice chancellor should be reversed.

By Mr. Senator YOUNG. This is the first cause, under one branch of the Revised Statutes, which has been removed to the court of last resort ; and it being, in all probability, the pioneer to many others, it is of great moment that the principles it involves should be maturely considered. The disposition of a large estate, amounting, as is stated by the chancellor, to three millions of dollars ; the rents and profits of this estate, already producing annually between eighty and ninety thousand dollars, and the rights and interests of a considerable number of respectable individuals, will be more or less affected by the decision. But when it is considered, that as a people, we are yet in an infant state ; that time will constantly unfold and multiply new elements of wealth ; that acquisitions of large estates by individual industry and enterprise will probably be commensurate with the future increase of population, and the continual development of new resources—the amount in controversy, together with the number and respectability of the claimants, is wholly merged in more important considerations. The adjudication now to be made will throw its influence into the future for good or for evil ; it will stand as a land mark for those who come after us ; and will probably control the disposition of an amount of property, and the rights of a number of individuals beyond the reach of computation or conjecture.

The provisions contained in the will of George Lorillard, which have given rise to this appeal, are sufficiently detailed by the vice chancellor of the first circuit, and also by the chancellor, in their respective decrees, and in the opinions

appended to the same, respectively; and without a recapitulation of those provisions, I shall content myself with a reference to these decrees and opinions. The cause was fully argued before the vice chancellor, and again, on an appeal from his decree, more elaborately, before the chancellor; and in this court for ten successsive days, by some of the most eminent counsel in this state, with a talent, learning and ingenuity which have been rarely equally. The main question to be decided is, whether the trusts created, or attempted to be created, by the testator, are valid in the whole, or in part; or rather, whether the decree of the chancellor, which establishes the validity of these trusts to a certain extent, is correct and ought to be sustained. The views of the chancellor and vice chancellor, on several important points, conflict with each other; no two of the revisers agree on the argument, in their expositions of those sections of the statute which are supposed to have a material influence upon the decision of this cause; and of the seven learned counsel, there was no one who did not disagree with all the rest, both in his premises and conclusions.

Are the difficulties and applications with which this cause from the beginning has been shrouded, intrinsic or artificial? Do they result from a conflict between the common law and the statute; from the impossibility of defining the respective boundaries of each, of ascertaining where the one terminates and the other commences its operation? These are questions which naturally force themselves upon the mind. In an English court of common law, the will under consideration would present very little, if any difficulty. All its provisions would receive a judicial sanction. In the examination which I have given to this cause, I have come to the conclusion that its decision must be wholly controlled by the Revised Statutes; that the common law, in reference to real property, to its tenure and transmission, with all their incidents, is wholly abolished. To elucidate the opinion I have formed, some preliminary observations respecting the old law, the mischief and the remedy, will be necessary. It is highly proper, in such a cause, to advert to first princi-

ples.   The rules of the common law in respect to real prop-
erty are exceedingly difficult and complex.   They are
deeply imbued with the mystified ignorance of the scholas-
tic ages. ⅃ The doctrines of uses and trusts, of remainders
and executory devises, are beyond the comprehension of
any mind which has not been long drilled and disciplined in
the school of legal science. ⅃ Indeed many of these doctrines
have been elaborated to such a degree of metaphysical re-
finement, that they sometimes elude the grasp of the most
profound and discriminating lawyer.   " These rules," say
the revisers in their notes, " are in a great measure arbitra-
ry and technical, and, in the language of Blackstone, it were
endless to attempt to enter into the particular subtleties and
refinements into which, in the course of centuries, they have
been spun out and subdivided.   So great, indeed, (add the
revisers,) is the multitude of rules on this subject, and so
nice and difficult of apprehension the distinctions on which
they rest, that to draw a will or family settlement, contain-
ing future limitations, is justly esteemed in England one of
the most arduous and responsible duties which the most
learned in the profession can be called to perform.   No
man in that country can be a good conveyancer, who is not
also a profound lawyer.   Hence have arisen the evils of
which the nation is now complaining, and which their wisest
statesmen are seeking to redress ; the complexity of their
titles, the great hazard and expense of alienation, and the
frequent and ruinous litigation in which estates are invol-
ved."   In several of their notes, the revisers have strongly
depicted the metaphysical labyrinth and absurdities of the
old system.

The rules of the common law also authorize the exclusion
of real property from alienation, for a much longer period than
is consistent with the interests of society.   The absolute own-
ership in property, of him who uses or possesses it, is indis-
pensable to secure the greatest degree of care in its preserva-
tion and improvement.   If, for instance, all the real property
in this state, was in the occupancy of individuals who were
merely to collect and enjoy the rents and profits for twelve
lives in being, and then to surrender it to others, such an ar-
rangement would impede the accumulation of wealth, ob-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

struct the current of improvement, and blight the public prosperity. Modern science has clearly developed the important and fundamental truth, that the welfare and happiness of states and nations is materially dependant on the increase and proper distribution of wealth. Every rule of law, therefore, which impedes or discourages the acquisition or alienation of property, is a subtraction from the elements of public prosperity. The desire to accumulate, which is both the cause and effect of civilization, should be unfettered, and permitted to exercise its influence freely upon all; for it is only when the incentives to amass by industry and frugality are equally operative upon all, that the greatest and most beneficial results will be attained. If a portion of those who are to occupy the theatre of life fifty or one hundred years hence, were to be born and educated with the knowledge that, on attaining the age of twenty-one, they were to come into possession of great wealth, that they were freed from the necessity of labor and industry, that they were a privileged class, *nati consumere fruges*, and exempted from the ordinary wants and contingencies of human life—what more effectual means could be adopted to paralyze their industry and poison their morals; and the contagious example of idleness, extravagance and dissipation upon the rest of the community would tend to the most pernicious consequences. To appreciate the result of such a state of things, we have only to turn our eyes to the land of the common law, where property, power and pride are transmissible to the eldest born, from generation to generation, and where those who are thus shielded from the common wants and necessities of mankind are also exempt from those virtues and sympathies which are ordinary concomitants of man's nature. *Haud ignara mali, miseris succurrere disco.*

The progress of knowledge and civilization is however greatly in advance of the institutions of that country; and it is perhaps safe to predict that ten years more will see the feudal tenures entirely abolished. The ruggedness of their ancient features has been from time to time relaxed; but it has always been a striking characteristic of the common law, that, encumbered with its ponderous train of complicated ma-

chinery, it has constantly lagged behind the intelligence of each successive age. Every branch of the common law, (and there are many,) which has been moulded to the form and structure of the British government, is at war with the simplicity of our republican institutions. The aggregation of wealth in the hands of an aristocracy, its exclusion from alienation in perpetuity or for long periods of years, by remainders, trusts, uses and powers, to gratify the vanity of the possessor and the pride of the recipient, are regulations diametrically opposed to those principles of equality upon which our government is founded. At common law, when a man dies intestate, his real property descends to his eldest son in entire exclusion of all his other children. The male who happens first to come into existence, without any reference to his personal merit, may thus be thrown into the possession of immense wealth, whilst all his brothers and sisters are reduced to beggary. This is the unfeeling and barbarous rule in the feudal ages—a rule which has been adopted by the common law, but against which the humanity and civilization of modern times is carrying on a vigorous warfare. Many years ago, a device was adopted to bar an entailment by fine and recovery ; and estates might be thus partially unfettered, and subjected to alienation by deed or devise. When the iron chain of the law was thus broken, a testator might by will divide his property among his children or relations, in pursuance of the natural sympathies of the human heart ; and the most enlightened and humane judges of England, instinctively impelled by the laws of nature, have struggled to elude the heartless disposition of the common law, by resorting to a most liberal interpretation of wills; by implying meaning and sometimes words, and by giving to words employed in these instruments a much more extensive and efficacious import than they gave to the same words when used in deeds. They have gone even beyond this. In furtherance of the dictates of humanity, they have resorted to what is called the doctrine of *cy pres*, by which, in certain cases, if they could not give entire effect to the intention of the testator, they approximated *as near*, or (more literally) *so near* to that point as the strong barriers of the law would permit. Under the common

law, the lands of an intestate who leaves no lineal or collate-ral relations, escheats to the king, although the father or mother of the intestate, or both, may be living ; and the rea-son assigned for this outrage upon nature affords a charac-teristic example of scholastic logic. Reduced to a syllogism, it is literally as follows : " Lands must ascend in order to pass from a child to a parent. Now, no heavy body can go upwards. And lands, being heavy, cannot therefore as-cend." This is a fair specimen of ancient ratiocination. It regards the estate, instead of the right to its possession, and substitutes the laws of gravitation for filial affection and the ties of blood. The Revised Statutes, when carefully exam-ed, will be found to have remedied these mischiefs, and to have provided every requisite rule and regulation with re-spect to the acquisition, the enjoyment, and the transmission of property, real and personal ; and to simplify this impor-tant subject, so that it might be understood by the commu-nity, every common law rule and regulation is abrogated. Part 2d, ch. 1st, tit. 1st, sec. 3d, vol. 1st, p. 718, establishes an allodial tenure, which is wholly unknown to the common law : " and all feudal tenures, of every description, with all their incidents, are abolished." The language of this sec-tion is too clear and explicit to admit of doubt. It creates a new tenure, which invests the owner of real property with the primordial right ; it bestows upon him that unqualified ownership which was bestowed upon Adam ; it establishes the most simple and the most natural rule ; and it sweeps away the whole catalogue of feudal tenures, with all the in-cidents that have been engrafted upon them by the com-mon law ; not only rents and services, but remainders, trusts, uses and powers. If there can be any doubt wheth-er the words " with all their incidents," which are used in this section, were intended to embrace trusts, uses and powers, that doubt is wholly removed by subsequent sec-tions. In section 45, p. 727, it is provided, that " uses and trusts, except as authorized and modified in this article, are abolished." All the uses and trusts of the common law are thus abrogated ; and none whatever can be tolerated in this state, except those which are specially authori-zed, defined and modified by the statute. The language

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

of the statute in relation to powers is equally explicit. Sec-
tion 73, p. 732, is as follows : " Powers, as they now exist
by law, are abolished ; and from the time this chapter
shall be in force, the creation, construction and execution of
powers shall be governed by the provisions of this article."
The language of these several sections tends to one simple
object—the entire abrogation, the utter repeal of all common
law tenures, with all their complicated incidents and appur-
tenances ; and the substitution in their stead of a new ten-
ure, and new trusts, uses and powers adapted to the simpli-
city of our institutions. The constitution of this state au-
thorizes the abrogation of the common law ; and unless this
ancient, complicated and barbarous system exercises a pow-
er and a thraldom over us, superior to the constitution and
laws, it is entirely abrogated in relation to the tenure, the
acquisition, the enjoyment and the transmission of property,
both real and personal. It is a matter of curious history, to
trace the successive inroads upon the common law, which
have been made during the last half century, by more than
fifty prominent acts of the legislature. Shortly after the re-
volution, primogeniture and entailments were abolished, and
rules of descent were established, imperfect however, com-
pared to the regulations of the existing laws. Uses, trusts,
tenancies, dower, and other branches of the law relating to
real property, underwent various and repeated modifications.
Legislation acquired confidence by practice, and wisdom by
experience. At the time of the revision, the monarchical
machinery of landed tenures had been much simplified ; and
every one will recollect that it was the boast of that period,
that our whole code of laws was to be remodelled, divided
and concentrated into appropriate titles and subdivisions,
and rendered so plain and simple that every citizen who
would read might understand his rights and duties. But if
we are not yet emancipated ; if we are still afloat on the
fathomless abyss of metaphysical subtleties; if we must
steer our devious track among springing and secondary uses,
resulting trusts, executory devises and cross-remainders ;
if the statute is subordinate only, and must be subjected to
the ordeal, to the red hot ploughshares of the common
law, we are then in a situation infinitely worse than before

the revision. For if the statute is to be construed as in any

way subordinate to the old system, there will then be a double conflict of technicalities, the statute warring against the common law, and the common law against the statute; "confusion will be worse confounded," and every cause involving principles like the present will be an insoluble enigma.

One of the Roman tyrants has excited the detestation of mankind, for having caused the laws to be written in such small characters, and placed so high upon pillars that they were not legible ; nor is a milder censure due to the revisers and the legislature, if they have subjected us to the double complication of statutory and common law regulations ; for there is no difference in principle, whether, laws are incapable of being read, or, when read, of being understood by the mass of mankind, for whose benefit laws should be enacted. But this is not the case. One of the leading objects of the revision was to disenthral the community from the common law, in relation to every rule respecting the tenure and transmission of property. These rules favored trusts and uses, which were incompatible with our institutions. They authorized testamentary accumulations of property, without any other obvious design than to gratify human vanity ; they sanctioned trusts for longer periods of years, so that the rich man could throw over posterity the dark shadow of his accumulated wealth. They permitted any amount of the great capital of the community (which is composed of the aggregate wealth of all) to be diverted from the business purposes of life—to be dragged from the prolific stream of alienation, and lashed to sterile rocks upon the shore. These were the evils of the old system, which it was the object of the legislature to remedy ; and if the obvious intent of the statute is not perverted, the remedy will be found to be complete. To understand the statute, it is only necessary to know the meaning of the words which are used ; and definitions are often given in the statute. All uses and trusts, of every description, which might have been created previous to the revision, are wholly abolished. *See sec.* 45, 46, 47, 48, 49. The language of these sections is so strong against the creation of any trusts whatever, that the legislature deemed it necessary to introduce a quali-

fication into the 50th section, which provides that "the pre-
ceding sections shall not be construed to prevent or affect
the creation of such express trusts as are hereafter authorized
and defined." No trust, therefore, of any description, can be
created for any purpose whatever, except such as are ex-
pressly "authorized," and not only authorized, but "defined"
by subsequent parts of the statute. The only authority to
create express trusts is found in the 55th section. This sec-
tion defines the only purposes for which any trust can be
created. It is as follows: "Express trusts may be created,
for any or either of the following purposes: 1. To sell lands
for the benefit of creditors; 2. To sell, mortgage or lease
lands, for the benefit of legatees, or for the purpose of satis-
fying any charge thereon; 3. To receive the rents and pro-
fits of lands, and apply them to the education and support,
or either, of any person, during the life of such person, or for
any shorter term, subject to the rules prescribed in the first
article of this title; 4. To receive the rents and profits of
lands, and to accumulate the same, for the purposes and
within the limits prescribed in the first article of this title."
It will be perceived, on examination, that the four purposes
specified in this section, and to subserve which alone, trusts
can be created, are purposes of utility, and not of pride or
vanity; and if it were necessary to defend the legislature
from the charge of having authorized or permitted any por-
tion of the capital of the community to be abstracted from
circulation, in order to sustain idle or ostentatious trusts, or
any trusts which are not required by the wants of mankind,
the materials for such defence are amply afforded by the
Revised Statutes. The interests of society are best pro-
moted when all property, both real and personal, is wholly
unfettered and freely transmissible from man to man; nor
should any departure from this principle be tolerated, except
where individual benefit is paramount to the public injury.
This is the spirit of the Revised Statutes. The utility of
the first class of trusts, "for the benefit of creditors," is suf-
ficiently obvious. The object of the second, to sell, mort-
gage or lease lands, in order to pay legacies or debts, is equal-
ly apparent and useful. Under this class, some of the trust
powers authorized by the statute can be exercised. The

third and fourth classes of trusts, as defined and illustrated by other parts of the statute, are as simple and salutary as the first and second. The fourth authorizes a trust to receive and accumulate the rents and profits of lands for an infant during the period of minority, and no longer. The third purpose for which trusts are authorized, is the only one under which the trusts in the will of the testator can be sustained, if indeed they are in any respect sustainable ; and it is therefore important to bestow upon the third purpose, to effect which trusts are permitted, a more careful examination.

The power given by the Revised Statutes to accomplish the third purpose, is, to appoint trustees " to receive the rents and profits of lands, and apply them to the education and support, or either, of any person, during the life of such person, or for any shorter term, subject to the rules prescribed in the first article of this title." This is the language of the Revised Statutes. But after they were printed, and their several provisions more minutely and carefully examined, it was perceived that this clause would authorized rents and profits to be applied for the education of a person, during the life of such person ; and as education is usually bestowed only during the period of minority, and as infants were amply provided for in other parts of the statute, an amendment was made by which the words " education and support, or either," were stricken out, and the word " use" substituted in their stead. But what cause induced the legislature to authorize the creation of the third class of trusts? What necessities could it subserve ? What class of individuals need the aid of trustees to deal out to them, from time to time, for their support for life or a shorter term, or, in other words, to apply to their use the rents and profits of land ? The greatest part of mankind would feel themselves degraded by being placed in such a situation ; by being excluded from all control over property, the rents and profits of which were dealt out to them by others for their support, and by being inhibited also from assigning or in any manner disposing of their interest in such rents and profits. It is apparent, then, that it was not intended by the legislature that trusts of this description should be created to sub-

ALBANY,
Dec 1835.

Coster
v.
Lorillard.

serve the ordinary wants of the community.    But there is a
description of individuals, for whose wants and comfort such
a trust is required.  The revisers submitted this consideration
to the legislature, as the reason for authorizing this class of
trusts.    They remark, in reference to trusts in general, "As
the creation of trusts," say they, " is always in a greater or
less degree the source of inconvenience and expense, by em-
barrassing the title, and requiring the frequent aid of a court
of equity, it is desirable that express trusts should be limited
as far as possible, and the purposes for which they may be
created strictly defined."    In reference to the third class of
trusts, they say, " where the trust is to receive the rents and
profits of lands, and to apply them to the education of a mi-
nor, the separate use of a married woman, or the support of
a lunatic or spendthrift, (the general objects of trusts of this
description,) the utility of vesting the title and possession is
the trustees is sufficiently apparent."  Persons of imbecile
minds, females who have married unfortunately, dissipated
sons, the aged and infirm—in short, all that class of individ-
ual who, from mental debility or any other cause, are ren-
dered incompetent to hold and manage property for them-
selves, compose the description of persons for whose benefit
alone this species of trust was authorized. Independent of
the suggestions of the revisers, the conclusion resulting from
the provisions of the statute is irresistible, that the author-
ization of this trust was clearly and specially intended for
the aid of the description of individuals above mentioned,
and for no other purpose whatever. By section 60, the
whole estate, legal and equitable, is vested in the trustee.
By section 65, every sale, conveyance, or other act of the
trustee, in contravention of the trust, is declared to be ab-
solutely void.    By section 63, it is provided that no per-
son beneficially interested in a trust for the receipts of the
rents and profits of lands, can assign or in any manner dis-
pose of such interest."    Thus the whole estate, legal and
equitable, is placed beyond the control of the beneficiary,
and vested indefeasibly in the trustee ; and the beneficia-
ry, who alone is interested in the rents and profits, is inhib-
ited from assigning or in any manner disposing of " such in-
terest."   No other instance can be found within the multi-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

farious provisions of our laws, in which any person or persons are forbidden to sell, assign or dispose of any right, title or thing, in which such person or persons alone have an interest. If a law of this description, which was general in its operation, should be enacted, such law would at once receive the indignant reprobation of the whole community. No reason or apology could be assigned for such a gross and injurious interference with the volitions of mankind. Unless, then, the third class of trusts was specially authorized for the exclusive benefit of those alone who, from mental incapacity, from the legal duress of coverture, or some other cause, were unsafe depostaries of property, the sections above cited are deeply fraught with a more despotic and arbitrary principle than has been adopted by any civilized government within the last century. On this point the opinion of the vice chancellor and the chancellor are the same ; nor can any intelligent individual carefully read the provisions of the statute without giving to them a similar exposition. The vice chancellor says, " The great object of the statute, in allowing the creation of express trusts for the above purposes, undoubtedly is, to enable persons to make provision, by deed or devise, for the infirm and helpless, or those laboring under some disability, or who may be unfit to be trusted with the management of property. Hence the propriety of vesting the trustee in such cases with the legal estate, and declaring that the *cestui que trust* shall take no estate or interest in the lands, but only a beneficial interest in the performance of the trust, which may be enforced in equity. Trusts of this character being moreover intended as the means of affording continual support, either during life or for a shorter period, and often to the most improvident, it was deemed proper to guard them against being diverted from that object. This is done by declaring, in the first place, that the interest of the *cestui que trust* in accruing rents and profits shall be unassignable by him, though his right and interest in a trust for the payment of a gross sum may be assigned, §.63 ; and secondly, avoiding every sale, conveyance, or other act of the trustee, done in contravention of the trust, with notice. (Sec. 64 and 65.") The chancellor, also, is equally strong in his views respecting the object of the law. " The

CASES IN THE COURT OF ERRORS

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

object," says he, " of the third subdivision of the 55th section of the title before referred to, when taken in connection with the 63d section, was to enable the owner of property to create a trust therein, for the benefit of an unfortunate or improvident child or relative, for his support and maintenance for life, or for any shorter period." To authorize an unfailing support to be applied for life, or for a shorter period, through the intervention of trustees, to the necessities of the unfortunate and the imbecile, is an object worthy of the legislature. The duty of trustees under this department of the statute is fiducial in its nature, and indeed of the most confidential character; it is to apply rents and profits to the support, to the necessities or to the use of the incapacitated; it is to be the ministering angels of the unfortunate. It may often happen that a testator who has a dissipated son may confide to trustees the paternal office of reclaiming him, may authorize them in their discretion to apply more or less to his use, as he shall exhibit symptoms of reformation or relapse. It is the duty of courts of justice to give their aid in effectuating the benevolent object of the legislature; but it is also a duty not less imperative, to guard most strongly against its perversion. The whole estate, legal and equitable, is vested in the trustees. They are consequently to superintend and manage it, to collect its rents and profits, and from time to time for the life of the beneficiary, or for a shorter period, apply them to his support or use. He is the mere passive recipient of the rents and profits, and even deprived of the power of assigning, or in any way divesting himself of the right to receive them. No part of the estate vests in him; and the statute has merely authorized him to file a bill in chancery against the trustee for the performance of the trust. The legal character of the trustee is wholly separate and distinct from that of the beneficiary. They are each incompatible with the other, and both cannot by possibility, under the statute, be united in the same person. To constitute an individual a fiducial agent or trustee for himself, to vest in him as trustee the legal and equitable estate in lands, with the confidential office of managing the estate, collecting the rents and profits and applying them to his own support or use for life, or for a shorter period; to

declare that in his character as beneficiary, no part of the estate in the lands vests in him, because he is deemed mentally incompetent to manage property; to pronounce that he shall not assign or in any way divest himself of the right to receive the rents and profits from himself as trustee, because he is adjudged to be improvident or imbecile; and to authorize him as beneficiary to file a bill against himself as trustee to enforce performance of the trust—are an aggregation of conflicting absurdities, which are neither authorized nor can be sanctioned by the Revised Statutes. The only object of the statute, as has been shown, was to authorize this trust for the benefit of those who were destitute of the will, the discretion or the power to manage property for themselves. The statute does not require of him who by deed or will creates this trust, to specify the incapacity of the beneficiaries for whom the trust is created. It is enough that the instrument is silent on this subject; for the presumption of law would then be, that the persons named as beneficiaries were of that description. But where the instrument creating the trust distinctly repels this presumption; where the testator, for instance, clearly shows that the beneficiaries are perfectly competent to have the charge and management of property by creating them trustees; or where, from the enormously large and accumulating income which is bestowed on the beneficiaries, it is clearly manifest that it could not be designed merely for the support of that description of individuals for whose benefit alone the trust was authorized; in such cases, to give effect to the trust would be to pervert and prostrate the statute.

If these principles are applied to the will in question, it will be perceived that the trusts attempted to be created by the testator are wholly invalid. He appoints his twelve nephews and nieces trustees, together with Jacob Lorillard; and afterwards constitutes the same twelve nephews and nieces the beneficiaries of the trust. This junction in the same individuals of the character of trustee and beneficiary is wholly incompatible with the provisions of the statute. Beside this, the testator, in direct contravention of the statute, authorizes the beneficiaries to assign and sell their right to the rents and profits, provided a majority of them, not to be less than three,

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

shall give their written consent to such assignment or sale. These facts speak a language which cannot be misunderstood. They are tantamount to a declaration in the will, that the trusts which the testator designs to create, are not such as the laws of this state authorize. The trustees in the will are directed to "pay over" the rents and profits to themselves, (excepting Jacob Lorillard ;) whilst the trust authorized by the statute is, "to apply to the use." The difference is important and material. "To apply to the use" in the meaning of the statute, is to deal out with circumspection ; and this circumspection, either original or delegated, will always be manifest *in every genuine and valid trust under the 3d subdivision of* the 55th section. For it is hardly possible to conceive a case in which the benefactor, who was about to create a trust for life or for a shorter period for the support of those who were incompetent or unable to hold and manage property, would *not particularly specify in the instrument the times and manner of* the application of his bounty, or specially confide this office to the judgment and discretion of the trustee. The testator, after the payment of legacies and annuities, gives the whole income of his estate, which now amounts to between eighty and ninety thousand dollars annually, to his twelve nephews and nieces, and he directs that this income shall be divided between them "during their natural lives, and to the survivors and survivor of them, equally to be divided between them, or such of them as shall from time to time be living, share and share alike." By this provision, as the number is diminished by death, the survivors take the whole income. The estate is mostly in the city of New-York, and what is not, is by the will to be converted into real estate in that city, so that with the increase of property, it is probable that the income to be received by the last of the twelve would amount to nearly or quite two hundred thousand dollars annually. It may possibly be presumed, when there is nothing to repel the presumption, that all the nephews and nieces of a testator, amounting to twelve in number, are of that description of individuals for whose benefit alone this species of trust is authorized—that they are all incompetent to be trusted with the management and disposition of property ; but it requires an

extravagant effort of the imagination to presume that a testator can foresee that this incompetency will be cumulative, that it will constantly increase as the numbers diminish, so that the last will require for support the application of rents and profits to the amount of one or two hundred thousand dollars annually. Can such a trust be sustained without an entire perversion of the obvious intent and meaning of the statute? And if such a disposition of property should receive a judicial sanction, is there not danger that the precedent may be pernicious, that the rich hereafter, under the benevolent guise of providing a permanent support for imbecile and unfortunate connexions, may erect whole families into aristocracies?

But there are other provisions of the will which require examination. The testator devises and bequeaths all his estate real and personal to the thirteen "trustees, and to the survivors of them, their heirs and assigns forever, as joint tenants and not as tenants in common, in trust," &c. The 44th section of the Revised Statutes, vol. 1, p. 727, enacts, that "every estate granted or devised to two or more persons, in their own right, shall be a tenancy in common, unless expressly declared to be a joint tenancy; but every estate vested in executors or trustees as such, shall be held by them in joint tenancy." Now if it could be pretended that the testator devised his estate to the thirteen trustees "in their own right," still it would be held by them in joint tenancy, because, in the language of the statute, it is "expressly declared to be a joint tenancy" by the testator himself, and not a tenancy in common. But this pretence neither has been nor can be made. The estate is granted to thirteen trustees "as such" in trust, and the statute declares that "every estate vested in executors or trustees as such, shall be held by them in joint tenancy. It is impossible therefore to make the estate which is vested in the trustees a tenancy in common, without both revoking this part of the will and repealing the statute. If it is a valid trust, the statute vests indefeasibly in the trustees all the "estate legal and equitable;" and the trust created in the will, is, that the trustees shall hold and manage the estate thus vested in them, in joint tenancy, for twelve lives, and pay over the rents and profits to the twelve beneficiaries and to the survivors and sur-

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

vivor of them, equally to be divided among them, share and share alike. An estate in joint tenancy is continuous and indivisible. Each tenant is seized not only for himself but for his co-tenants, and the estate is therefore entire and unseverable. It is not susceptible of division. If therefore an estate cannot be indefeasibly vested in trustees in joint tenancy for twelve lives, the trust attempted to be created by the will of the testator is wholly inoperative and void. To prevent estates from being thus wrested from alienability, the 15th section of the statute, 1st vol. p. 723, enacts as follows : " The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the state." Many sections in the statute, and this among others, are separate and distinct enactments, as much so as the commandments in the decalogue ; nor is it of the least moment in what order they are read. This section was enacted for the purpose of giving the limit in point of time beyond which no estate shall be rendered inalienable " by any limitation or condition whatever." The natural and reasonable inference on reading this section would be, that any device, " any limitation or condition whatever" which, in defiance of the statute, should attempt to suspend the power of alienation for more than two lives in being, would be wholly void—and this inference is strongly fortified by other sections of the statute. No rule is given in this section by which the lives, if more than two, can be reduced to two : whether the two *first named,* as in the 17th section, may be taken ; or the two that first happen to die ; nor is any consequence of such supposed reduction either specified or alluded to. In the 17th section, in respect to successive estates for life, both the rule and the consequence are given. This section, the 17th, is as follows: " Successive estates for life shall not be limited, unless to persons in being at the creation thereof ; and where a remainder shall be limited on more than two successive estates for life, all the life estates subsequent to those of the two persons first entitled thereto, shall be void, and upon the death of those persons, the remainder shall take effect, in the same manner as if no other life estate had been created."

Here the estates for life beyond two, are declared to be void, and the remainder takes effect as if no other life estates had been created. The rule is not only given, but also the consequence, the vesting of the remainder. So in the 38th section, in reference to accumulations, it is provided that if an accumulation shall be for a longer term than during the minority of the person intended to be benefitted thereby, it shall be void as respects the time beyond such minority. The previous section, the 37th, had provided that an accumulation, if made, must be made for the benefit of one or more minors, and that it must "terminate at the expiration of their minority." Now if it had not been understood by the revisers and legislature, that an accumulation which should extend beyond the time given in the 37th section, that is, the period of minority, would be wholly void, then the 38th section was an entirely nugatory, idle and useless enactment. If a court would have had the power, under the 37th section, to separate the accumulation into parts, and to pronounce one good and the other bad, then the 38th section is a nugatory encumbrance upon the revised statutes. It would seem, therefore, to follow, by the same reasoning, that the legislature intended that every instrument which should transcend the limits given in the 15th section, by suspending the power of alienation for more than two lives in being, should be *wholly void*. They did not presume that any court would undertake to legislate by making an abscision of what was deemed the unsound part of a trust, and by cutting down and remodelling a will or other instrument to suit the taste of the operator. The legislature having taken upon themselves the office of applying the rule of *cypres*, if it may be so called, to successive estates for life in the 17th section, and also to accumulations in the 38th section, can we assume their functions and apply it to the 15th section? *Legem dicere non dare*, is our only legitimate function. To make laws is the business of the legislator, and to expound them the proper office of the judge. The fact that the legislature have had this subject under consideration, and acted upon it; that they have distinctly adopted and applied the rule and its consequences to cases in which they have deemed its

applicability proper and useful, is, although a tacit, yet a strong prohibition to all courts against applying it in any other : it is virtually an admonitory injunction, " thus far shalt thou come, and no farther." The revision of the statutes in respect to real property was made with great labor and circumspection. The revisers and the legislature made every provision, and adopted every rule which they deemed necessary, and abolished all others ; and if there is any defect, it is a *casus omissus* which a court have not the power to supply. If the trusts in the will are not such as are authorized by the statute, they are wholly inoperative and void ; for by the 45th section all " trusts except as authorized and modified in this article are abolished." If the trusts are such as are authorized by the statute, then the trustees are vested inalienably with the whole estate, legal and equitable, as joint tenants during the continuance of the trust, and the beneficiaries are vested with the right to receive the rents and profits, and divested of the power to " assign or in any manner dispose of such interest." These two conditions are inseparably attached to every valid trust under the third subdivision of the 55th section ; and the trust in the will belongs to that class, or if not, is unauthorized by the statute and void. Every effort, therefore, that was used on the argument to establish the position, either that the trustees were tenants in common in the estate, or that the beneficiaries had the power to assign or in any manner dispose of their interest in the rents and profits, was calculated to prove that the trusts in the will are out of the statute, and therefore void. The result is, that if out of the statute the trusts are void, and if in other respects within the statute, the estate being in joint tenancy and indivisible, ten lives from the twelve cannot be subtracted, and the whole is therefore invalid.

But there is another view of the question which has not yet been considered, and which it is believed is also entirely decisive. The will directs the rents and profits to be paid to the beneficiaries for twelve lives in being ; and that the trustees shall not alien the estate during that period. The 14th section of the statute enacts that " every future estate shall be void in its creation, which shall suspend the absolute power of alienation for a longer period than is prescribed in this article."

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

The next section, the 15th, prescribes and limits the period to two lives in being at the creation of the estate. The 36th section is in the following words : " Dispositions of the rents and profits of lands, to accrue and be received at any time subsequent to the execution of the instrument creating such disposition, shall be governed by the rules established in this article in relation to future estates in lands." Every future estate *shall be void in its creation*, which shall suspend the power of alienation for more than two lives in being. These are the rules established in the 14th and 15th sections in relation to future estates. And the 36th section subjects "dispositions of the rents and profits of lands to accrue and be received at any time subsequent to the execution of the instrument creating such distribution" to the same rules. The disposition of the rents and profits made by the testator was to accrue and be received subsequent to the execution, the signing and sealing of his will, and even subsequent to his death, when the will took effect. This disposition being for twelve lives, did transcend the rules established in the 14th and 15th sections, and is declared by the 36th section to be *void in its creation*. Not good in part and bad in part, but wholly bad : *void in its creation*. And all that part of the testator's will which attempts to establish this unauthorized disposition of the rents and profits is blank paper. When the plain and obvious meaning of these three sections, the 14th, 15th and 36th, in reference to the dispositions of rents and profits, is collected, it is evidently as follows : " Every disposition of the rents and profits of lands to accrue and be received at any time subsequent to the execution of the instrument creating such disposition, which shall be for a longer period than two lives in being, *shall be void in its creation*." Human ingenuity can give no other reasonable construction to these sections, in reference to dispositions of rents and profits. The 3d subdivision of the 55th section would seem to limit the period of the disposition of rents and profits to the life of a person, or for a shorter term ; but as another provision of the statute authorizes " person" to be read " persons," the 36th section, as explained by the 14th and 15th, was necessary, in order to remove all doubt, and give the exact limits as to dispositions of rents and profits.

The trusts in the will being thus void in their creation, what result will follow with respect to the legacies and annuities which the testator, under what he assumed to be valid trusts, bestowed upon his relations? His main object was to secure his vast estate from partition or alienation for twelve lives: in order to give it to his grand-nephews and nieces who should then be living, and the descendants of such as should be dead; and in the meantime to distribute the annual rents and profits of his estate among his twelve nephews and nieces and the survivors of them. These prominent and controlling objects of the testator cannot be carried into effect. The great plan is destroyed; and to maintain the subordinate parts would be to make for him a new will. He gave to his brother, Daniel Holsman, an annuity for life of two thousand dollars a year, and to each of his children, after they should attain the age of twenty-one, an annuity of five hundred dollars. This was all that he designed for Daniel Holsman and his family. But Daniel Holsman is one of his heirs at law, and as such will take one-fifth of his estate. Shall he and his children also take the annuities? This would obviously be a perversion of the intention of the testator. Nearly all the legatees and annuitants are the heirs at law, or the children of the heirs at law of the testator. They will take the estate either directly or indirectly through their parents; and to superadd the legacies and annuities would be a manifest departure from the meaning of the testator. The main intent and object of the will having failed, the provisions for the relatives of the testator, founded on that intent, must fail also. He intended to roll the unbroken mass of his great wealth over the graves of those who are now living, in order to bestow it upon a future generation. His attachment for those whom he could never see or know, was stronger than for those among whom he lived and moved. But he did not forget those by whom he was surrounded; he gave them legacies and annuities; he bestowed upon them rents and profits. He did this in discharge of the duty which he felt that he owed to the relatives around him, and to console them for his having passed the fee of his estate beyond their reach. And now, when it is discovered that he acted under a misapprehension of the law,

that his great and leading objects were unauthorized, that his estate must go at once to his heirs at law and next of kin, shall the remnants of what was thus his mistaken intention be called his will? Shall some of the fractions which enter-tered into the composition be substituted for the whole? Shall the scaffolding be preserved when the building is de-molished, and not only preserved but substituted for the edi-fice? We have not to resort to the common law for rules of construction, either for wills or any other instruments in reference to the transfer of real property. The rule is fur-nished by the statute, and is applicable to all cases of this description. It is in the following words : " In the construc-tion of every instrument, creating or conveying, or authori-zing the creation or conveyance of any estate or interest in lands, it shall be the duty of courts of justice to carry into effect the intent of the parties, so far as such intent can be collected from the whole instrument, and is consistent with the rules of law " 1 *R. S.* 748, § 2. So far as the intent can be collected from the whole instrument, and is consistent with the rules of law, it must prevail. The main intent to be collected from the whole will in the case before us, is in-consistent with the rules of law, and cannot prevail. The prominent provisions of the will are unauthorized. No valid intent therefore can be collected from the whole instrument ; and an intent cannot be collected from a part of an instru-ment, especially where that part is necessarily connected with an invalid whole. To deduce an intent, we are requi-red by the statute to look at the *whole* instrument ; and we are consequently forbidden to collect an intent from a part. Nor can we, where what is lawful and unlawful is blended and amalgamated in the intent itself, construct a judicial cru-cible in order to melt down the composition and separate the gold from the baser metal. If the testator has alloyed the whole mass, it should not pass current here. But if there are separate and detached parts which are good, these parts ought to receive our sanction. And the disposition which the law makes of the testator's estate among his next of kin and heirs at law, cannot be supposed to interfere with his in-tention as to the two legacies, one of twenty thousand dol-lars to the trustees of the General Theological Seminary of

ALBANY,
Dec. 1835.

Coster
v.
Lorillard.

the Protestant Episcopal Church, and the other of one thousand dollars to the trustees or vestry of St. Philip's Church; and these legacies must be a charge upon the estate in the hands of the heirs at law and next of kin. These legacies are separate and independent bequests; which, having no necessary connection with other parts of the will, may therefore, for the purpose of collecting the intention of the testator, be considered as the "whole instrument." The religious intent of the testator was unconnected with his secular intent. I regard them as two separate and distinct intents. If there was any reason to believe that they were blended in his mind, I should feel constrained to pronounce the whole will void.

To substitute portions of a will for the whole, where these portions are connected with the general intent of a testator, and which general intent is unauthorized by law, would lead to dangerous results. The will in all such cases would be changed into an instrument very different from what the testator designed. It would not be his will but the will of the court. Nor is there any reason under our system of laws for such metamorphoses; but there are very strong reasons against such a course. Our rule of descent follows the law of nature, and gives the property of an intestate in equal shares to those in whose veins equal portions of blood flows. This is not only in accordance with the dictates of humanity, but is also in conformity with that spirit of equality which pervades our institutions. Human ingenuity cannot devise a more equal, humane and natural disposition of property, than is prescribed in the Revised Statutes; and with equal truth it may be said that none was ever adopted, in any age or country, which is more heartless and partial than that of the common law. Our laws, however, authorize any individual within certain limits, to make such disposition of his property as he pleases. He may overlook all his relatives and bestow his wealth upon a stranger; or he may give the whole to a favorite child in exclusion of the rest. Actuated by vanity or whim, he may make the most capricious and unnatural distribution of his property; and if his will does not transcend the provisions of the law, it is binding upon all courts of justice, and must be carried into effect. English courts have strug-

gled to give validity to wills, and have substituted parts for the whole; and if the common law rule of descent, which gives an estate to the eldest born, was in force in this state, such precedents ought to be religiously followed and carried to their utmost limit. But slavishly to follow precedents, which are calculated in another country to counteract the operation of a barbarous rule, and to apply them here to defeat the humanity and equity of our law of descent and distribution, would be bad policy as well as bad logic. No injustice to individuals nor injury to the community can result from the operation of our system. All the mischiefs which we have to apprehend from the disposition of property must arise from individual vanity, partiality or caprice ; and if rules of construction are applied to wills which give scope to the exercise of these passions, there is no doubt but that they will be frequently manifested. In the construction of a will it would seem to be the duty of a court carefully to examine all its parts, and then attentively to consider the whole, in order to arrive at the intent. And if, in consecutive and connected parts any one is found, which the law cannot sustain, the result or intent, as collected from the " whole instrument," is as certainly changed, as is the solution of a mathematical problem by the mistake of a figure in the process ; or, as in reasoning, the conclusion is varied or destroyed by the unsoundness of one or more of the premises. And when the intent, as collected from the whole, is thus destroyed or rendered uncertain, there is no other safe or reasonable conclusion than that the whole must fail. I have no hesitation in saying, that if I had merely found that the remainders over to the grand-nephews and nieces were unauthorized by law, I should have considered all the machinery connected with those remainders to be entirely void. This, I apprehend, under our system of descent and distribution, would be the conclusion of common sense, although it might not conform to the artificial reasoning of English judges under the common law. To illustrate the doctrine of *cy pres*, I will allude to a recent case under the late statute, which required three witnesses to a will, in order to devise real property, and which case was substantially as follows : A testator, possessed of real and personal property

amounting in the whole to about $10,000, and having two children, sons, devised his farm, worth $5000, to the eldest, who was a farmer, and to the youngest, who was a merchant, he bequeathed personal property, bonds, notes, money, &c. to the amount of $5000 ; intending that there should be no cost or trouble in the division of his property after his death. But being ignorant or forgetful of the provisions of the statute, he procured but two witnesses to the attestation of his will. Under these circumstances his will did not convey the farm, but was good by *cy pres* as to the personal property. And the rule of *cy pres*, which gives all it can to prevent one from taking all, would bestow the whole of the personal property on the youngest, and he would also take one-half of the farm by descent ; so that by the help of *cy pres* he would obtain three-fourths of his father's estate, and the eldest one-fourth. If such a case were now before us, could we sanction this rule, and then conscientiously say, that by such a judgment, we were carrying into effect the *intent* of the testator " so far as such intent can be collected from the whole instrument ?" Would not such a decision strike the unsophisticated sense of mankind as a mockery of justice ? And although the mere technical lawyer, by the aid of metaphysical subtleties derived from English decisions under the common law, might be able to obscure, to confound and to elude human reason, as the cuttle fish escapes his pursuer by ejecting a turbid cloud of special pleading before his eyes ; yet the manifest wrong of such an adjudication would tower in bold relief above the mists which had been thrown around it. The rule of *cy pres* was not made for our institutions, nor will it bear transplantation into our judicial soil. I have reflected upon it as intently as I was able, and can foresee no good, but much evil and injustice from its adoption. And if others who can think much more deeply than I can do, shall be able to perceive *cases in which* it would promote the ends of justice, the legislature can apply the remedy. In giving an exposition to an important branch of the Revised Statutes, it would seem to be the part of wisdom that we should carefully reflect upon the future operation of the rules of construction which we may adopt and establish ; that with prospective vision we should

look forward and not backward, and endeavor to foresee the effect of those rules upon the rights and interests of the millions who are to succeed us; that we should make them as plain and simple as possible; and thereby adapt them to the comprehension of the mass of mankind; and that we should discard all misticisms, and march *pari passu* with the intelligence of the age, recollecting that man with all his frailties, in dark ages, made the common law, but that God made common sense. In conclusion, it is my opinion that all the provisions in the will of the testator, except the two religious or eleemosynary bequests before specified, are in contravention of both the letter and spirit of the Revised Statutes; that the estate of the testator must go to his heirs at law and next of kin, charged with the above bequests, and that the decree of the chancellor must be reversed.

By Mr. Senator TRACY. After the very elaborate opinions that have been already pronounced by several membe, s of the court, I shall withhold any detailed expression of my views of this case; and I am especially induced to do so, because I concur essentially in most of the general propositions advanced by the *chief justice;* many of which, indeed, do not differ materially from those contained in the opinion of the *chancellor.* In following out, however, the views of the chief justice in respect to the illegality of the trust, so far as it applies to future or contingent estates in the *cestuis que trust,* I find myself differing from him wholly in regard to the validity of their present estate. This difference arises, I perceive, upon the construction that should be given to the third division of the 55th section. Admitting that the estate of the grand-nephews and nieces is a future estate, suspending the power of alienation for a longer period than the law allows, and that the trust otherwise is contrary to the policy and provisions of the Revised Statutes, in so far as it proposes to secure to the twelve nephews and nieces a successive interest to be continued for the life of the longest liver; still the question arises, can it not be maintained under the 55th section as a valid trust for one-twelfth of the rents and profits, to each of the

twelve nephews and nieces during his or her life.    To avoid this conclusion, the Chief Justice and Mr. Senator Young adopt different and opposing arguments; and it is particularly to express my dissent to these arguments, that I feel bound to make a few observations.

The senator resists the conclusion by denying that since the Revised Statutes the doctrine of *cy pres* can be allowed in any cases whatever, and maintains if any part of the will is ineffectual, the whole of it must fail—on the principle that if the whole intent of the testator cannot be sustained, it is impossible to know that he would have wished any part of it to be carried into effect—in short, that a whole will is to be regarded as a single intent, and not capable of containing distinct and independent intents.    I shall not discuss this proposition, but content myself with saying that I find nothing in the Revised Statutes to justify the notion, that the construction to be given to wills or other instruments is different in this respect from what it was previously to their adoption.

The Chief Justice's idea is, that the third division of the 55th section, authorizing the creation of a trust "to receive the rents and profits of lands, and apply them to the use of any person during the life of such person," does not authorize a trust to receive rents and profits and pay them over to another, but only to apply them; that is, to expend them for the benefit of another, in such manner and to such extent as the trustee from time to time may be disposed.    This, I am persuaded, is too narrow a construction of the provision.    It is the very construction against which I think the legislature intended to guard, when, immediately after the adoption of the Revised Statutes, they changed the language from the original into its present form..    If this construction be adopted, it evidently would destroy many trusts which, on every consideration of nature, policy and justice, should be sustained.    It would defeat a provision for a married daughter, intended to be protected from the unthriftiness or profligacy of her husband, or any annuity to a relation, charged on the rents and profits of the testator's estate; for whether a trustee was expressly named, or the heir at law, or a general devisee was made trustee by implication, would be the same thing.    Be-

sides, if this construction prevail, it would seem to follow that under a trust to receive rents and profits and apply them to the use of another, the trustee must be independent of the supervisory power of the chancellor—at least that it must be for the trustee alone to determine whether it was proper to apply, within any given time, the whole or only a small portion of the rents and profits, for the use of his dependant pensioner. However niggardly the trustee should choose to dole out the eleemosynary provision of the testator, it must be submitted to by the recipient, on the ground that the absolute discretion over the mode and time of applying the fund was vested absolutely in the trustee, or, as he might be more properly termed, the *post mortem* almoner of the testator. In short, I am satisfied that the chief justice cannot be correct in his views of this provision, and that it does authorize the creation of a trust to receive rents and profits, and to *pay them over* as received, to another.

If this be so, it follows that if the testator had divided his property into twelve parts, and created a trust of the rents and profits of each twelfth, for the use of each of his twelve nephews and nieces, during his or her life, that they would have been valid trusts under the 55th section equally, whether the trustees for the several *cestuis que trust* were the same or different persons. And it cannot be doubted, I think, that trusts in favor of different persons may be charged on the same fund; and therefore that the testator was not required to divide his property in order to charge it with trusts in favor of different persons; but might content himself with directing the rents and profits to be divided as they accrued, and to be distributed, in such portions as he chose, among the several object of his bounty. This is an every-day occurrence, the legality of which was never before brought into question; and it is in fact the precise thing which the testator in the present case has done, in respect to the rents and profits of his estate during the lives of all his twelve nephews and nieces. The direction of his will is explicit and undisputed, that the income, rents and profits of his real estate in the city of New-York, should be divided equally, share and share alike, between his twelve nephews and nieces, so long as the whole

twelve were alive. If the trust had stopped here, and said nothing about the survivors or survivor of them, could there be a doubt of its validity under the 55th section ? I feel sure that the case would never have come into controversy. But admitting that the contingent or expectant estate, which the testator proceeds to create in favor of each of the *cestuis que trust*, on the death of any other of them, is wholly void, should it destroy the life estate or interest which is already given, of a twelfth of the rents and profits to each of the nephews and nieces during his or her individual life ? If I understand the chief justice, he does not suppose it would ; but he denies that any such trust, even for a single life, can be created under the 55th section ; but the senator from the 4th, while he does not deny that such a trust may be created under the 55th section, insists that inasmuch as the testator attempted to create a trust more extensive and complicated than the 55th section contemplates, therefore that much of the trust which would have been valid had it stood alone, is made void by being connected by the part that is invalid. This is denying the power of giving effect to any part of the will, unless effect can be given to every part of it. It is going so far as to say, that if there is a devise or grant of a fee simple to a person capable of taking only a life estate, the whole devise or grant is void. I should be sorry to think that the Revised Statutes have made such an unreasonable and mischievous innovation upon the common law. In conclusion, though I believe the chancellor's decree in this case is nearer to my notions of right than the decree which I apprehend this court is about to make ; yet, believing that in some respects that decree is wrong, I must vote on the general question of affirmance or reversal, in favor of reversal.

On the question being put, *Shall this decree be reversed ?* all the members of the court voted in the *affirmative ;* whereupon the following decree was directed to be entered :

The cause having been heard, &c. it is ordered, adjudged, declared and decreed, that the devise and bequest of all the estate, real and personal, whatsoever and wheresover, of

which the testator died seized or possessed, in possession, reversion or remainder, to his executors and trustees and the survivors of them, their heirs and assigns, forever; and the several uses, trusts, intents and purposes for which the same were devised and bequeathed, as is declared in and by the said will and the codicil thereto annexed, are, and each and every of them is, wholly void, except the bequest therein contained, of twenty thousand dollars to be paid to the trustees of the General Theological Seminary of the Protestant Episcopal Church of the United States, and except the bequest of one thousand dollars to be paid to the trustees or vestry of St. Philip's Church: which bequests were not the subjects of appeal to this court; and saving the rights of those annuitants whose annuities are not drawn into question by the appeals in this cause; and that on the death of the said George Lorillard, the said real estate descended to and vested in his heirs at law, in the same manner as though the said George Lorillard had died intestate; and that all the said personal estate of the said George Lorillard, bequeathed to the said trustees, subject only to the payment of debts and funeral expenses, must be distributed according to law.

It is further ordered, adjudged, declared and decreed, that the proceeds of the real estate, directed by the first article of the said codicil to be paid by Peter Lorillard, junior, to the said trustees, in case he elect to take the said real estate therein devised to him, and the said real estate, in case he shall not elect to take the same, together with the rents, income and profits thereof, are subject to the same disposition as is herein before directed and declared in relation to the other parts of the real or personal estate, as the case may be, of the testator, devised to the trustees; and that the remainder in fee in the farm or land, devised by the second article of said codicil for life to George Lorillard, grandson of Blaze Lorillard, the late brother of the testator, and the remainder in fee in the farm or land, devised by the fourth article of said codicil for life to Blaze Lorillard, also grandson of the testator's said late brother, and also the remainder in fee in the lands, farms and mills devised by the seventh article of said codicil to Maria R. Bartow for life, *together with the life estates of the sev-*

*eral tenants for life therein,*\* descended to the heirs at law of the said George Lorillard, deceased, in like manner as though the said George Lorillard had died intestate.

It is further ordered, adjudged and decreed, that the said trustees shall not be liable for any act done or any expenditure incurred by them in good faith, in discharge of their duties as pointed out in and by said will and codicil, so far as relates to the management of the estate; but this is not to affect the right of the heirs and next of kin, to recover what may have been received by any of the annuitants or devisees, contrary to the rights of the parties as established by this decree.

It is further ordered, adjudged and decreed, that the costs of all the parties in the original suit, as well as upon the several appeals, be paid out of the funds in the hands of the said executors, as shall be just and equitable.

And it is further ordered, adjudged and decreed, that so much of the decree of the Chancellor as declares the ultimate remainder in fee to the grand-nephews and nieces absolutely void, and so much of the said decree as declares void the devise of the one-sixteenth part of the income of the estate of the testator to each of his grand-nephews and nieces who shall act as trustees, are hereby affirmed, and that the decree of the vice chancellor made in this cause, and so much of the decree of the chancellor made therein as is inconsistent with this decree, including that part of the chancellor's decree which directs a reference to a master to settle the form of conveyances to be taken by the executors and trustees, be, and the same are hereby reversed and annulled; and further, that the cause be remitted to the court of chancery, to the end that such proceedings may be had in that court as may be neces-

---

\* The members of the court divided on the insertion of the words in *italics* declaring void the life estates. The vote stood as follows: *In favor* of the insertion of this clause, *Senators* BECKWITH, CROPSEY, DOWNING, FISK, FOX, GRIFFIN, HALSEY, LACY, LOOMIS, MACK, MAISON, VAN SCHAICK, WILLES, YOUNG—14. *Against* the insertion of the clause, the PRESIDENT of the Senate, the CHIEF JUSTICE, Mr. Justice NELSON, and *Senators* BEARDSLEY, GANSEVOORT, HUBBARD, JONES, LANSING, MACDONALD, TRACY—10. With this exception, the decree was unanimously adopted.

sary to carry the foregoing decree into full effect. And that the said court do direct a reference to a master thereof, to take and state an account of the personal estate of the testator at the time of his death, and an account of the receipts and expenditures of the executors of his will in relation to his personal estate, and an account of the receipts and expenditures of the executors and trustees in relation to the real estate of the testator ; and that the said court do make all just allowances for their services and expenditures to the said trustees and executors, and that interest be allowed according to equity ; and that the said court cause the said allowances and expenditures to be apportioned on the real and personal estate as shall be just.